REED SMITH LLP
James C. McCarroll
Jordan W. Siev
Kurt F. Gwynne (pro hac vice)
599 Lexington Avenue
New York, NY  10022-7650
Telephone:  (212) 521-5400
Facsimile:  (212) 521-5450
Email: jmccarroll@reedsmith.com
        jsiev@reedsmith.com
        kgwynne@reedsmith.com

*Counsel for the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Aramid Entertainment Fund Limited, *et al.*,[1] | Case No.:  14-11802 (SHL) |
| | (Jointly Administered) |
| Debtors. | **Relates to ECF No. 536** |

**NOTICE OF FILING OF FIRST AMENDED DISCLOSURE STATEMENT PURSUANT
TO SECTION 1125 OF THE BANKRUPTCY CODE FOR THE FIRST AMENDED
JOINT LIQUIDATING PLAN OF REORGANIZATION OF THE DEBTORS
AND DEBTORS IN POSSESSION**

PLEASE TAKE NOTICE that Aramid Entertainment Fund Limited ("AEF"), Aramid

Liquidating Trust, Ltd. ("ALTL") and Aramid Entertainment, Inc. ("AEI", together with ALTL

and AEF, the "Debtors"[2]), as debtors and debtors in possession, hereby file the First Amended

Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code for the First Amended

---

[1]  The Debtors and, if applicable and known, the last four digits of their taxpayer identification numbers are as follows: Aramid Entertainment Fund Limited; Aramid Liquidating Trust, Ltd. (f/k/a Aramid Entertainment Participation Fund Limited); and Aramid Entertainment, Inc. (0704).  The Debtors' U.S. address is c/o Duff & Phelps, LLC, 55 East 52nd Street, 31st Floor, New York, NY 10055.

Joint Liquidating Plan of Reorganization of the Debtors and Debtors in Possession dated December 15, 2015.

Dated:  December 15, 2015
New York, New York

Respectfully submitted,

REED SMITH LLP

/s/ James C. McCarroll
James C. McCarroll
Jordan W. Siev
Kurt F. Gwynne (pro hac vice)
599 Lexington Avenue
New York, NY  10022-7650
Telephone:  (212) 521-5400
Facsimile:  (212) 521-5450
Email: jmccarroll@reedsmith.com
        jsiev@reedsmith.com
        kgwynne@reedsmith.com

*Counsel for the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Aramid Entertainment Fund Limited, *et al.*, | Case No.:  14-11802 (SHL) |
| Debtors.[1] | (Jointly Administered) |

**FIRST AMENDED DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE FOR THE JOINT LIQUIDATING PLAN OF REORGANIZATION OF THE DEBTORS AND DEBTORS IN POSSESSION**

December 15, 2015

**REED SMITH LLP**
James C. McCarroll
Jordan W. Siev
Kurt F. Gwynne (pro hac vice)
599 Lexington Avenue
New York, NY  10022-7650
Telephone:  (212) 521-5400
Facsimile:  (212) 521-5450
Email:     jmccarroll@reedsmith.com
           jsiev@reedsmith.com
           kgwynne@reedsmith.com

*Counsel for the Debtors and Debtors in Possession*

---

[1] The Debtors and, if applicable and known, the last four digits of their taxpayer identification numbers are as follows: Aramid Entertainment Fund Limited; Aramid Liquidating Trust, Ltd. (f/k/a Aramid Entertainment Participation Fund Limited); and Aramid Entertainment, Inc. (0704).  The Debtors' U.S. address is c/o Duff & Phelps, LLC, 55 East 52nd Street, 31st Floor, New York, NY 10055.

US_ACTIVE-124376202.13

**FIRST AMENDED DISCLOSURE STATEMENT DATED NOVEMBER 13, 2015
SOLICITATION OF VOTES WITH RESPECT TO THE FIRST AMENDED JOINT
LIQUIDATING PLAN OF REORGANIZATION OF DEBTORS AND DEBTORS IN
POSSESSION**

---

      **Geoffrey Varga and Jess Shakespeare, the appointed joint voluntary liquidators ("JVLs") of Aramid Entertainment Fund Limited ("AEF") and Aramid Liquidating Trust, Ltd. ("ALTL"), two of the debtors in these Chapter 11 cases, and Aramid Entertainment, Inc. ("AEI", together with ALTL and AEF, the "Debtors"), the third debtor, a wholly-owned subsidiary of AEF, believe that the First Amended Joint Liquidating Plan of Reorganization of Debtors and Debtors in Possession attached as Exhibit A (the "Plan")[2] to this First Amended Disclosure Statement for the Plan (this "Disclosure Statement") is in the best interests of Creditors and Interest holders. All Creditors and Interest holders entitled to vote thereon are urged to vote in favor of the Plan. A summary of the voting instructions is set forth beginning on page 32 of this Disclosure Statement. More detailed instructions are contained on the ballots distributed to Creditors or Interest holders entitled to vote on the Plan. To be counted, your ballot must be duly completed, executed and received by 5:00 p.m. (Eastern) on January 19, 2016 (the "Voting Deadline"), unless extended.**

      **The effectiveness of the proposed Plan is subject to material conditions precedent, some of which may not be satisfied. See Section IV.M. There is no assurance that these conditions will be satisfied or waived.**

      No person is authorized by any of the Debtors in connection with the Plan or the solicitation of acceptances of the Plan to give any information or to make any representation other than as contained in this Disclosure Statement and the exhibits attached hereto or incorporated by reference or referred to herein and, if given or made, such information or representation may not be relied upon as having been authorized by any of the Debtors. Although the Debtors will make available to Creditors and Interest holders entitled to vote on acceptance of the Plan such additional information as may be required by applicable law prior to the Voting Deadline, the delivery of this Disclosure Statement will not under any circumstances imply that the information herein is correct as of any time after the date hereof.

      **All Creditors and Interest holders entitled to vote on the Plan are encouraged to read and carefully consider this entire Disclosure Statement, including the Plan attached as Exhibit A and the Risk Factors described in Article VI, prior to submitting ballots in response to this solicitation.**

      The summaries of the Plan and other documents contained in this Disclosure Statement are qualified by reference to the Plan itself, the exhibits thereto and documents described therein as being Filed prior to approval of the Disclosure Statement. In the event that any inconsistency

---

[2] All capitalized terms used in this Disclosure Statement and not otherwise defined herein shall have the meanings given to them in the Plan.

or conflict exists between this Disclosure Statement and the Plan, the terms of the Plan will control.  Except as otherwise indicated, the Debtors will File all exhibits to the Plan with the Bankruptcy Court and make them available for review no later than ten days before the Confirmation Hearing.  The Debtors also will serve the exhibits to the Plan via first class mail on the parties on the general service list being maintained in the Chapter 11 Cases on or before ten days before the Confirmation Hearing.

If any inconsistencies exist between the Plan and this Disclosure Statement, the terms of the Plan are controlling.  All Exhibits hereto are incorporated into, and are a part of, this Disclosure Statement as if set forth in full herein.

No representations concerning the Debtors, their financial condition or any aspect of the Plan are authorized by the Debtors other than as set forth in this Disclosure Statement.

The financial information contained herein, unless otherwise indicated, is unaudited.   In addition, the information contained herein may be incomplete or inaccurate.  For the foregoing reasons, the Debtors and their professionals are unable to warrant that the information contained herein is without any inaccuracy.  Great effort, however, has been made to ensure that all such information is fairly presented.

The Debtors, the JVLs, and the professionals representing the Debtors have relied upon information previously prepared by the Debtors in connection with the preparation of this Disclosure Statement and have not independently verified the factual information contained herein.  The contents of this Disclosure Statement should not be construed as legal, business or tax advice.  You should consult with your own legal counsel and accountant as to legal, tax, and related matters concerning your Claim or Interest.

The statements contained in this Disclosure Statement are made as of the date hereof, and there can be no assurance that the statements contained herein will be correct at any time after the date hereof.

The information contained in this Disclosure Statement, including the information regarding the history, businesses and operations of the Debtors, the financial information regarding the Debtors and the liquidation analyses relating to the Debtors, is included for purposes of soliciting acceptances of the Plan.  As to contested matters, adversary proceedings, and other actions or threatened actions, this Disclosure Statement shall not constitute or be construed as an admission of any fact, liability, stipulation, or waiver, but rather as a statement made without prejudice solely for settlement purposes, with full reservation of rights.  This Disclosure Statement shall not be used against the Debtors for any litigation purpose whatsoever. This Disclosure Statement shall not be construed to be conclusive advice on the tax, securities law, or other legal effects of the Plan as to Holders of Claims against or Interests in the Debtors.

## FORWARD-LOOKING STATEMENTS

**This Disclosure Statement contains forward-looking statements based primarily on the current expectations of the Debtors and projections about future events and financial trends affecting the financial condition of the Debtors' businesses, if any, and assets.  The words "believe," "may," "estimate," "continue," "anticipate," "intend," "expect" and**

similar words or expressions identify these forward-looking statements. These forward-looking statements are subject to a number of risks, uncertainties and assumptions, including those described below under the caption "Risk Factors" in Article VI. In light of these risks and uncertainties, the forward-looking events and circumstances discussed in this Disclosure Statement may not occur, and actual results could differ materially from those anticipated in the forward looking statements. The Debtors do not undertake any obligation to update or revise publicly any forward looking statements, whether as a result of new information, future events or otherwise.

This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "SEC"), any state securities commission or any securities exchange or association. None of the SEC, any state securities commission or any securities exchange or association passed upon the accuracy or adequacy of the statements contained herein.

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................................. 1

II.   OVERVIEW OF THE PLAN ............................................................................... 2

      A.    Summary of Classification and Treatment Under the Plan ..................... 2

            1.    Classification/Treatment of AEF Claims and Interests Under Plan .......... 3
            2.    Classification/Treatment of ALTL Claims and Interests Under Plan........ 5
            3.    Classification/Treatment of AEI Claims and Interest Under Plan............. 7

      B.    Overview of a Chapter 11 ....................................................................... 8
      C.    Plan of Reorganization............................................................................ 8
      D.    Confirmation of a Plan of Reorganization .............................................. 9
      E.    Summary of Classes and Treatment of Claims and Interests ................. 10

            AEF......................................................................................................... 11

            1.    AEF Priority Claims (Class A-1 Claims) are unimpaired ....................... 11
            2.    AEF Secured Claims (Class A-2 Claims) are unimpaired....................... 11
            3.    AEF Unsecured Claims (Class A-3 Claims) are impaired....................... 12
            4.    AEF Subordinated Claims (Class A-4 Claims) are impaired ................... 12
            5.    AEF - ALTL Participation Interest (Class A-5 Interest) is impaired........ 13
            6.    AEF Subordinated Claims (Class A-6 Subordinated Claims
                  relating to "Class B, C, D, or E" Interests) are impaired ......................... 13
            7.    AEF Interests (Class A-7 Shares) are impaired ...................................... 13

            ALTL....................................................................................................... 13

            1.    ALTL Priority Claims (Class B-1 Claims) are unimpaired ..................... 13
            2.    ALTL Secured Claims (Class B-2 Claims) are unimpaired ..................... 13
            3.    ALTL Unsecured Claims (Class B-3 Claims) are impaired ..................... 14
            4.    ALTL Subordinated Claims (Class B-4 Claims) are impaired ................. 14
            5.    ALTL Interests (Class B-5 Interests) are impaired.................................. 15
            6.    ALTL Subordinated Claims (Class B-6 Subordinated Claims
                  (ALTL Subordinated Claims relating to the ALTL Interests
                  pursuant to section 510(b) of the Bankruptcy Code) are impaired.......... 15

            AEI .......................................................................................................... 15

            1.    AEI Priority Claims (Class C-1 Claims) are unimpaired........................ 15
            2.    AEI Secured Claims (Class C-2 Claims) are unimpaired........................ 15
            3.    AEI Unsecured Claims (Class C-3 Claims) are impaired........................ 16
            4.    AEI Subordinated Claims (Class C-4 Claims) are impaired ................... 16
            5.    AEI Interests (Class C-5 Interests) are impaired .................................... 17

III.  EVENTS PRECEDING THESE CHAPTER 11 CASES............................................ 17

      A.    Brief History and Description of Debtors' Prepetition Businesses ..................... 17
      B.    Debtors' Prepetition Capital Structure.................................................... 20

            1.    AEF's Suspension of Voluntary Redemptions ........................................ 20

    **2.**    AEF's Compulsory Redemption *in Specie* .............................. 21

**C.**    Litigation By and Against the Debtors ................................................ 22

    **1.**    The Molner Litigations ........................................... 23
    **2.**    The Wimbledon Litigation........................................ 25
    **3.**    The KBC Litigation ............................................. 26

**IV.**    EVENTS DURING THE CHAPTER 11 CASES ........................................ 27

**A.**    Commencement of Chapter 11 Cases ............................................... 27
**B.**    Retention of Professionals for the Debtors ........................................ 27
**C.**    Post-Petition Settlements ........................................................... 27

    **1.**    The Global Settlement with the Bergstein Parties ................... 27
    **2.**    The Relativity and Fortress Settlements ........................... 28
    **3.**    The Stroock Settlement .......................................... 28
    **4.**    The KBC Litigation ............................................. 29

**D.**    The Debtors' Motion Picture Related Assets........................................ 29
**E.**    Post-Petition Asset Sales........................................................... 30

    **1.**    Sierra Transaction .............................................. 30
    **2.**    Content Transaction ............................................ 31

**F.**    Assumption and Rejection of Unexpired Executory Contracts and Leases ........ 31
**G.**    Claims Process and Bar Dates ..................................................... 32
**H.**    Extension of Exclusive Periods .................................................... 32
**I.**    Impact of Classification of Claims on Subordination Rights ..................... 33

    **1.**    Classification of Claims.......................................... 33
    **2.**    Settlement ..................................................... 33

**J.**    General Information Concerning Treatment of Claims and Interests.................. 33
**K.**    Special Provisions Relating to the Rights of Setoff of Creditors.......................... 34
**L.**    Voting on and Confirmation of the Plan............................................ 34

    **1.**    Voting Procedures and Requirements............................... 34
    **2.**    Confirmation Hearing ........................................... 35
    **3.**    Confirmation .................................................. 35
    **4.**    Acceptance or Cramdown........................................ 36
    **5.**    Feasibility...................................................... 37
    **6.**    Best Interests Test; Chapter 7 Liquidation Analysis................... 37
    **7.**    Compliance with Applicable Provisions of the Bankruptcy Code .......... 39
    **8.**    Alternatives to Confirmation and Consummation of the Plan................ 39

**M.**    Conditions Precedent to the Effective Date of the Plan........................... 39

    **1.**    Conditions to the Effective Date.................................. 39
    **2.**    Waiver of Conditions to Confirmation or the Effective Date................ 40
    **3.**    Effect of Nonoccurrence of Conditions to the Effective Date................ 40
    **4.**    Request for Waiver of Stay of Confirmation Order................... 40
    **5.**    Modification of the Plan ......................................... 40
    **6.**    Revocation of the Plan........................................... 40

**V.**  THE DISTRIBUTION TRUST CREATED PURSUANT TO THE PLAN ................... 41

**A.**  Distribution Trust Generally ............................................................. 41
**B.**  Funding of and Transfer of Assets Into the Distribution Trust ............... 42
**C.**  Distribution Trustee ........................................................................ 43
**D.**  Distribution Trust Agreement ........................................................... 43
**E.**  Reports to be Filed by the Distribution Trustee ................................... 43
**F.**  Fees and Expenses of the Distribution Trust ....................................... 44
**G.**  Indemnification .............................................................................. 44
**H.**  Tax Treatment ............................................................................... 44
**I.**  Settlement of Claims ....................................................................... 45
**J.**  Sales of Assets by Distribution Trust. ................................................ 45
**K.**  Maintenance of Businesses by Distribution Trustee. ............................ 45
**L.**  Creation and Maintenance of Trust Accounts and Distribution Trust Pools ........ 46

   **1.**  Creation of Trust Accounts ...................................................... 46
   **2.**  Additional Funding of Trust Accounts ....................................... 46
   **3.**  Closure of Trust Accounts ....................................................... 46

**VI.**  RISK FACTORS ..................................................................................... 46

**A.**  Allowance of Claims ....................................................................... 46
**B.**  Risk of Non-Confirmation of the Plan ................................................ 48
**C.**  Nonconsensual Confirmation. ........................................................... 48
**D.**  Delays in Confirmation or Effective Date ........................................... 48
**E.**  Litigation Risks ............................................................................. 48
**F.**  Distribution Trust Expenses ............................................................. 49
**G.**  Avoidance Actions ......................................................................... 49
**H.**  Securities Laws Considerations Regarding Trust Interests .................... 49

   **1.**  Non-Transferability of Trust Interests ....................................... 50
   **2.**  Uncertainty of Value of Trust Interests ..................................... 50

**VII.**  DISTRIBUTIONS UNDER THE PLAN ......................................................... 50

**A.**  Payment of Administrative Claims ..................................................... 50

   **1.**  Administrative Claims in General ............................................. 50
   **2.**  Statutory Fees ...................................................................... 50
   **3.**  Bar Dates for Administrative Claims ......................................... 51

      **a.**  General Administrative Claim Bar Date Provisions ............... 51
      **b.**  Bar Dates for Certain Administrative Claims ...................... 51

**B.**  Payment of Priority Tax Claims ........................................................ 51
**C.**  Distributions for Claims Allowed as of the Effective Date .................... 52
**D.**  Method of Distributions to Holders of Claims ..................................... 52
**E.**  Compensation and Reimbursement for Services Related to Distributions .......... 52
**F.**  Investment of Trust Accounts ........................................................... 52
**G.**  Delivery of Distributions and Undeliverable or Unclaimed Distributions .......... 53

   **1.**  Delivery of Distributions ........................................................ 53
   **2.**  Undeliverable or Unclaimed Distributions ................................. 53

|  |  | **a.** | Holding of Undeliverable or Unclaimed Distributions | 53 |
|  |  | **b.** | After Distributions Become Deliverable | 53 |
|  |  | **c.** | Failure to Claim Undeliverable Distributions | 54 |
|  | **H.** | Distributions on Account of Allowed Claims or Allowed Interests | | 54 |
|  |  | **1.** | De Minimis Distributions | 54 |
|  |  | **2.** | Postpetition Interest | 54 |
|  |  | **3.** | Compliance with Tax Requirements | 54 |
|  |  | **4.** | Allocation of Distributions | 55 |
|  | **I.** | Distribution Record Date | | 55 |
|  | **J.** | Means of Cash Payments | | 55 |
|  | **K.** | Setoffs | | 55 |
| **VIII.** | DISPUTED CLAIMS AND IMPLEMENTATION OF THE PLAN | | | 56 |
|  | **A.** | Treatment of Disputed Claims | | 56 |
|  |  | **1.** | Tort Claims | 56 |
|  |  | **2.** | No Distributions Pending Allowance | 56 |
|  | **B.** | Objections to Claims | | 56 |
|  |  | **1.** | Authority to Prosecute | 56 |
|  |  | **2.** | Pending Objections | 56 |
|  |  | **3.** | Authority to Amend Schedules | 57 |
|  |  | **4.** | Request for Extension of Claims Objection Bar Date | 57 |
|  | **C.** | Distributions on Account of Disputed Claim or Disputed Interest that Becomes Allowed | | 57 |
|  | **D.** | Corporate Existence | | 57 |
|  | **E.** | Dissolution Transactions | | 57 |
|  |  | **1.** | Dissolution Transactions Generally | 57 |
|  |  | **2.** | Recourse Solely to Distribution Trust Assets | 58 |
|  | **F.** | Corporate Governance, Directors and Officers | | 58 |
|  |  | **1.** | Certificates of Incorporation and Bylaws | 58 |
|  |  | **2.** | Directors and Officers | 58 |
|  |  | **3.** | Corporate Action | 58 |
|  | **G.** | No Revesting of Assets | | 59 |
|  | **H.** | Preservation of Causes of Action; Settlement Agreements and Releases; Exculpation | | 59 |
|  |  | **1.** | Preservation of Causes of Action; Recovery Actions | 59 |
|  |  | **2.** | Settlement of Holders' Claims, Interests, and Controversies | 60 |
|  |  | **3.** | Releases | 60 |
|  |  | **a.** | General Releases by Debtors | 60 |
|  |  | **b.** | General Releases by Holders of Claims or Interests | 61 |
|  |  | **c.** | Injunction Related to Releases | 61 |
|  |  | **d.** | Exculpation | 61 |

**I.**    Cancellation and Surrender of Instruments, Securities and Other Documentation .................................................................................................. 61
**J.**    Release of Liens ............................................................................................. 62
**K.**    Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes ............................................................................................... 62

   **1.**    Effectuating Documents and Further Transactions................................. 62
   **2.**    Exemption From Transfer Taxes ............................................................ 62

**L.**    Substitution of Pending Legal Actions .......................................................... 63

**IX.**    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ......... 63

**A.**    Rejection of Executory Contracts and Unexpired Leases ............................... 63

   **1.**    Rejection ................................................................................................. 63
   **2.**    Notice of Rejection ................................................................................ 63
   **3.**    Bar Date for Rejection Damages ............................................................ 63

**B.**    Contracts and Leases Entered Into After the Petition Date ........................... 64
**C.**    Pre-existing Obligations to the Debtors Under Executory Contracts and Unexpired Leases ........................................................................................... 64
**D.**    Payments Related to the Assumption of Executory Contracts and Unexpired Leases ........................................................................................... 64

   **1.**    Assumption and Assignment Generally .................................................. 64
   **2.**    Assignments to Distribution Trust .......................................................... 64
   **3.**    Approval of Assumptions and Assumption Procedures .......................... 64

**X.**    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN ............................................................................... 66

**A.**    General ........................................................................................................... 66
**B.**    U.S. Federal Income Tax Consequences to AEI ............................................ 66
**C.**    U.S. Federal Income Tax Consequences to the U.S. Holders of Claims or Interests .......................................................................................................... 67
**D.**    Certain Other Tax Considerations for U.S. Holders of Claims ...................... 68

   **1.**    Accrued but Unpaid Interest ................................................................... 68
   **2.**    Post-Effective Date Distributions .......................................................... 68
   **3.**    Bad Debt Deduction and/or Worthless Securities Deduction .................. 68
   **4.**    Market Discount ...................................................................................... 69
   **5.**    Installment Method ................................................................................. 69
   **6.**    Medicare Tax .......................................................................................... 69
   **7.**    Information Reporting and Backup Withholding ..................................... 69

**E.**    Importance of Obtaining Professional Tax Assistance ................................... 70

**XI.**    ADDITIONAL INFORMATION ................................................................................ 70

**XII.**    RECOMMENDATION AND CONCLUSION ........................................................... 71

## I.    INTRODUCTION

The Debtors are seeking approval of the Plan, a copy of which is attached as Exhibit A. This Disclosure Statement is submitted by the Debtors in connection with the solicitation of acceptances of the Plan.

The Plan proposes the liquidation of the Debtors' assets under Chapter 11 of the Bankruptcy Code and the distribution of the proceeds of the Debtors' assets to the Creditors and Interest holders in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that the recovery to Creditors and Interest holders under the Plan would exceed the recovery to Creditors and Interest holders under any other feasible reorganization or liquidation alternative.  Creditors and Interest holders should thoroughly review both the Plan and the Disclosure Statement before deciding whether to accept or reject the Plan.  No materials, other than the Disclosure Statement and the exhibits and schedules attached thereto or referenced therein, have been approved by the Debtors for use in soliciting acceptances or rejections of the Plan.

The purpose of the Disclosure Statement is to provide adequate information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the Debtors and the condition of the Debtors' books and records, that would enable a hypothetical reasonable investor typical of holders of Claims against and Interests in the Debtors to make an informed judgment about the Plan.

This Disclosure Statement is submitted pursuant to Section 1125 of the Bankruptcy Code to holders of Claims against or Interests in the Debtors in connection with (i) the solicitation of acceptances of the Plan, and (ii) the hearing to consider confirmation of the Plan, scheduled for **February 4, 2016, at 11:00 a.m. (Eastern)**.

Attached as exhibits to this Disclosure Statement are copies of the following:

- The Plan (Exhibit A);

- The Estimated Liquidation Analysis (Exhibit B) (the "Liquidation Analysis").

If you did not receive copies of the exhibits to the Disclosure Statement, you may obtain the exhibits by contacting the Debtors' counsel in writing as follows: James C. McCarroll, Esquire, Reed Smith LLP, 599 Lexington Avenue, New York, NY 10022-7650 (Facsimile: 212-521-5450) or Kurt F. Gwynne, Esquire, Reed Smith LLP, 1201 Market Street, Suite 1500, Wilmington, Delaware 19801 (Facsimile: 302-778-7575).

On [insert date], after notice and a hearing, the Bankruptcy Court entered the Disclosure Statement Order approving this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of holders of Claims against and Interests in the Debtors to make an informed judgment as to whether to accept or reject the Plan.  Approval of the Disclosure Statement does not constitute a determination by the Bankruptcy Court as to the fairness or merits of the Plan.

The Disclosure Statement Order sets forth in detail the deadlines, procedures, and instructions for, among other things, (a) voting to accept or reject the Plan, (b) filing objections to Confirmation of the Plan, (c) the Record Date, and (d) the tabulation of votes. In addition, detailed voting instructions accompany each ballot. Each holder of a Claim or Interest entitled to vote on the Plan should read the Disclosure Statement, the Plan, the Disclosure Statement Order, and the instructions accompanying the ballots in their entirety before voting on the Plan.

## II.    OVERVIEW OF THE PLAN

**By an order of the Bankruptcy Court dated [insert date], this Disclosure Statement has been approved as containing "adequate information" for Creditors and Interest holders of the Debtors in accordance with section 1125 of the Bankruptcy Code. The Bankruptcy Code defines "adequate information" as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and the history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan . . . ." 11 U.S.C. § 1125(a)(1).**

The Debtors believe that the Plan is in the best interests of Creditors and Interest holders. All Creditors or Interest holders entitled to vote are urged to vote in favor of the Plan by no later than the Voting Deadline.

### A.    Summary of Classification and Treatment Under the Plan

With respect to each Debtor, Administrative Claims (which are, generally, Claims arising during the Chapter 11 Cases) and Priority Tax Claims are unclassified under the Plan. Allowed Administrative Claims and Priority Tax Claims, if any, will be paid in full on the Effective Date or as soon thereafter as is practicable.[3] Holders of Administrative Claims and Priority Tax Claims are not entitled to vote on the Plan.

A summary of the treatment of various classes of Claims and Interests of each Debtor is set forth in the tables below.[4] Except to the extent that the Plan provides otherwise, a Claim or Interest that is properly includable in more than one Class is classified in a particular Class only to the extent that it qualifies within the description of that Class, and is placed in a different Class to the extent it qualifies within the description of such different Class. The Classes of Claims and Interests are summarized as follows:

---

[3] The IRS filed "protective claims" in the Priority amount of $20,575.90 in which the IRS alleges that AEF and ALTL, Cayman Islands' entities, are liable for United States Taxes. The Debtors have objected to the IRS's Claims and believe they should be disallowed. The NYC Department of Finance filed proofs of Claim against AEF and AEI alleging a $245,500 Priority Tax Claim consisting of $45,000 for general corporate tax, $91,000 for commercial rent tax, and interest and penalties thereon. The Debtors expect that the claim will be withdrawn as none of the Debtors conducted business in New York City. If not withdrawn, the Debtors expect that the Claim will be disallowed.

[4] As this table merely provides a summary of the classification and treatment of Claims and Interests under the Plan, reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Claims and Interests.

1.    **Classification/Treatment of AEF Claims and Interests Under Plan**

The classification and treatment of Claims and Interests are summarized below:

| Class/Interest | Status/Entitled to Vote? | Estimated Total Amount of Claims / Interests | Estimated Recovery |
|---|---|---|---|
| Class A-1 (AEF Priority Claims) | Unimpaired; Deemed to Accept Plan; Not Entitled to Vote | $0.00 | N/A |
| Class A-2 (AEF Secured Claims) | Unimpaired; Deemed to Accept Plan; Not Entitled to Vote | $0.00[5] | N/A |
| Class A-3 (AEF Unsecured Claims) | Impaired; Entitled to Vote | AEF believes that AEF Unsecured Claims will total approximately $7.5 million.[6] | 100% |
| Class A-4 (AEF Subordinated Claims Pursuant to Section 510(c) of the Bankruptcy Code) | Impaired; Entitled to Vote | $0.00[7] | N/A |

[5] Jeffer Mangels Filed an alleged secured Claim in the $1,199,375.12 in which Jeffer Mangels asserts an attorneys' charging lien on the proceeds of the Debtors' claims against Fortress Investment Group LLC and CF Film Finance AB LLC (together, "Fortress") and Relativity Media Holdings I LLC and Beverly Blvd, LLC (together, "Relativity").  The Debtors have objected to Jeffer Mangels claim and believe that it should be disallowed.

[6] Pursuant to the Settlement Agreement, Bergstein has an Allowed Unsecured Claim against each of AEF and ALTL in the amount of $6,000,000 (although Bergstein is entitled to only one satisfaction of such Claims in the amount of $6,000,000).  As set forth more fully in Section IV.C.1., the Bergstein Claim is subject to certain appeal in the United States District Court for the Central District of California, and the appeal, if successful, could result in the Bergstein Claim being null and void pursuant to the terms of the Settlement Agreement.  The Debtors believe that the standard of review is abuse of discretion and that any such appeal is unlikely to succeed.  Two Class B Shareholders have asserted claims related to certain compulsory redemptions in 2011 and 2012, which if allowed would either provide for an affirmative payment due to such parties, or increase the estimated amount of the AEF Unsecured Claims by up to $2.6 million, reducing the estimated recovery to such claimholders.

[7] The Debtors believe that, if not disallowed in their entirety, the $50 million Claim Filed by Wesley Avery (as the Tregub Chapter 7 Trustee), and the Claims Filed by Molner, Sharma, ACP, ARP, SCIC, and GCC will be equitably subordinated under section 510(c) of the Bankruptcy Code (if not withdrawn or disallowed).  In the aggregate, all such Claims total approximately $58.7 million.  The $50 million Claim Filed by the Tregub Chapter 7 Trustee was

| Class/Interest | Status/Entitled to Vote? | Estimated Total Amount of Claims / Interests | Estimated Recovery |
|---|---|---|---|
| Class A-5 (Interest - ALTL Participation) | Impaired; Entitled to Vote | ALTL holds a residual interest in AEF pursuant to the Participation Agreements.[8] | Approximately $975,000 to $6,050,000 (depending largely on amount of Allowed Claims in Classes A1 through A4) (ignoring value of litigation claims) |
| Class A-6 (AEF Subordinated Claims relating to "Class B, C, D, or E" Shares pursuant to Section 510(b) of the Bankruptcy Code) | Impaired; Deemed to Reject the Plan; Not Entitled to Vote | AEF believes that approximately $70 million of the Claims filed against AEF (ignoring duplication) are subject to subordination under Section 510(b) of the Bankruptcy Code. | $0.0 |
| Class A-7 (AEF "Class A" Shares) | Impaired; Deemed to Reject the Plan; Not Entitled to Vote | N/A | $0.0 |

released in the Settlement Agreement. Thus, the Debtors expect that Claim to be withdrawn. The Debtors have objected or will object to each of those Claims if they are not withdrawn. AEF believes that the AEF Subordinated Claims should be disallowed.

[8] All former Class B, C, D, E and F shares in AEF were voluntarily or compulsorily redeemed *in specie* for ALTL Class R or Class L shares, as discussed further *infra*. Certain of the holders of former Class B, C, D, and E shares have filed claims asserting that the in specie compulsory redemption resulted in such shareholders' claims becoming AEF Unsecured Claims. If these claims of the shareholders are allowed as Unsecured Claims, then the estimated total of AEF Unsecured Claims will increase by approximately $70 million. The Debtors, however, believe that such Claims will be recharacterized, subordinated or disallowed. Also, certain shareholders have asserted Claims related to purported redemptions of their shares prior to the suspension of redemptions in December 2008 and/or December 2009. If Allowed, then the estimated total AEF Unsecured Claims may also material increase, reducing the estimated recovery to such claimholders.

### 2.    Classification/Treatment of ALTL Claims and Interests Under Plan

The classification and treatment of Claims and Interests are summarized below:[9]

| Class/Interest | Status/Entitled to Vote? | Estimated Total Amount of Claims / Interests | Estimated Recovery |
|---|---|---|---|
| Class B-1 (ALTL Priority Claims) | Unimpaired; Deemed to Accept Plan; Not Entitled to Vote | $0.00 | N/A |
| Class B-2 (ALTL Secured Claims) | Unimpaired; Deemed to Accept Plan; Not Entitled to Vote | $0.00 | N/A |
| Class B-3 (ALTL Unsecured Claims) | Impaired; Entitled to Vote | $6,000,000[10] | 100% |
| Class B-4 (ALTL Subordinated Claims Pursuant to Section 510(c) of the Bankruptcy Code) | Impaired; Entitled to Vote | $0.00[11] | N/A |

[9] As indicated in ALTL's Summary of Schedules, ALTL believes that it has no creditors. *See* Summary of Schedules [Docket No. 57] at p. 9 of 20.

[10] Pursuant to the Settlement Agreement, Bergstein has an Allowed Unsecured Claim against each of AEF and ALTL in the amount of $6,000,000 (although Bergstein is entitled to only one satisfaction of such Claims in the amount of $6,000,000).

[11] The Debtors believe that, if not withdrawn or disallowed in their entirety, the $50 million Claim Filed by the Tregub Chapter 7 Trustee, and the Claims Filed by Molner, Sharma, ACP, ARP, SCIC, and GCC will be equitably subordinated under section 510(c) of the Bankruptcy Code. The $50 million Claim Filed by the Tregub Chapter 7 Trustee was released in the Settlement Agreement. Thus, the Debtors expect that Claim to be withdrawn. In the aggregate, all such Claims total approximately $58.7 million. The Debtors have objected or will object to each of those Claims if they are not withdrawn. ALTL believes that the ALTL Subordinated Claims should be disallowed.

| Class/Interest | Status/Entitled to Vote? | Estimated Total Amount of Claims / Interests | Estimated Recovery |
|---|---|---|---|
| Class B-5 (ALTL Interests) | Impaired; Entitled to Vote | (Class R and Class L shares in ALTL) | Approximately $975,000 to $6,050,000 (depending largely on amount of Allowed Claims in Classes A3 and A4 and ignoring value of litigation claims). Holders of Allowed Interests in Class B-5 will receive their Pro Rata share of the Distributions on account of the ALTL Participation from the Distribution Trust after payment of or reserve for Claims in the above Classes, unclassified Claims and expenses of administrating the Plan and the Distribution Trust. |
| Class B-6 (ALTL Subordinated Claims relating to the ALTL Interests pursuant to section 510(b) of the Bankruptcy Code) | Impaired; Deemed to Reject the Plan; Not Entitled to Vote | ALTL believes that more than $30 million of the Claims filed against ALTL (ignoring duplication) are subject to subordination under Section 510(b) of the Bankruptcy Code. | 0.00% |

### 3.   Classification/Treatment of AEI Claims and Interest Under Plan

The classification and treatment of Claims and Interests are summarized below:[12]

| Class/Interest | Status/Entitled to Vote? | Estimated Total Amount of Claims | Estimated Recovery |
|---|---|---|---|
| Class C-1 (AEI Priority Claims) | Unimpaired; Deemed to Accept Plan; Not Entitled to Vote | $0.00 | N/A |
| Class C-2 (AEI Secured Claims) | Unimpaired; Deemed to Accept Plan; Not Entitled to Vote | $0.00 | N/A |
| Class C-3 (AEI Unsecured Claims) | Impaired; Entitled to Vote | $0.00[13] | N/A |
| Class C-4 (AEI Subordinated Claims Pursuant to Section 510(c) of the Bankruptcy Code) | Impaired; Entitled to Vote | $0.00[14] | N/A |
| Class C-5 (AEI Interests) | Impaired; Entitled to Vote | (AEF's equity interest in AEI) | Approximately $0.00 to $52,000 |

For purposes of computations of Claim amounts, administrative and other expenses and similar computational purposes, the Effective Date is assumed to occur on or about February 20, 2016.  There can be no assurance, however, if or when the Effective Date will actually occur.

---

[12] As indicated in AEI's Summary of Schedules, AEI believes that it has no creditors.  *See* Summary of Schedules [Docket No. 55] at p. 9 of 19.

[13] The IRS asserted an Unsecured Claim in the amount of $304,371.00 against AEI.  AEI has or shortly will file an amended 2012 tax return indicating that it incurred a loss in excess of $900,000 in 2012.  Accordingly, AEI believes that, if not withdrawn, the IRS' claim will be disallowed.

[14] The Debtors believe that, if not withdrawn or disallowed in their entirety, the $50 million Claim Filed by the Tregub Chapter 7 Trustee, and the Claims Filed by Molner, Sharma, ACP, ARP, SCIC, and GCC will be equitably subordinated under section 510(c) of the Bankruptcy Code.  In the aggregate, all such Claims total approximately $58.7 million.  The $50 million Claim Filed by the Tregub Chapter 7 Trustee was released in the Settlement Agreement.  Thus, the Debtors expect that Claim to be withdrawn.  The Debtors have objected or will object to each of those Claims if they are not withdrawn.  AEI believes that the AEI Subordinated Claims should be disallowed.

### B.      Overview of a Chapter 11

The Bankruptcy Cases were brought under Chapter 11 of the Bankruptcy Code.  Unless otherwise ordered by a bankruptcy court, a Chapter 11 debtor continues to manage its affairs as a "debtor-in-possession" and as a fiduciary to the creditors of its estate.

The commencement of a Chapter 11 case creates an estate comprising all of the legal and equitable interests that the debtor has in property as of the date the bankruptcy petition is filed.  The filing of a Chapter 11 petition triggers the "automatic stay" provisions of Section 362 of the Bankruptcy Code.  The "automatic stay" prohibits creditors and other parties from undertaking any action to collect a pre-petition debt, claim, or obligation from the debtor or otherwise to interfere with its property or financial affairs.  Unless the bankruptcy court orders otherwise, the automatic stay remains in full force and effect until a plan of reorganization is confirmed.  At that time, the plan may provide for a stay or injunction pending the liquidation of assets pursuant to the plan.

The Bankruptcy Code authorizes the formation of certain official committees from interested creditors or equity security holders.  In these Bankruptcy Cases, no official committee was formed.

### C.      Plan of Reorganization

Although Chapter 11 of the Bankruptcy Code is titled "Reorganization" the Bankruptcy Code permits a debtor to liquidate its business and wind up its affairs under Chapter 11.  Accordingly, the primary objective of a Chapter 11 case is the formation, confirmation and implementation of a plan of reorganization or liquidation.  A plan may either be consensual or non-consensual.  A plan sets forth, among other things, the proposed treatment of claims against and equity interests in the debtor.  The confirmation process and the conditions for confirming either a consensual or non-consensual plan are more fully described in Article IV.C below.  The Plan calls for the liquidation of the Debtors' assets and the distribution of Cash to Creditors and Interest holders holding Allowed Claims and Allowed Interests in certain Classes.

After a plan is filed, the holders of claims against or interests in a debtor who will receive distributions under the plan and whose claims or interests are proposed to be "impaired" by the plan are permitted to vote to accept or reject the plan.  Generally, under the Bankruptcy Code, a claim or interest is "impaired" if the plan alters the legal, equitable or contractual rights to which the holder of that claim or interest is entitled.  Creditors or equity holders who are "unimpaired" are deemed to accepted a plan and, therefore, do note vote.  Creditors or equity holders that receive no distribution under a plan are deemed to reject a plan and, therefore, do not vote.

Section 1125 of the Bankruptcy Code requires that, prior to soliciting acceptances of the proposed plan, the debtor must prepare a disclosure statement.  The disclosure statement must contain adequate information about the debtor, its assets and liabilities and the plan of reorganization or liquidation to enable a hypothetical, reasonable investor to make an informed judgment about the plan.  This Disclosure Statement is presented to Creditors and Interest holders to satisfy Section 1125 of the Bankruptcy Code.  Acceptances of the Plan are being

- 8 -

solicited only from those Persons or Entities who hold Claims or Interests in an impaired Class that will receive a Distribution under the Plan.

### D.     Confirmation of a Plan of Reorganization

The Bankruptcy Code requires that the plan establish various Classes of Claims and Interests.  The Bankruptcy Code further requires that each of the Claims or Interests in a Class must be substantially similar to the other Claims or Interests in that Class.  Under the Bankruptcy Code, a Class of Claims will have accepted the Plan if the Plan has been accepted by Creditors that hold at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims of such Class that actually vote on the Plan.  A Class of Interests will have accepted the Plan if the Plan has been accepted by Interest holders that hold at least two-thirds (2/3) in amount of the Allowed Interests of such Class that actually vote on the Plan.  Thus, Chapter 11 does not require that each holder of a Claim or Interest vote in favor of the Plan in order for the Bankruptcy Court to confirm the Plan.

Confirmation of a plan, which is the vehicle for satisfying the rights of holders of claims against and equity interests in a debtor, is the ultimate goal of a chapter 11 case.  Although referred to as a plan of reorganization or plan of liquidation, a plan may provide anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of assets.  In either event, upon confirmation of the plan, it becomes binding on the debtor and all of its creditors and stakeholders, and the obligations owed by the debtor to those parties are compromised and exchanged for the treatment specified in the plan.  In these Chapter 11 Cases, the Plan contemplates a liquidation of each of the Debtors and is, therefore, referred to as a "plan of liquidation." The primary objective of the Plan is to maximize the value of the ultimate recoveries to all Creditors and Interest holders on a fair and equitable basis in accordance with the priorities established by the Bankruptcy Code.   The Plan may settle, compromise or otherwise dispose of certain Claims and Interests on terms that the Debtors believe to be fair and reasonable and in the best interests of the Debtors' respective Estates, Creditors and Interest holders.  The Plan provides for, among other things: (a) the establishment of the Distribution Trust to take possession of the Debtors' remaining assets and then distribute the assets of the Distribution Trust to the holders of Allowed Claims and Interests; (b) rejection of all unexpired Executory Contracts and Unexpired Leases to which any Debtor is a party that were not previously assumed and assigned or rejected (subject to certain limited exceptions); and (c) certain other transactions to effect the Plan.

In order to confirm the Plan, the Bankruptcy Court must determine that the Plan satisfies the requirements of Section 1129 of the Bankruptcy Code, including the voting requirements described above.   In addition, Section 1129 requires, among other things, that the Plan be "feasible" and in the "best interests" of Creditors and Interest holders.  In determining the "feasibility" of the Plan, the Bankruptcy Court must find that there is a reasonable probability that the Debtors will be able to perform their obligations under the Plan.  The "best interests" test generally requires that the value of the consideration to be distributed to the Creditors and Interest holders under the Plan must not be less than what they would receive if the Debtors' assets were to be liquidated under a hypothetical liquidation pursuant to Chapter 7 of the Bankruptcy Code.  The Debtors believe that the Plan satisfies these requirements.

Even though a Creditor or Interest holder may choose not to vote or may choose to vote against the Plan, such Creditor or Interest holder will be bound by the terms and treatment set forth in the Plan if the Plan is confirmed by the Bankruptcy Court.  Likewise, those holders of Claims and Interests that are not entitled to vote on the Plan will nonetheless be bound by the terms and treatment set forth in the Plan if the Plan is confirmed by the Bankruptcy Court.

If the Plan is not accepted by a Class of Claims or Interests entitled to vote on the Plan, the Debtors will seek confirmation of the Plan under the so-called "cramdown" provisions of the Bankruptcy Code.  Pursuant to Section 1129(b) of the Bankruptcy Code, the Debtors may "cramdown" the Plan on non-accepting Classes of Claims and Interests if the Plan complies with all of the requirements of Section 1129(a) (except section 1129(a)(8), which requires acceptance by all impaired Classes), and the Debtors establish, among other things, that (i) the Plan is accepted by at least one impaired Class of Creditors or Interests, (ii) the Plan is "fair and equitable," and (iii) the Plan does not "unfairly discriminate."  For a more complete description of the "cramdown" requirements, see Article XIV.D of this Disclosure Statement.

### E.      Summary of Classes and Treatment of Claims and Interests

The estimated percentage recovery for each Class under the Plan is provided in the table below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified.

The Debtors paid $9,263,041.68[15] to retained professionals from the inception of the Chapter 11 Cases through November 30, 2015, as follows:  (a) Kinetic Partners - $1,024,627.29; (b) Reed Smith LLP - $7,655,847.68 ($4,375,000 of which was a contingent fee earned by Reed Smith for obtaining a $17,500,000 recovery from Stroock & Stroock & Lavan LLP, in respect of which Reed Smith was not paid any hourly compensation); (c) Duff and Phelps- $484,553.61; (d) Maples & Calder- $55,362.72; and (e) O'Connor Davies LLP-  $42,650.38.

For a discussion of certain additional matters related to Administrative Claims and Priority Tax Claims, see Section II.A.  The Debtors' estimate of recoveries for holders of Claims and Interests in Classes A-3, A-4, A-5, B-3, B-4, B-5, C-3, C-4, and C-5 under the Plan are based on, among other things, their estimate of the Administrative Claims, Cure Amount Claims, Priority Tax Claims, Priority Claims and Secured Claims that will ultimately be Allowed, including those that were not yet Filed as of the date of this Disclosure Statement; *however*, there can be no assurance that the Debtors' estimate of the likely aggregate allowed amount of such Claims will prove to be accurate.

The estimated amounts of Claims shown in the table above are based upon the Debtors' preliminary review of certain (but not all) of the Claims Filed on or before November 10, 2014 and the Debtors' books and records and may be revised substantially following the completion of a detailed analysis of all the Claims Filed.  In addition, the amount of any Disputed Claim that ultimately is allowed by the Bankruptcy Court may be significantly more or less than the estimated amount of such Claim.

---

[15] Excluding expenses except with respect to Kinetic Partners and Duff & Phelps.

In determining the "Estimated Recovery" in the table above, the Debtors have assumed that the Plan is consummated as described therein. These calculations do not include any value attributed to claims and causes of action (including preference claims and other Recovery Actions) by any of the Estates. The Debtors have not commenced a review of potential Recovery Actions and, therefore, they are not in a position to provide an estimated value for such actions.

For a discussion of various factors that could materially affect the amount of Cash and other assets of the Distribution Trust to be distributed pursuant to the Plan, see Articles II and VI and the Liquidation Analysis attached hereto as Exhibit B. In addition, the Debtors' estimates for recoveries by holders of Allowed Claims and Allowed Interests are based on the Debtors' current view of the likely amount of Allowed Claims incurred by the Debtors through Confirmation of the Plan. There can be no guaranty that the Debtors' estimates of Allowed Claims will prove to be accurate.

The Plan divides holders of Claims against and Interests in the AEF Debtors into seven (7) separate Classes as follows:

**AEF**

1.     **AEF Priority Claims (Class A-1 Claims) are unimpaired**. On the Effective Date, each holder of an Allowed AEF Priority Claim will receive, from AEF or the Distribution Trust, Cash equal to the amount of such Allowed Claim. Class A-1 is deemed to accept the Plan and is not entitled to vote. AEF does not believe that there will be any Allowed Class A-1 Claim.

2.     **AEF Secured Claims (Class A-2 Claims) are unimpaired**. On the Effective Date, unless otherwise agreed by a Claim holder and AEF or the Distribution Trustee, each holder of an Allowed Secured Claim will be classified in Class A-2 and receive treatment on account of such Allowed Secured Claim in the manner set forth in Option A or B below, at the election of AEF or the Distribution Trustee. AEF will be deemed to have elected Option A except with respect to any Allowed Secured Claim as to which AEF elects Option B (to the extent permitted by applicable law) prior to the Distribution on account of such Allowed Secured Claim.

*Option A*: On the Effective Date, Allowed Secured Claims in Class A-2 with respect to which AEF elects Option A will receive Cash equal to the amount of such Allowed Secured Claim.

*Option B*: On the Effective Date, a holder of an Allowed Secured Claim in Class A-2 with respect to which AEF elects Option B will be entitled to receive (and AEF or the Distribution Trustee will release and transfer to such holder) the collateral securing such Allowed Secured Claim up to the amount of such Allowed Secured Claim.

Notwithstanding the foregoing, the holder of an Allowed Secured Tax Claim in Class A-2 will not be entitled to receive any payment on account of any penalty arising with respect to or in connection with such Allowed Secured Tax Claim. Any such Claim or demand for any such penalty will be subject to treatment in Class A-3. The holder of an Allowed Secured Tax Claim

may not assess or attempt to collect such penalty from the Debtors, the Distribution Trust or Distribution Trustee, or their respective property (other than as a holder of a Class A-3 Claim). In addition, to the extent a Class A-2 Claim is based upon or subject to a right of setoff, the Debtors or the Distribution Trustee will not be required to pay such Claim, if Allowed, in Cash, but instead may exercise the right of setoff to satisfy the Claim.  Class A-2 is deemed to accept the Plan and is not entitled to vote.

AEF does not believe that there will be any Allowed Class A-2 Secured Claim.  Jeffer Mangels Filed an alleged secured Claim in the $1,199,375.12 in which Jeffer Mangels asserts an attorneys' charging lien on the proceeds of the Debtors' claims against Fortress and Relativity. The Debtors have objected to Jeffer Mangels' Claim and believe that it should be disallowed.

     **3.**      **<u>AEF Unsecured Claims (Class A-3 Claims) are impaired</u>**.  Class A-3 is comprised of Unsecured Claims against AEF, excluding Subordinated Claims.  The Distribution Trust will make Distributions, from time to time as the Distribution Trustee deems appropriate, to holders on account of their Allowed AEF Unsecured Claims.  AEF estimates that such Distributions will pay the Allowed AEF Unsecured Claims in full in Cash, without interest, provided that such Claims do not materially exceed AEF's estimate of the amount of Allowed AEF Unsecured Claims.  AEF believes that Allowed Class A-3 Claims will total approximately $7.5 million (including the Allowed Bergstein Claim).  Class A-3 is entitled to vote.  Two "Class B" Shareholders have asserted claims related to certain compulsory redemptions in 2011 and 2012, which if allowed would either provide for an affirmative payment due to such parties, or increase the estimated amount of the AEF Unsecured Claims by up to $2.6 million, reducing the estimated recovery to such claimholders.

If the Distribution Trust is unable to pay Class A-3 Claims in full, however, then the Distribution Trust will make Distributions, Pro Rata, on account of Class A-3 Claims after payment of or reserve for Claims in the above Classes, unclassified Claims and expenses of administering the Plan and the Distribution Trust, and holders in Classes A-4 and A-5 will not receive any Distributions.

     **4.**      **<u>AEF Subordinated Claims (Class A-4 Claims) are impaired</u>**.  Class A-4 is comprised of Subordinated Claims under section 510(c) of the Bankruptcy Code against AEF.  The Distribution Trust will make Distributions, from time to time as the Distribution Trustee deems appropriate, to holders on account of their Allowed AEF Subordinated Claims. AEF believes that, if not withdrawn or disallowed in their entirety, the $50 million Claim Filed by Wesley Avery (as the Tregub Chapter 7 Trustee), and the Claims Filed by Molner, Sharma, ACP, ARP, SCIC, and GCC will be equitably subordinated under section 510(c) of the Bankruptcy Code.  In the aggregate, all such Claims total approximately $58.7 million.  The $50 million Claim Filed by the Tregub Chapter 7 Trustee was released in the Settlement Agreement. Thus, the Debtors expect that Claim to be withdrawn.  The Debtors have objected or will object to each of the Subordinated Claims if they are not withdrawn and believe that such Claims should be disallowed in full on other grounds.  Class A-4 is entitled to vote.

If the Distribution Trust is unable to pay Class A-4 Claims in full, however, then the Distribution Trust will make Distributions, Pro Rata, on account of Class A-4 Claims after payment of or reserve for Claims in the above Classes, unclassified Claims and expenses of

administering the Plan and the Distribution Trust, and holders in Class A-5 will not receive any
Distributions.

     **5.**      **AEF - ALTL Participation Interest (Class A-5 Interest) is impaired**.
After the payment in full of or reserve for Claims in Classes A-1, A-2, A-3, A-4, and unclassified
Claims, AEF estimates that Distributions on account of the ALTL Participation will be
approximately $975,000 to $6,050,000 (depending largely on the Allowed amount of Claims in
Classes A-3 and A-4) after the payment of or reserve for the expenses of administering the Plan
and the Distribution Trust. The allowance of Claims in Class A-3 and A-4 will reduce the
Distributions on account of the ALTL Participation. Certain of the holders of former Class B, C,
D, and E shares have filed claims asserting that the *in specie* compulsory redemption resulted in
such shareholders' claims becoming AEF Unsecured Claims. If these claims of the shareholders
are allowed as Unsecured Claims, then the estimated total of AEF Unsecured Claims will
increase by approximately $70 million. The Debtors, however, believe that such Claims will be
recharacterized, subordinated or disallowed. Also, certain shareholders have asserted Claims
related to purported redemptions of their shares prior to the suspension of redemptions in
December 2008 and/or December 2009. If Allowed, then the estimated total AEF Unsecured
Claims may also materially increase, reducing the estimated recovery to such claimholders.
Class A-5 is entitled to vote.

     **6.**      **AEF Subordinated Claims (Class A-6 Subordinated Claims relating
to "Class B, C, D, or E" Interests) are impaired**. Class A-6 is comprised of Subordinated
Claims under section 510(b) of the Bankruptcy Code against AEF. No property will be
distributed to or retained by the holders of Allowed Claims in Class A-6. AEF believes that
more than $30 million (ignoring any duplication) of the Claims filed against AEF are subject to
subordination under section 510(b) of the Bankruptcy Code. Class A-6 is deemed to reject the
Plan.

     **7.**      **AEF Interests (Class A-7 Shares) are impaired**. No property will be
distributed to or retained by the holders of Allowed Interests (Class A Shares) in Class A-7,
which are deemed to be canceled on the Effective Date. Class A-7 Interests will be canceled on
the Effective Date. Class A-7 is deemed to reject the Plan.

     The Plan divides holders of Claims against and Interests in the ALTL Debtors into six (6)
separate Classes as follows:

**ALTL**

     **1.**      **ALTL Priority Claims (Class B-1 Claims) are unimpaired**. On the
Effective Date, each holder of an Allowed ALTL Priority Claim will receive, from ALTL or the
Distribution Trust, Cash equal to the amount of such Allowed Claim. Class B-1 is deemed to
accept the Plan and is not entitled to vote. ALTL does not believe that there will be any Allowed
Class B-1 Claim. Class B-1 is deemed to accept the Plan.

     **2.**      **ALTL Secured Claims (Class B-2 Claims) are unimpaired**. On the
Effective Date, unless otherwise agreed by a Claim holder and ALTL or the Distribution Trustee,
each holder of an Allowed Secured Claim will be classified in Class B-2 and receive treatment

on account of such Allowed Secured Claim in the manner set forth in Option A or B below, at the election of ALTL or the Distribution Trustee. ALTL will be deemed to have elected Option A except with respect to any Allowed Secured Claim as to which ALTL elects Option B (to the extent permitted by applicable law) prior to the Distribution on account of such Allowed Secured Claim. Class B-2 is deemed to accept the Plan.

> *Option A*: On the Effective Date, Allowed Secured Claims in Class B-2 with respect to which ALTL elects Option A will receive Cash equal to the amount of such Allowed Secured Claim.

> *Option B*: On the Effective Date, a holder of an Allowed Secured Claim in Class B-2 with respect to which ALTL elects Option B will be entitled to receive (and ALTL or the Distribution Trustee will release and transfer to such holder) the collateral securing such Allowed Secured Claim up to the amount of such Allowed Secured Claim.

Notwithstanding the foregoing, the holder of an Allowed Secured Tax Claim in Class B-2 will not be entitled to receive any payment on account of any penalty arising with respect to or in connection with such Allowed Secured Tax Claim. Any such Claim or demand for any such penalty will be subject to treatment in Class B-3. The holder of an Allowed Secured Tax Claim will not assess or attempt to collect such penalty from the Debtors, the Distribution Trust or Distribution Trustee, or their respective property (other than as a holder of a Class B-3 Claim). In addition, to the extent a Class B-2 Claim is based upon a right of setoff, the Debtors or the Distribution Trustee will not be required to pay such Claim, if Allowed, in Cash, but instead may exercise the right of setoff to satisfy the Claim. Class B-2 is deemed to accept the Plan and is not entitled to vote.

ALTL does not believe that there will be any Allowed Class B-2 Secured Claim.

**3.      ALTL Unsecured Claims (Class B-3 Claims) are impaired**. Class B-3 is comprised of Unsecured Claims against ALTL, excluding Subordinated Claims. The Distribution Trust will make Distributions, from time to time as the Distribution Trustee deems appropriate, to holders on account of their Allowed ALTL Unsecured Claims, if any. ALTL estimates that holders of Allowed ALTL Unsecured Claim, if any, will receive payment in full in Cash. Class B-3 is entitled to vote.

ALTL does not believe that there will be any significant, if any, Allowed Class B-3 Unsecured Claim. If the Distribution Trust is unable to pay Class B-3 Claims in full, however, then the Distribution Trust will make Distributions, Pro Rata, on account of Class B-3 Claims after payment of or reserve for Claims in the above Classes, unclassified Claims and expenses of administering the Plan and the Distribution Trust, and holders in Classes B-4 and B-5 will not receive any Distributions.

**4.      ALTL Subordinated Claims (Class B-4 Claims) are impaired**. Class B-4 is comprised of Subordinated Claims under section 510(c) of the Bankruptcy Code against ALTL. The Distribution Trust will make Distributions, from time to time as the Distribution Trustee deems appropriate, to holders on account of their Allowed ALTL Subordinated Claims, if any. ALTL estimates that holders of Allowed ALTL Subordinated Claims, if any, will receive

payment in full in Cash.  ALTL believes that, if not withdrawn or disallowed in their entirety, the $50 million Claim Filed by the Tregub Chapter 7 Trustee, and the Claims Filed by Molner, Sharma, ACP, ARP, SCIC, and GCC will be equitably subordinated under section 510(c) of the Bankruptcy Code.  The $50 million Claim Filed by the Tregub Chapter 7 Trustee was released in the Settlement Agreement.  Thus, the Debtors expect that Claim to be withdrawn.  In the aggregate, all such Claims total approximately $58.7 million.  The Debtors have objected or will object to each of those Claims if they are not withdrawn and believe that such Claims should be disallowed in full on other grounds.  Class B-4 is entitled to vote.

If the Distribution Trust is unable to pay Class B-4 Claims in full, then the Distribution Trust will make Distributions, Pro Rata, on account of Class B-4 Claims after payment of or reserve for Claims in the above Classes, unclassified Claims and expenses of administering the Plan and the Distribution Trust, and holders in Class B-5 will not receive any Distributions.

**5.        ALTL Interests (Class B-5) Interests) are impaired**.  After the payment in full of or reserve for Claims in Classes B-1, B-2, B-3, B-4 and unclassified Claims, the holders of Allowed ALTL Interests in Class B-5 will receive their Pro Rata share of the Distributions on account of the ALTL Participation (the Class A-5 Interest) from the Distribution Trust after payment of or reserve for expenses of administering the Plan and the Distribution Trust.  ALTL estimates that the aggregate amount of such Distributions account of the ALTL Participation will be approximately $975,000 to $6,050,000 (depending largely on the Allowed amount of Claims in Classes A-3 and A-4) after the payment of or reserve for the expenses of administering the Plan and the Distribution Trust.  Class B-5 ALTL Interests will be deemed to be canceled on the Effective Date.

**6.        ALTL Subordinated Claims (Class B-6 Subordinated Claims (ALTL Subordinated Claims relating to the ALTL Interests pursuant to section 510(b) of the Bankruptcy Code) are impaired**.  Class B-6 is comprised of Subordinated Claims under section 510(b) of the Bankruptcy Code against ALTL.  No property will be distributed to or retained by the holders of Allowed Claims in Class B-6.  Holders of Class B-6 Claims will be deemed to have rejected the Plan.

The Plan divides holders of Claims against and Interests in the AEI Debtors into five (5) separate Classes as follows:

### AEI

**1.        AEI Priority Claims (Class C-1 Claims) are unimpaired**.  On the Effective Date, each holder of an Allowed AEI Priority Claim will receive, from AEI or the Distribution Trust, Cash equal to the amount of such Allowed Claim.  Class C-1 is deemed to accept the Plan and is not entitled to vote.  AEI does not believe that there will be any Allowed Class C-1 Claim.  Class C-1 is deemed to accept the Plan.

**2.        AEI Secured Claims (Class C-2 Claims) are unimpaired**.  On the Effective Date, unless otherwise agreed by a Claim holder and AEI or the Distribution Trustee, each holder of an Allowed Secured Claim will be classified in Class C-2 and receive treatment on account of such Allowed Secured Claim in the manner set forth in Option A or B below, at

the election of AEI or the Distribution Trustee. AEI will be deemed to have elected Option A except with respect to any Allowed Secured Claim as to which AEI elects Option B (to the extent permitted by applicable law) prior to the Distribution on account of such Allowed Secured Claim. Class C-2 is deemed to accept the Plan.

> *Option A*: On the Effective Date, Allowed Secured Claims in Class C-2 with respect to which AEI elects Option A will receive Cash equal to the amount of such Allowed Secured Claim.

> *Option B*: On the Effective Date, a holder of an Allowed Secured Claim in Class C-2 with respect to which AEI elects Option B will be entitled to receive (and AEI or the Distribution Trustee will release and transfer to such holder) the collateral securing such Allowed Secured Claim up to the amount of such Allowed Secured Claim.

Notwithstanding the foregoing, the holder of an Allowed Secured Tax Claim in Class C-2 will not be entitled to receive any payment on account of any penalty arising with respect to or in connection with such Allowed Secured Tax Claim. Any such Claim or demand for any such penalty will be subject to treatment in Class C-3. The holder of an Allowed Secured Tax Claim will not assess or attempt to collect such penalty from the Debtors, the Distribution Trust or Distribution Trustee, or their respective property (other than as a holder of a Class C-3 Claim). In addition, to the extent a Class C-2 Claim is based upon a right of setoff, the Debtors or the Distribution Trustee will not be required to pay such Claim, if Allowed, in Cash, but instead may exercise the right of setoff to satisfy the Claim. Class C-2 is deemed to accept the Plan and is not entitled to vote.

AEI does not believe that there will be any Allowed Class C-2 Claim.

       **3.**      **AEI Unsecured Claims (Class C-3 Claims) are impaired**. Class C-3 is comprised of Unsecured Claims against AEI, excluding Subordinated Claims. The Distribution Trust will make Distributions, from time to time as the Distribution Trustee deems appropriate, to holders on account of their Allowed AEI Unsecured Claims. AEI estimates that such Distributions will pay the Allowed AEI Unsecured Claims in full in Cash, without interest, provided that such Claims do not materially exceed AEI's estimate of the amount of Allowed AEI Unsecured Claims. The IRS filed an Unsecured Claim against AEI in the amount of $304,371 for alleged penalties and interest on taxes due from AEI. AEI has filed an amended tax return and objected to the IRS's Claim. AEI does not believe that there will be any Allowed Class C-3 Claim. Class C-3 is entitled to vote.

If the Distribution Trust is unable to pay Class C-3 Claims in full, then the Distribution Trust will make Distributions, Pro Rata, on account of Class B-3 Claims after payment of or reserve for Claims in the above Classes, unclassified Claims and expenses of administering the Plan and the Distribution Trust, and holders in Classes C-4 and C-5 will not receive any Distributions.

       **4.**      **AEI Subordinated Claims (Class C-4 Claims) are impaired**. Class C-4 is comprised of Subordinated Claims under section 510(c) of the Bankruptcy Code against AEI. The Distribution Trust will make Distributions, from time to time as the Distribution Trustee

deems appropriate, to holders on account of their Allowed AEI Subordinated Claims. AEI estimates that such Distributions will pay the Allowed AEI Subordinated Claims in full in Cash, without interest, provided that such Claims do not materially exceed AEI's estimate of the amount of Allowed AEF Unsecured Claims. AEI believes that, if not withdrawn or disallowed in their entirety, the $50 million Claim Filed by the Tregub Chapter 7 Trustee, and the Claims Filed by Molner, Sharma, ACP, ARP, SCIC, and GCC will be equitably subordinated under section 510(c) of the Bankruptcy Code. The $50 million Claim Filed by the Tregub Chapter 7 Trustee was released in the Settlement Agreement. Thus, the Debtors expect that Claim to be withdrawn. In the aggregate, all such Claims total approximately $58.7 million. The Debtors have objected or will object to each of those Claims if they are not withdrawn and believe that such Claims should be disallowed in full on other grounds. Notwithstanding the Debtors' expectations, if a significant amount of AEI Subordinated Claims are Allowed, then such Claims may receive only a small Pro Rata Distribution from the Distribution Trust. Class C-4 is entitled to vote.

If the Distribution Trust is unable to pay Class C-4 Claims in full, then the Distribution Trust will make Distributions, Pro Rata, on account of Class C-4 Claims after payment of or reserve for Claims in the above Classes, unclassified Claims and expenses of administering the Plan and the Distribution Trust, and holders in Classes C-5 will not receive any Distributions.

     **5.**     **AEI Interests (Class C-5 Interests) are impaired**. AEI Interests are impaired. After the payment in full of or reserve for of Claims in Classes C-1, C-2, C-3, C-4 and unclassified Claims, AEI estimates that AEF will receive Distributions, Pro Rata, on account of its AEI Interests in Class C-5, after payment of or reserve for expenses of administering the Plan and the Distribution Trust, in the amount of approximately $0.00 to $52,000 (assuming that there are no Class C-4 Claims). Class C-5 AEI Interests will be deemed to be canceled on the Effective Date. Class C-5 is entitled to vote.

## III.  EVENTS PRECEDING THESE CHAPTER 11 CASES

Below is a brief description of the Debtors and a recitation of the significant events and factual circumstances surrounding the commencement of the Bankruptcy Cases. Copies of all filings with the Court are on file with the Bankruptcy Court.

### A.  Brief History and Description of Debtors' Prepetition Businesses

On May 7, 2014, Geoffrey Varga and Jess Shakespeare were appointed as the JVLs of AEF and ALTL, two of the debtors in these Chapter 11 cases. Under the laws of the Cayman Islands, the JVLs are charged with winding up the affairs of AEF and ALTL and distributing their assets in an orderly manner. These Chapter 11 cases were commenced voluntarily by the Debtors as part of the orderly asset monetization process.

AEF is an investment fund organized under the laws of the Cayman Islands that provided short and medium term liquidity to producers and distributors of media and entertainment assets through loans, equity investments and other financial investments. AEF was established in

August 2006, and its shareholders[16] have included pension funds, family offices, so-called "fund of funds" investors, and high net worth individuals.[17]   AEI, a Delaware corporation, is wholly-owned by AEF.

In 2008, Aramid Entertainment Participation Fund Limited ("APFL") n/k/a ALTL was formed.   In 2008 and 2014, in connection with the voluntary and compulsory redemptions of equity interests in AEF, shareholders of AEF became shareholders of ALTL.   Pursuant to the Participation Agreements, ALTL has the right to participate in the residual distributions of AEF's assets after payment in full of AEF's creditors.   As indicated in Section II.A.1, certain holders of former Class B, C, D, and E Shares have disputed the validity of the compulsory *in specie* redemption of their shares in exchange for shares of ALTL.

Based on the AEF offering documents, AEF was focused on opportunities in four main areas of film finance:

> (1)    AEF provided producers in need of short-term liquidity prior to the commencement of principal photography with bridge financing.   These loans generally had approximately three to six month terms.

> (2)    AEF provided advance liquidity to producers who expected to generate discounting tax credits but who were in need of funding sooner.   These loans generally had approximately eighteen month terms.

> (3)    AEF provided gap financing to producers for the uncovered amount of a motion picture's budget remaining after other sources of financing had already been taken into account.   These loans generally had twelve to twenty-four month terms.

> (4)    AEF provided producers and distributors of entertainment content with an alternative source of asset-backed lending by way of a loan or equity investment in portfolios or "slates" of feature films or other forms of filmed entertainment.   Commercial terms of these studio co-financing arrangements varied, but they typically involved a contribution of capital by third parties toward the financing of a substantial, multi-year portfolio of films, all to be produced and/or released by the studio.   Under the offering documents, AEF had considerable discretion concerning the nature and terms of the transactions in which AEF engaged.

The Debtors have never had any employees.   The Directors of AEF were David Bree, Roger H. Hanson, Timothy Levy and Thomas McGrath.[18]   During the period prior to the appointment of the JVLs, consistent with the Board of Directors' authority and pursuant to a Services Provision Agreement, the Board of Directors retained ACP, a United Kingdom

---

[16]  Under Cayman's Companies Law, the names and addresses of the members who hold this equity are not a matter of public record and are not available for public inspection.

[17]  As noted above, ALTL has no direct business operations, but rather has the right to participate in the residual from the monetization of AEF's assets.

[18]  For a short time in 2010, Christopher Borde was also a director.

partnership, as AEF's technical service provider.[19]   The key members of ACP's management team included Molner and, for a time, Timothy Levy[20].    Under this Service Provision Agreement, ACP was to serve as the investment provider and provide certain services to AEF, including referring investment opportunities as it considered appropriate, advising on such investment opportunities, preparing due diligence reports on potential investments and reporting on the same.   The Services Agreement was restated and amended in 2011 (the "Amended Services Agreement").   The effective date of the Amended Services Agreement was January 1, 2011.   While the Amended Services Agreement largely did not alter the duties and obligations owed by ACP to AEF, it did alter the indemnification obligations of AEF.   The Amended Services Agreement was again amended on December 5, 2012 (the "Second Amended Services Agreement").   Finally, the parties again amended the Second Amended Services Agreement (the "Third Amended Services Agreement" and together with the Services Agreement, the Amended Services Agreement and the Second Amended Services Agreement, the "ACP Services Agreement") by amendment in March 2014.   The Third Amended Services Agreement contemplated the appointment of the JVLs and, accordingly, terminated the investment advisory relationship between AEF and ACP.

On or about May 1, 2014, AEF and ARP entered into a Services Agreement (the "ARP Services Agreement" and together with the ACP Services Agreement, the "Services Agreements").

ACP was owned and controlled by its members, which included Future Capital Partners, a UK provider of financial products and services, and SCIC, a Los Angeles based company specializing in structuring and facilitating cross-border tax-advantaged financing for major motion picture producers in investment vehicles involving private, public, and corporate investors on an international basis.[21]   Molner, the founder of SCIC, was the lead individual involved in ACP's relationship with AEF.

Pursuant to an Administration Agreement, Admiral Administration Ltd. in the Cayman Islands, a locally licensed fund administrator, acted as the administrator of AEF.   The administrator performed a wide range of administrative functions for AEF, including, as necessary, the processing of the issue and redemption of shares, the maintenance of AEF's registration of members, calculating net asset value, and performing anti-money laundering procedures in respect of shareholders.

Prior to the Petition Date, ARP, a Cayman Islands exempted company, was retained by AEF to help monetize assets and pursue or defend certain legal proceedings.

---

[19]  Upon information and belief, the partners of ACP included SCIC, a Los Angeles based company, and Future Capital Partners, a London based entity.
[20]  Upon information and belief, Levy is chief executive officer, founder and sole owner of Future Capital Partners.
[21]  Until June 30, 2011, another entity, Stonehenge Capital Company LLC, a US national specialty finance company, was also an owner of ACP.

**B.      Debtors' Prepetition Capital Structure**

Currently, ALTL holds the residual right in AEF's assets because the prior equity interests in AEF were compulsorily redeemed *in specie* as described below in Section III.B.2. Prior to such redemptions, the original authorized share capital of AEF was USD $50,000 and GBP £25,000, divided into the following Classes: 100 voting nonredeemable, nonparticipating Class A Shares of par value USD $1.00 each; 4,990,000 nonvoting redeemable participating shares of par value USD $0.01 each; and 2,500,000 nonvoting redeemable participating shares of par value GBP £0.01 each.  Beginning in 2006, AEF conducted an initial private offering of Class B, C, D and E participating redeemable shares.  All of the nonparticipating Class A Shares have been issued at par and are owned or controlled by ACP.

As described below in Section III.B.2, upon the mandatory redemption *in specie* of the participating shares in AEF, the participating shareholders of AEF became Class R or Class L shareholders of ALTL. ALTL now owns the residual interest in AEF's assets.

Aramid Entertainment BV ("AEBV"); Cayman Film Holdings Limited ("CFH"), Cayman Film Holdings UM Limited ("CFHU"), and AEI are wholly-owned subsidiaries of AEF. AEBV made loans on certain European transactions.  CFH held certain foreclosed assets, and CFHU held the foreclosed assets of *Ultramarines*.  AEI held net profit participations in some U.S. films, which rights were transferred to AEF.

**1.      AEF's Suspension of Voluntary Redemptions**

AEF, as a Cayman Islands Exempted Limited Company, is governed by its Articles of Association dated August 15, 2006 (the "AEF Articles").  Pursuant to the AEF Articles, the Directors of AEF were authorized to issue shares in AEF in various classes to which certain rights would attach, inclusive of redemption rights.  Shares in AEF were offered in Classes B, C, D, E, F and R.  Paragraph 48 of the AEF Articles provides that the "Directors may, from time to time, in their absolute discretion and for any reason declare a Suspension of the . . . redemption of the Participating Shares".  The AEF Articles further provide that the "Directors may suspend redemptions in order to effect orderly liquidation of [AEF's] assets in relation to a particular class of Participating Shares…."

Paragraph 74 of the AEF Articles provides that, subject to the Companies Law of the Cayman Islands, "all or any of the special rights for the time being attached to any Shares in issue…may from time to time…be altered or abrogated with the consent in writing of the holders of not less than three-fourths of the issued shares of a class or series of Shares…."  The AEF Articles further provide that in the event the fund is wound down, the assets available for distribution among the fund's shareholders would be applied in the following priority: (i) to the holders of Class A Shares, an amount equal to the par value of such Class A Shares; and (ii) to the various share classes of AEF paid *pro rata* to the shareholders of such share classes from the account designated for each particular share class.

On December 8, 2008, AEF held an Extraordinary General Meeting of the Class B Shareholders of AEF (the "December 2008 Shareholder Meeting").  At the December 2008 Shareholder Meeting, a quorum of AEF's Class B shareholders voted on a special resolution to

alter the terms of the Class B shares in AEF (the "Special Resolution"). The Special Resolution proposed to render the Class B shares non-redeemable "(i) in the case of shares in issue on [December 8, 2008], until after twelve months from (a) [January 1, 2009] or, if later, (b) the date that such shares would have ceased to be subject to a Non-Redemption Period had the rights of such shares not been varied by the special resolution dated on or about [December 8, 2008]; and (ii) for any shares issued subsequent to the date hereof, for a period of twelve months from the date of issue." At the close of the December 2008 Shareholder Meeting, the chairman of the Board of Directors of AEF declared that the Class B shareholders had resolved to adopt the Special Resolution. Accordingly, by virtue of the Special Resolution, AEF investors holding Class B shares as of December 8, 2008 were not permitted to redeem such shares until, at the earliest, January 1, 2010. Likewise, any Class B shareholders that were issued shares subsequent to the December 2008 Shareholder Meeting could not redeem their interest in AEF until a year from the date of share issuance. Certain holders of former Class B Shares have disputed the validity of the Extraordinary General Meeting of Class B Shareholders, or the actions taken at such meeting, including the suspension of redemptions of the Class B Shares.

On December 17, 2009, the AEF Board of Directors held a meeting (the "December 2009 Board Meeting") wherein the Directors determined to extend the suspension of redemptions indefinitely effective as of December 24, 2009. More specifically, the Directors resolved that AEF would "declare a suspension of redemptions, but not of the determination of net asset value, with effect from [December 24, 2009] (or such other date as any one director shall determine) in accordance with Article 59 of the [Articles]…."

As such, at the December 2009 Board Meeting the AEF Board resolved to extend, indefinitely, the suspension of shareholder redemptions instituted through the Special Resolution and to apply the suspension to all AEF share classes – meaning that any redemption request submitted by an AEF investor subsequent to the December 2009 Board Meeting would not result in AEF incurring any payment obligation to the redeeming investor. As noted above, redemptions already had been suspended in the Class B shares as of December 8, 2008, which suspension was continued as a result of this December 2009 resolution.

The minutes for the December 2009 Board Meeting also note that at the time of the meeting, AEF had approximately $8.5 million in "current redeemers," that is, fully-vested redemptions requests, which were scheduled to be paid on December 31, 2009, January 31, 2010, and March 31, 2010. With respect to these redeemers, the AEF board resolved (i) to request that such shareholders agree to a 12 month deferred payment plan in connection with the due and payable redemption proceeds; and (ii) if a redeemed investor would not agree to such a payment plan, to redeem such investor in kind by making a payment to them of shares in a new special purpose company.

## 2.    AEF's Compulsory Redemption *in Specie*

The AEF Articles provide that "[t]he Directors may redeem or cause the Company to redeem all or some of the Participating Shares held by any person at the Redemption Price for any reason and without providing notice to the Member affected thereby."

Pursuant to the 2008 Participation Agreement, certain Class B and Class F shareholders of AEF elected to redeem their AEF shares, *in specie*, for Class R shares in APFL, which later became ALTL. The 2008 Participation Agreement provided ALTL with an undivided participation interest of 30.7769085808% in AEF's securities, loans, loan interests, derivatives, debt obligations and other assets and liabilities. As indicated in Section II.A.1, certain holders of former Class B, C, D, and E Shares have disputed the validity of the compulsory *in specie* redemption of their shares in exchange for shares of ALTL.

On May 1, 2014, AEF compulsorily redeemed *in specie* the outstanding AEF shares by exchanging them for Class L shares of a commensurate value in ALTL (the "Compulsory Redemption"). Specifically, pursuant to the 2014 Participation Agreement, AEF sold to ALTL an undivided participation interest in 100% of new assets of AEF acquired or vested after January 1, 2009 and 69.22% of legacy assets of AEF existing at December 31, 2008. AEF transferred the Class L shares to AEF's shareholders as part of the Compulsory Redemption.

Therefore, the former equity holders of AEF became either Class R or Class L equity holders of ALTL, which pursuant to the Participation Agreements, had a right to share in the distribution of AEF's assets. Accordingly, as of the Petition Date, the former equity holders of AEF are equity holders of ALTL, which holds the ALTL Participation.

The JVLs do not believe that the Debtors obtained any new assets, or made any borrowings under their prior revolving credit facility, after January 1, 2009. Accordingly, the Debtors believe that the Class R and Class L shares in ALTL are entitled to *pari passu* treatment, and the Plan so provides (absent order of the Bankruptcy Court providing otherwise).

## C.    Litigation By and Against the Debtors

Upon their appointment, the JVLs were tasked with, among other things, investigating and understanding the assets and liabilities of the Debtors. From the outset of their appointment, it quickly became apparent to the JVLs that the pervasive litigations between the Debtors, and parties related to Molner, on one hand, and Bergstein, and parties related to Bergstein, on the other hand (the "Actions"), had historically, consumed, and continued to, consume an extraordinary amount of the Debtors' time and resources. Accordingly, the JVLs expedited their efforts to understand and take affirmative control of the Actions. The JVLs quickly concluded that if allowed to proceed unabated, the Actions would consume the Debtors' resources to the detriment of Creditors and Interest holders.

In the weeks that followed, the JVLs decided that the commencement of these bankruptcy cases was necessary, in part, because AEF did not have the liquidity to pay the exorbitant legal bills associated with the Actions (which fees and expenses bore no relation to the likelihood of success or the amount at issue), and to provide the Debtors with the protections afforded by the automatic stay.

Molner is a key member of the management teams of both ACP and ARP and is the primary point of contact for both ACP and ARP in respect to their dealings with AEF. Molner is also the founder of SCIC and GCC. SCIC is the controlling member of ACP and GCC is the sole shareholder of SCIC.

Under Molner's stewardship, the Debtors and Molner have been entangled in numerous "scorched earth" litigations from 2010 through the present (including the Actions, the "Molner Litigations").  It has taken years, and crushing expense, to untangle much of the litigation morass, but many of such disputes remain unresolved and pending.

### 1.    The Molner Litigations

Prior to December 2009, AEF had an extensive lending relationship with certain Bergstein Companies (as defined below).  Specifically, beginning in February 2007, AEF had engaged in approximately 36 transactions in which entities owned or controlled by Bergstein (collectively, the "Bergstein Companies") had borrowed a total of approximately $62.7 million from AEF.  By January 2010, AEF had recovered approximately $20 million, leaving more than $42 million outstanding, and that debt was not being serviced by the Bergstein Companies. Accordingly, by December 2009, AEF had foreclosed on two film titles, "$5 a Day" and "Love Ranch" that served as collateral for the loans to the Bergstein Companies.

Molner then launched a firestorm of costly litigation against Bergstein and the Bergstein Companies.  This litigation campaign included (i) the filing of now dismissed and wholly wasteful involuntary bankruptcy proceedings against the Bergstein Companies; (ii) the filing of over 100 now dismissed and wholly wasteful adversary proceedings relating to such bankruptcy cases; and (iii) the filing of a host of other doomed to fail state and federal court litigations.  All of these legal actions were known by Molner to be doomed to fail, due to the stolen privileged and confidential and/or proprietary information upon which Molner secretly knew them to be based.  Without knowledge by the independent directors of the hopelessness of these proceedings, all of such proceedings were funded exclusively by AEF.

On March 16, 2010, AEF and Cayman Film Holdings Ltd., a wholly-owned subsidiary of AEF, filed a suit in the United States District Court for the Central District of California against Bergstein and Tutor, individually, seeking to collect approximately $12 million owed on guaranties of loans made to finance motion pictures known as "Love Ranch" and "Bad Meat". *Aramid Entm't Fund Ltd. et al. v Bergstein,* Case No. 2:10-cv-01881-JFW-PLA.  In answering that complaint, Bergstein and Tutor conceded that they had guaranteed these loans.  However, they alleged that AEF had charged unlawful interest on the loans.

One day after commencing litigation against Bergstein and Tutor to enforce guaranties, on March 17, 2010, involuntary bankruptcy petitions (initially filed by a group of 13 creditors that subsequently increased to 27 creditors) were filed in the U.S. Bankruptcy Court in Los Angeles with respect to certain of the Bergstein Companies.[22]  During the period of October 2010 through February 2011, orders for relief were entered in the Bergstein-related entities' bankruptcy cases. Ronald L. Durkin (the "Bergstein Trustee") was appointed as the Chapter 11

---

[22]  The Bergstein related entities' bankruptcy cases included the following cases (filed in the United States Bankruptcy Court for the Central District of California (Los Angeles division)): (i) *In re ThinkFilm, LLC*, Case No. 2:10-bk-19912-BR; (ii) *In re R2D2, LLC*, Case No. 2:10-bk-19924-BR; (iii) *In re CT-1 Holdings, LLC*, Case No. 2:10-bk-19927-BR; (iv) *In re Capco Group, LLC*, Case No. 2:10-bk-19929-BR; and (v) *In re Capitol Films Development, LLC*, Case No. 2:10-bk-19912-BR.

trustee of the Bergstein bankruptcy cases, and continues to serve in that capacity. The Bergstein-related entities' bankruptcy cases were extraordinarily contentious and litigious. Molner, through SCIC and at AEF's expense, filed numerous adversary proceedings against Bergstein, the Bergstein Companies and other defendants. Virtually all of the adversary proceedings were dismissed for failure to state a claim for relief. Pursuant to contractual indemnity claims, AEF paid or allegedly assumed responsibility for upwards of $4-5 million in fees and expenses related to those adversary proceedings.

On May 4, 2010, AEF, AEBV, and Cayman Films Holdings, Inc. filed an action entitled *Aramid Entm't Fund Ltd., et al v. David Bergstein, et al*, Case No. BC437131 (the "Bontempo Action") pending before the Superior Court of California, County of Los Angeles. Cross-claims were filed in the Bontempo Action. The Debtors expended over $8.8 million in fees and expenses in connection with the Bontempo Action.

In July 2011, AEF commenced an action in New York state court against Bergstein, Wimbledon Financing Master Fund, Ltd. ("Wimbledon"), MF Holdings Ltd., Stillwater Capital Partners, Inc., Stillwater Market Neutral Fund III SPC, Gerova Financial Group, Ltd., Fortis Bank Cayman, Ltd., Charles Frederic & Co. and Joseph Bianco (the "Gerova Action"). In the Gerova Action, AEF asserted claims for tortious interference with prospective economic advantage, *prima facie* tort and willful misconduct, all arising out of the defendants' alleged interference with a potential purchase of AEF's assets. Each of the claims was summarily dismissed for failure to establish personal jurisdiction or failure to state a claim.

AEF appealed the trial court's decision to the New York Supreme Court's Appellate Division, which affirmed the decision dismissing AEF's complaint on April 30, 2013. On May 30, 2013, AEF filed a motion seeking either reargument or permission to appeal to the New York Court of Appeals, which was denied on September 13, 2013. AEF's subsequent application for leave to appeal that decision was also denied. The Gerova Action spawned two Malicious Prosecution Actions against AEF, *David Bergstein v. Aramid Entm't Fund, Ltd. et al.,* Index No. 651298/2014 (Sup. Ct. N.Y. Cnty.)- which together seek over $55 million in damages.

On June 21, 2012, Bergstein, Graybox, LLC, and certain other parties filed an action against AEF, and certain other parties, in the case of *Bergstein, et al. v. Aramid Entm't Fund Ltd. et al.*, Case No. BC487059 (the "ThinkFilm Release Action"), in which the plaintiffs asserted claims relating to enforcement of a prior release. AEF prevailed on an anti-SLAPP motion and obtained dismissal of the complaint. Bergstein appealed the dismissal, which appeal was pending in the California Court of Appeals, Appeal No. B251409, as of the Petition Date.

On August 22, 2012, Bergstein and his affiliates obtained a verdict and judgment against Tregub in the case of *Bergstein et al. v. Susan H. Tregub et al.*, Case No. BC434558 pending before the California State Court (the "Tregub State Court Case"), in the aggregate amount of $50 million based on breach of fiduciary duty, legal malpractice and punitive damages.

On or about March 19, 2013, AEF filed an action against Bergstein in the United States District Court for the Central District of California captioned as *Aramid Entm't Fund Ltd. v. David Bergstein et al.*, Case No. 13-cv-01952 (the "HCC Guaranty Action"). Notably, AEF's counsel in the HCC Guaranty Action submitted a declaration stating that nearly 30,000 hours of

- 24 -

attorney time and $13 million dollars in fees had been billed to AEF over the course of five years in connection with certain of the Molner Litigations.[23]

On May 14, 2013, Bergstein and Pineboard Holdings Inc. filed a complaint against, *inter alia*, Parmjit Singh Parmar ("Parmar") (an individual who had business dealings with Bergstein), AEF, Molner and two other entities. *David Bergstein, et al. vs. David Molner, et al.* – Los Angeles Superior Court, Case No. BC508916. This complaint alleged "civil extortion" claims against Parmar and further alleged that the other defendants had aided, abetted and conspired to commit such civil extortion. The complaint also asserted that Parmar had attempted to extort money from Bergstein by threatening to make criminal allegations against Bergstein and report him to Federal authorities. It also alleged that Parmar had threatened to disclose confidential and damaging information about Bergstein to Molner that would allegedly aid Molner in various other lawsuits. The complaint, which asserted that Molner and the other defendants had encouraged Parmar in his extortion attempt, sought damages in an unspecified amount.

The Molner Litigations also included litigation filed on February 8, 2012, against Fortress, Relativity, and related defendants in the Los Angeles Superior Court (the "Fortress Action"). AEF sued Fortress based on causes of action for intentional interference, breach of contract, breach of the implied covenant of good faith and fair dealing, and for being the beneficiary of a fraudulent transfer. As part of its breach of contract action, AEF contended that the information that Fortress used to analyze a slate of motion pictures was acquired from AEF in connection with earlier due diligence of AEF by Fortress that was subject to a non-disclosure agreement. A critical issue in the case was the amount of damages that AEF would receive if it were successful in the action. Citibank had valued the notes at $0 and sold them for $1. AEF (through Molner), however, believed that if Fortress had not terminated the slate, the films in the slate and remaining films to which the slate had rights would generate significant revenue for the repayment of the notes. After the JVLs and Irell & Manella were appointed and familiar with all of the analysis and work performed by their respective predecessors and experts, Fortress and the JVLs agreed to mediate their dispute. On June 10, 2015, after over 11 hours of mediation, Judge Meisinger made a mediator's proposal that Fortress pay, and AEF accept, $4 million to settle their dispute. The proposal was accepted. The fees incurred prior to the settlement, including excessive fees of Jeffer Mangels, were disproportionate to the likely recovery.

As the principal in control of ACP, the technical services provider to AEF, Molner was bound under the ACP Services Agreement to provide certain investment management expertise and services to AEF. Instead of discharging these obligations, Molner consistently caused AEF to invest in underperforming assets and loans and otherwise managed the fund in a manner inconsistent with its investment objectives. While so doing, Molner reaped exorbitant management fees from AEF without conferring corresponding value to AEF.

## 2.    The Wimbledon Litigation

In July 2011, Wimbledon and Stillwater Market Neutral Fund III SPC ("Stillwater"), commenced a lawsuit styled, *Wimbledon Financing Master Fund, Ltd. v. Molner, at al.*,

BC466001 in the Superior Court of California, in which AEF was a nominal defendant (the "Wimbledon Action"). In essence, Wimbledon and Stillwater asserted claims based on AEF's suspension of distributions, AEF's failure to transfer their shares, alleged misrepresentations in the AEF Offering Memorandum and alleged self-dealing by Molner, ACP and SCIC. The case was removed to federal court in Los Angeles under the Federal Arbitration Act. The District Court denied the motion to compel arbitration and remanded the action back to California state court. That decision was appealed to the United States Court of Appeals for the Ninth Circuit, which affirmed the District Court's decision in July 2014. The case was remanded to the Superior Court of California where Wimbledon has since filed a third amended complaint dropping the derivative claims that were asserted against AEF and acknowledging that any claims Wimbledon had against AEF were automatically stayed. Stillwater was dropped from the suit because it entered into liquidation, but a decision as to whether Stillwater will re-join the suit as co-plaintiff through its liquidators is currently pending.

On October 12, 2015, Molner and SCI made an indemnity demand on AEF arising out of the Wimbledon action, requesting that AEF seek an injunction to stay the action against Molner and SCI. AEF responded to this demand by stating that the indemnity demand was not entitled to any administrative priority under applicable bankruptcy law, and that AEF would not seek a stay as to Molner and SCI, but that Molner and SCI were free to seek such a stay if they wished.

### 3.    **The KBC Litigation**

On July 10, 2013, KBC, a company incorporated in the Cayman Islands, filed a creditor's petition for the winding up of AEF (the "Winding Up Petition") to the Grand Court of the Cayman Islands (the "Grand Court"). The Winding Up Petition was based on AEF's alleged non-payment of redemption proceeds in respect of certain share redemptions made by KBC. The Winding Up Petition was served on AEF on July 10, 2013. Later on July 10, 2013, AEF filed proceedings against KBC and certain related entities in the Supreme Court of the State of New York (the "KBC Proceedings"). In the KBC Proceedings, AEF alleged claims against KBC which, if established, would have exceeded the distribution proceeds claimed by KBC against AEF.

On July 24, 2013, AEF filed an affidavit from one of its directors, Roger Hanson, in which AEF relied upon the KBC Proceedings to file a cross-claim and set-off against the distribution proceeds. On August 1, 2013, KBC applied for leave to withdraw its Winding Up Petition in light of the evidence served by AEF on July 24, 2013, on the basis that it would be inappropriate to have AEF's claim to set-off determined by way of winding up proceedings. KBC's application for leave to withdraw the Winding Up Petition was not opposed by AEF except in relation to the issue of which party would pay the legal costs of the Winding Up Petition. The Grand Court granted KBC leave to withdraw the Winding Up Petition, but adjourned the determination of costs to hearings to be held on August 15 and August 28, 2013.

On October 25, 2013, the Grand Court ordered that there should be no order as to the costs of the Winding Up Petition, i.e., both parties would bear their own legal costs ("Grand Court Order"). AEF filed an appeal against the Grand Court Order in the Cayman Islands Court of Appeal (the "Appellate Court") (C.I.C.A. Cause No. 38 of 2013 and Cause No. 95 of 2013 (AJEF)). On May 5, 2014, the Appellate Court allowed the appeal brought by AEF and replaced

the Grand Court Order with an order that KBC was to pay AEF's costs of and incidental to the Winding Up Petition and costs of the appeal, such costs to be taxed if not agreed to by AEF and KBC.

## IV.   EVENTS DURING THE CHAPTER 11 CASES

### A.   Commencement of Chapter 11 Cases

On June 13, 2014, the Debtors commenced their reorganization cases through the filing of voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.  The Chapter 11 Cases are being jointly administered as *In re: Aramid Entertainment Limited*, *et al.* (Case No. 14-11802 (SHL)).  Bankruptcy Judge Sean H. Lane presides over the Chapter 11 Cases.

### B.   Retention of Professionals for the Debtors

The Debtors obtained Bankruptcy Court approval of the retention of (i) Reed Smith LLP as bankruptcy counsel; (ii) Geoffrey Varga and Jess Shakespeare as Crisis Managers; (iii) Irell & Manella LLP as special litigation counsel; (iv) Maples and Calder as special Cayman law counsel; and (v) PKF O'Connor Davies LLP as financial advisors.  The Debtors have filed an application to retain Houlihan Capital Advisors LLC to provide valuation services.

### C.   Post-Petition Settlements

### 1.   <u>The Global Settlement with the Bergstein Parties</u>

By an Order entered on December 23, 2014 (Dkt. Item # 235), the Bankruptcy Court approved the Settlement Agreement, dated as of August 29, 2014, as modified at Dkt. Item # 214-1, which was entered into by and between the Debtors, AEBV, CFH, and their liquidators appointed under the laws of the Cayman Islands; and Sharma (collectively, the "<u>AEF Parties</u>"); Molner; SCIC; ARP; ACP; and GCC (collectively, the "<u>Molner Parties</u>"); Bergstein; Graybox, LLC; Pangea Media Group, LLC; Pangea Media Holdings, Ltd.; TFC Library, LLC; Zoopraxis Film Assets, LLC; Sara Bergstein; and all other non-debtor affiliates of Bergstein (collectively, the "<u>Bergstein Parties</u>"); Tutor; Library Asset Acquisition Corporation, Ltd.; Library Rights Company, Ltd.; Kratos LLC; Black Water Transit Acquisition LLC; Nailed Loan Acquisition Company LLC; and Zelus, LLC (the "<u>Tutor Parties</u>"); and the Tregub Chapter 7 Trustee (together with the AEF Parties, Molner Parties, Bergstein Parties, the "<u>Parties</u>").  This Settlement Agreement sought to resolve various litigations by and between the Parties, including the Bergstein bankruptcy cases, the adversary proceedings filed therein, and certain other actions. Pursuant to the Settlement Agreement, Bergstein has an Allowed $6.0 million Unsecured Claim against AEF and ALTL, although Bergstein is entitled to only one satisfaction of such Claims. On May 27, 2015, in furtherance of the Settlement Agreement, orders dismissing the Bergstein bankruptcy cases were entered.  For the avoidance of doubt, nothing in the Settlement Agreement released any of the AEF Parties' claims against the Molner Parties.

The May 27, 2015 orders are currently on appeal to the United States District Court for the Central District of California, and the Debtors believe that the standard of review is an abuse of discretion.  Pursuant to paragraph 3.9 of the Settlement Agreement, if the district court

reverses the May 27, 2015 orders, then the parties must seek further relief from the United States Bankruptcy Court in the form of an order stating either that: (i) this Agreement shall be null and avoid and the Parties will be placed in the same positions with respect to one another as immediately prior to the Signing Date, including but not limited to the negation of the Releases as provided in Paragraph 3.7.8 above and the disallowance of the Allowed Claim; or (ii) to the extent any or all of the LA Bankruptcy Court Litigations proceed, the AEF Parties shall fully indemnify the Bergstein Parties and/or the Tutor Parties for all costs, legal fees, and/or monetary awards incurred by and/or issued against the Bergstein Parties and/or the Tutor Parties related to the continued prosecution of the LA Bankruptcy Court Litigations. Bergstein, however, may waive such right of indemnification.

## 2.    The Relativity and Fortress Settlements

By an Order entered on February 4, 2015 (Dkt. Item # 268), the Bankruptcy Court approved a settlement agreement between ALTL, Relativity, and certain other parties. Pursuant to the settlement, Relativity paid $750,000 to the Debtors and the settling parties unconditionally and fully released each other from any and all claims whatsoever arising from the Fortress Action.

By an Order entered on July 29, 2015 (Dkt. Item # 422), the Bankruptcy Court approved a settlement agreement ALTL and Fortress. Pursuant to the settlement, Fortress paid $4,000,000 to the Debtors and the settling parties unconditionally and fully released each other from any and all claims whatsoever arising from the Fortress Action. With this settlement, the Fortress Action was fully resolved.

## 3.    The Stroock Settlement

After extensive investigation and analysis, AEF, AEI, ALTL, their respective subsidiaries, and the JVLs (the "Debtor Parties") determined that they had significant claims against Stroock Stroock and Lavan and related parties (the "Stroock Parties") relating to the relentless pursuit of the Molner Litigations and the related Tregub fiasco. The Debtor Parties and Bergstein and certain of his affiliates, Molner, SCIC, ARP, ACP, and GCC, and certain other parties agreed to mediate such claims. The Debtor Parties and the Bergstein parties agreed to present a "unified front" when dealing with the Stroock Parties in order to maximize the recovery to the AEF estate, with the expectation that they would allocate the settlement payment after reaching an agreement with the Stroock Parties. Through mediation, the parties were able to resolve certain claims among them.

Pursuant to the settlement agreement (the "Stroock Settlement Agreement"), the Stroock Parties agreed to pay to the Debtor Parties the sum of $17.5 million (subject to Reed Smith's contingent fee and an allocation between AEF and the Bergstein parties). The Bergstein parties received approximately $2.9 million from the $17.5 million settlement payment pursuant to an agreed allocation. By an Order entered on September 16, 2015, the Bankruptcy Court approved the Stroock Settlement Agreement and the allocation.

4.     <u>**The KBC Litigation**</u>

By an Order entered on July 24, 2015 (Dkt. Item # 421), the Bankruptcy Court approved the Debtors' settlement of their cost recovery claim against KBC relating to the Winding Up Petition. Pursuant to the settlement, the Debtors received Two Hundred Thousand ($200,000) from KBC.

D.     **The Debtors' Motion Picture Related Assets**

As a result of financing activities, one or more of the Debtors (or a subsidiary, such as AEBV) has an interest in the following motion pictures:

- $5 A Day
- All Good Things
- Area 51
- Bad Meat
- Before the Devil Knows You're Dead
- Beyond a Reasonable Doubt
- Bronson
- Cheri
- Choke
- Columbus Day
- Dorian Gray
- Eagle Eye
- Eden Lake
- Edge of Love
- Four Last Songs

- Franklyn
- Genova
- Good
- Guitar Hero
- Helen
- How to Lose Things and Alienate People
- I Come with the Rain
- In the Loop
- Incendiary
- It's Alive
- Love Ranch
- Lucky Ones
- Moon Princess
- My Sexiest Year
- My Talks with Dean Spanley

- Nailed
- New Worlds?
- Paranormal Activity
- Parker
- Secret of Moonacre
- Six Wives
- Skin
- Smashing Machine Marker
- Starstruck / Sounds Like Teen Spirit
- The Crazies
- The Day / Children
- The Return
- Triage
- Ultramarines: Warhammer
- W / Bush

As of the Petition Date, AEF also held security interests in the following motion pictures:

- Shark Night
- The Other Woman
- Blue Valentine
- WER
- The Strangers
- Balls of Fury
- Waist Deep
- The Return
- The Hitcher
- Doomsday
- Black Water Transit

- 29 -

A discussed further below, AEF foreclosed upon its security interest in those motion pictures (except for Black Water Transit) in a transaction with Content Partners Fund 3 SPV1 LP ("Content"). By an Order entered on September 16, 2015 (Dkt. Item # 465), the Bankruptcy Court authorized AEF to exercise its remedies as a junior secured creditor in respect of certain motion pictures that are part of the film library of Incentive Filmed Entertainment LLC ("IFE") and its subsidiaries by issuing the notification of disposition of such motion pictures and related rights pursuant to a "private sale" under Section 9-610 of the Uniform Commercial Code to for the sum of $5,500,000 minus cash received by IFE on or after February 28, 2015 (the "Content Sale Proceeds").

The Content transaction closed as of November 3, 2015. Most of the Content Sale Proceeds (in excess of $4.1 million) was distributed to JP Morgan Chase Bank, N.A. ("JP Morgan"), as agent, in full satisfaction of the senior secured claim on the IFE film library. The balance of the Content Sale Proceeds, $117,471.42 was paid to the Debtors. Importantly, the payoff of JP Morgan's senior secured loan also enables the Debtors to receive the future payments from, among other things, other motion pictures on which JP Morgan, as agent, held a senior lien.

Pursuant to the Global Settlement Agreement, AEF released its lien on the Black Water Transit film and waived any interest in Black Water Transit Acquisition LLC.

### E.    Post-Petition Asset Sales

### 1.    Sierra Transaction

By an Order entered on June 22, 2015 (Dkt. Item # 385), the Bankruptcy Court approved the release of the Debtors' security interests in connection with the sale of IFE's twenty percent (20%) interest in Sierra Pictures, LLC ("Sierra") in exchange for IFE's receipt of up to $2.0 million. Specifically, AEF agreed to sell back its 20% membership interest in Sierra for up to $2.0 million in consideration, payable as follows: (a) $300,000 in cash at closing; (b) $1.45 million pursuant to a three-year promissory note dated April 29, 2015, from Sierra payable to IFE (the "Note"); and (c) up to but not exceeding $250,000 of the purchase price being paid through Sierra's assignment to IFE of all right, title and interest in commissions and royalties due to Sierra from the following films: *Shark Night 3D, Parker and Wer* (collectively, the "Assigned Commissions") until the earlier of the third anniversary of the agreement or the date on which payments on the Assigned Commissions from and after the date of the agreement equal $250,000.

The Note provides for the payment of $1,450,000 in four (4) installments as follows: (i) first installment on August 19, 2015, in the amount of $200,000 and (ii) three (3) annual installments on the first, second and third anniversaries of the date of the Note in the principal amounts of $416,667, $416,667 and $416,666, respectively. Upon the occurrence of an Event of Default (as defined in the Note), IFE or its assignee shall be entitled to elect to receive, in lieu of any money otherwise due under the Note, a membership interest in Sierra representing 0.50% of all membership interests (as of February 1, 2015) in Sierra for each $50,000 of unpaid principal

as of the date of the Event of Default.  If IFE does not timely make such election, the sole remedy of IFE or its assignee shall be to seek recovery of the amounts under the Note.

On or about June 15, 2015, the Sierra transaction closed.  JP Morgan, the senior secured creditor, received the benefit of Sierra's $300,000 payment at closing.  Sierra paid to AEF the August 19, 2015, payment due under the Note.

## 2. Content Transaction

By an Order entered on September 16, 2015 (Dkt. Item # 465), the Bankruptcy Court authorized AEF to exercise its remedies as a junior secured creditor in respect of certain motion pictures that are part of the film library of IFE and its subsidiaries by issuing the notification of disposition of such motion pictures and related rights pursuant to a "private sale" under Section 9-610 of the Uniform Commercial Code to Content for the sum of $5,500,000 minus cash received by IFE on or after February 28, 2015 (the "Content Sale Proceeds").

The Content transaction closed as of November 3, 2015.  Most of the Content Sale Proceeds (in excess of $4.1 million) was distributed to JP Morgan, as agent, in full satisfaction of the senior secured claim on the IFE film library.  The balance of the Content Sale Proceeds, $117,471.42 was paid to the Debtors.  Importantly, the payoff of JP Morgan's senior secured loan also enables the Debtors to receive the future payments from the Note delivered in the Sierra transaction, the cash remaining at IFE, and the future proceeds of other motion pictures on which JP Morgan, as agent, held a senior lien.

## F. Assumption and Rejection of Unexpired Executory Contracts and Leases

As debtors in possession, the Debtors have the right under section 365 of the Bankruptcy Code, subject to the approval of the Bankruptcy Court, to assume, assume and assign or reject executory contracts and unexpired leases.  The Debtors have assumed, as modified, their Administration Services Agreements with Admiral Administration Ltd. to insure the continued provision of administrative services for the Debtors' benefit.

The Debtors are continuing to review their remaining Executory Contracts and Unexpired Leases.  As discussed in Section XI.A.1, except as otherwise provided in the Plan, in any contract, instrument, release or other agreement or document entered into in connection with the Plan or in a Final Order of the Bankruptcy Court, on the Effective Date, pursuant to section 365 of the Bankruptcy Code, the Debtors will be deemed to reject each Executory Contract or Unexpired Lease not previously assumed, assumed and assigned or rejected during the Chapter 11 Cases or pursuant to the Plan, which includes, but is not limited to, the Executory Contracts and Unexpired Leases identified on Exhibit IV.A.1 to the Plan.

Under applicable bankruptcy law, and unless the Bankruptcy Court orders otherwise, the Debtors have until Confirmation of the Plan to decide whether to assume or reject their other Executory Contracts and Unexpired Leases.

### G.    Claims Process and Bar Dates

Pursuant to an order dated September 30, 2014 (the "Bar Date Order"), the Bankruptcy Court established the following bar dates for the filing of proofs of Claim in the Chapter 11 Cases:

- November 10, 2014 as the general bar date for all Claims (the "General Bar Date"), except as noted below;

- December 31, 2014 as the bar date for government units holding Claims against the Debtors;

- the date set forth on any rejection order of an Executory Contract or Unexpired Lease as the bar date for any claims arising from the rejection of the Executory Contract or Unexpired Lease; and

- 30 days after the date that a notice of an amendment to the Schedules is served on a claimant as the bar date for Claims relating to such amendment to the Schedules.

As of the date of this Disclosure Statement, approximately eighty-eight (88) Claims had been Filed against the Debtors, which asserted (including duplicate claims but ignoring unliquidated claims) (a) over $135 million in Claims against AEF; (b) over $91 million in claims against ALTL; and (c) over $61 million in Claims against AEI.[24]  Approximately three Claims relating to prepetition taxes owed by the Debtors were Filed in the alleged amount of $2,246,780 (including duplicate claims).   One alleged Secured Claim in the approximate amount of $1,199,375.12 was Filed.

The Debtors believe that they have valid objections to many of the Claims that have been Filed and, thus, the ultimate allowed amount of such Claims will be significantly less than the asserted amounts (which include duplicate claims).   The Debtors have Filed or intend to File objections to Claims on a number of grounds, which may include, among others, that such Claims: (1) are duplicative of other Claims asserted against the Debtors; (2) were Filed after the applicable bar date; (3) have been amended and superseded by subsequently Filed Claims; (4) were Filed against the wrong Debtor; (5) overstate the Debtors' liability; (6) do not represent a valid obligation of the Debtors; or (7) were asserted with the improper priority status.

### H.    Extension of Exclusive Periods

The Debtors' exclusive right to File a chapter 11 plan was initially scheduled to expire on October 11, 2014.   The Debtors requested multiple extensions of their exclusive filing and solicitation periods.   By an Order dated October 22, 2015, the Bankruptcy Court extended the

---

[24] Each amount includes the $50 million Claim filed by the Tregub Chapter 7 Trustee, which should be withdrawn as the Tregub Chapter 7 Trustee released such claims under the Global Settlement Agreement.

Debtors' exclusive period to File a chapter 11 plan to December 13, 2015, and the Debtors' exclusive period to solicit acceptances thereof until February 13, 2016.

## I.   Impact of Classification of Claims on Subordination Rights

### 1.   <u>Classification of Claims</u>

The classification and manner of satisfying all Claims and Interests under the Plan takes into consideration all subordination rights, whether arising under general principles of equitable subordination, contract, section 510(a) of the Bankruptcy Code or otherwise, that a holder of a Claim or Interest may have against other Claim or Interest holders with respect to any Distribution made pursuant to the Plan.  All subordination rights that a holder of a Claim or Interest may have with respect to any Distribution to be made pursuant to the Plan will be discharged and terminated, and all actions related to the enforcement of such subordination rights will be permanently enjoined.  Accordingly, Distributions pursuant to the Plan to holders of Allowed Claims and Allowed Interests will not be subject to payment to a beneficiary of such terminated subordination rights or to levy, garnishment, attachment or other legal process by a beneficiary of such terminated subordination rights.

### 2.   <u>Settlement</u>

Pursuant to Bankruptcy Rule 9019 and in consideration for the Distributions and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all claims or controversies relating to the subordination rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest or any Distribution to be made pursuant to the Plan on account of any Allowed Claim or Allowed Interest.  The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors and Claim and Interest holders and is fair, equitable and reasonable.

## J.   General Information Concerning Treatment of Claims and Interests

Procedures for the Distribution of Cash and other assets of the Distribution Trust in the Distribution Trust pursuant to the Plan are described in Article V of the Plan or will be set forth in the Distribution Trust Agreement.  The determination of the relative Distributions to be received under the Plan by the holders of Claims in certain Classes was based upon, among other factors, estimates of the amounts of Allowed Claims and Allowed Interests in such Classes and the relative priorities of such Allowed Claims and Allowed Interests.  The Distributions to be received by Creditors or Interest holders in certain Classes could differ materially from these estimates if the estimates prove to be inaccurate.

The "cramdown" provisions of section 1129(b) of the Bankruptcy Code permit confirmation of a chapter 11 plan of reorganization or liquidation in certain circumstances even if the plan is not accepted by all impaired Classes of claims and interests.  The Debtors reserve the right to request Confirmation pursuant to the cramdown provisions of the Bankruptcy Code.  Although the Debtors believe that, if necessary, the Plan could be confirmed under the

cramdown provisions of the Bankruptcy Code, there is no assurance that the requirements of such provisions would be satisfied.

### K.      Special Provisions Relating to the Rights of Setoff of Creditors

Nothing in the Plan will expand or enhance a Creditor's right of setoff, which is determined as of the Petition Date. Nothing in the Plan is intended to, or should be interpreted to, approve any Creditor's effectuation of a postpetition setoff without the consent of the Distribution Trustee unless prior Bankruptcy Court approval has been obtained. Setoff rights of Creditors are discharged pursuant to section 1141 of the Bankruptcy Code.

### L.      Voting on and Confirmation of the Plan

### 1.      Voting Procedures and Requirements

Pursuant to the Bankruptcy Code, only classes of claims against or equity interests in a debtor that are "impaired" under the terms of a plan of liquidation or reorganization are entitled to vote to accept or reject a plan. Generally, a class is "impaired" if the legal, equitable or contractual rights attaching to the claims or interests of that class are modified other than by curing defaults and reinstating maturities. Classes of claims and equity interests that are not impaired are not entitled to vote on a plan and are conclusively presumed to have accepted the plan. Classes of claims and equity interests that receive no distributions under a plan are not entitled to vote on the plan and are deemed to have rejected plan unless such class otherwise indicates acceptance. The classification of Claims and Interests under the Plan is summarized, together with an indication of whether each Class of Claims or Interests is impaired or unimpaired, in Article II above.

Pursuant to section 502 of the Bankruptcy Code and Bankruptcy Rule 3018, the Bankruptcy Court may estimate and temporarily allow a Claim for voting or other purposes. By order of the Bankruptcy Court, certain vote tabulation rules may be approved that temporarily allow or disallow certain Claims for voting purposes only. Any such tabulation rules may be described in the solicitation materials provided with your ballot.

Voting on the Plan by each holder of an impaired Claim or Interest is important. If you hold Claims or Interests in more than one Class, if you hold multiple general unsecured Claims or under certain other circumstances, you may receive more than one ballot. You should complete, sign and return each ballot you receive.

Under the terms of the Plan, holders of Claims and Interests in Classes A-1, A-2, B-1, B-2, B-3, C-1, and C-2 are unimpaired and are deemed to have voted to accept the Plan. Under the terms of the Plan, only Classes A-3, A-4, A-5, A-6, A-7, B-3, B-4, B-5, B-6, C-3, C-4 and C-5 are impaired. Because holders of Claims in Classes A-6, A-7, and B-6 are deemed to have voted to reject the Plan, only holders of Claims in Classes A-3, A-4, A-5, B-3, B-4, B-5, C-3, C-4 and C-5 are entitled to vote on the Plan. If any of the voting Classes votes to reject the Plan, the Debtors reserve the right, in their sole discretion, to seek not to confirm the Plan. If any of the voting Classes votes to reject the Plan, (a) the Debtors may seek to satisfy the requirements for Confirmation of the Plan under the cramdown provisions of section 1129(b) of the Bankruptcy Code and, if required, may amend the Plan to conform to the standards of such section or (b) the

Plan may be modified or withdrawn with respect to a particular Debtor, without affecting the Plan as to other Debtors, or in its entirety.

Please carefully follow all of the instructions contained on the ballot or ballots provided to you with this Disclosure Statement if you are entitled to vote on the Plan. All ballots must be completed and returned in accordance with the instructions provided.

To be counted, your ballot or ballots must be received by the Voting Deadline of **5:00 p.m. (Eastern) on January 19, 2016**. It is of the utmost importance to the Debtors that you vote promptly to accept the Plan.

If you are entitled to vote and you did not receive a ballot, received a damaged ballot or lost your ballot, please call **Geoffrey Varga at (212) 871-2000**.

**Votes cannot be transmitted orally or by facsimile, except in the case of a master ballot submitted by a tabulation agent. Accordingly, you are urged to return your signed and completed ballot, by hand delivery, overnight service or regular U.S. mail, promptly, so that it is <u>received</u> by Geoffrey Varga of Duff & Phelps, LLC, 55 East 52nd Street, 31st Floor, New York, NY 10055, on or before the Voting Deadline.**

Holders of Claims and Interests entitled to vote may withdraw or modify their ballots by delivering (or having their nominee deliver) to Geoffrey Varga prior to the Voting Deadline, a subsequent properly completed and duly executed ballot. After the Voting Deadline, withdrawals of or modifications to ballots will not be permitted (absent the Debtors' written agreement to such withdrawal or modification).

### 2. Confirmation Hearing

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on whether the Debtors have fulfilled the confirmation requirements of section 1129 of the Bankruptcy Code. The Confirmation Hearing has been scheduled for **February 4, 2016, at 11:00 a.m. (Eastern)**. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing. Any objection to the Confirmation must be made in writing and must specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or Interest held by the objector. Any such objections must be Filed and served upon the persons designated in the Bankruptcy Rules or any notice of the Confirmation Hearing and in the manner and by the deadline described therein.

### 3. Confirmation

To confirm the Plan, the Bankruptcy Code requires that the Bankruptcy Court make a series of findings concerning the Plan and the Debtors, including that:

- the Plan has classified Claims and Interests in a permissible manner;

- the Plan complies with the applicable provisions of the Bankruptcy Code;

- the Debtors have complied with the applicable provisions of the Bankruptcy Code;

- the Debtors, as proponents of the Plan, have proposed the Plan in good faith and not by any means forbidden by law;

- adequate information has been disclosed to Creditors and Interest holders as required by section 1125 of the Bankruptcy Code;

- the Plan has been accepted by the requisite votes, except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code, of Creditors and Interest holders;

- the Plan is feasible;

- all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid, or the Plan provides for the payment of such fees on the Effective Date;

- the disclosures required under section 1129(a)(5) of the Bankruptcy Code concerning the identity and affiliations of persons who will serve as officers, directors and voting trustees of the successors to the Debtors have been made; and

- the Plan is in the "best interests" of all holders of Claims or Interests in an impaired Class by providing to Creditors or Interest holders on account of such Claims or Interests property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain in a hypothetical chapter 7 liquidation, unless each holder of a Claim or Interest in such Class has accepted the Plan.

### 4.    Acceptance or Cramdown

A plan is accepted by an impaired class of claims if holders of at least two-thirds in dollar amount and a majority in number of allowed claims of that class vote to accept the plan. A plan is accepted by an impaired class of interests if holders of at least two-thirds in amount of the allowed interests of that class vote to accept the plan. Only those holders of claims or interest who actually vote (and are entitled to vote) to accept or to reject a plan count in this tabulation.

In addition to this voting requirement, section 1129 of the Bankruptcy Code requires that a plan be accepted by each holder of a claim or interest in an impaired class or that the plan otherwise be found by the Bankruptcy Court to be in the best interests of each holder of a claim or interest in an impaired class.

The Bankruptcy Code contains provisions for confirmation of a plan even if it is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it. These so called "cramdown" provisions are set forth in section 1129(b) of the Bankruptcy Code. As indicated above, the Plan may be confirmed under the cramdown provisions if, in addition to

satisfying the other requirements of section 1129 of the Bankruptcy Code, it (a) is "fair and equitable" and (b) "does not discriminate unfairly" with respect to each Class of Claims or Interests that is impaired under, and has not accepted, the Plan. The "fair and equitable" standard, also known as the "absolute priority rule," requires, among other things, that, unless a dissenting Class of Unsecured Claims or a Class of Interests with respect to a debtor receives full compensation for its Allowed Claims or Allowed Interests, no holder of Allowed Claims or Allowed Interests with respect to such debtor in any junior Class may receive or retain any property on account of such Claims or Interests. The "fair and equitable" standard has also been interpreted to prohibit any Class senior to a dissenting Class from receiving under a plan more than 100% of the amount of their Allowed Claims or Allowed Interests. The Debtors believe that, if necessary, the Plan may be crammed down over the dissent of certain Classes of Claims or Classes of Interests, in view of the treatment proposed for such Classes.

The requirement that the Plan not "discriminate unfairly" means, among other things, that a dissenting Class must be treated substantially equally with respect to other Classes of equal rank. The Debtors do not believe that the Plan unfairly discriminates against any Class that may not accept or otherwise consent to the Plan.

Any Classes of Claims or Interests that receive nothing under the Plan are deemed to be dissenting Classes. As a result, in addition to any Class that does not vote to accept the Plan, the Debtors will, to the extent required, seek to use the "cramdown" provisions described above in respect to the Claims and Interests.

## 5.    Feasibility

In connection with Confirmation of the Plan, the Bankruptcy Court would have to determine that the Plan is feasible pursuant to section 1129(a)(11) of the Bankruptcy Code, which requires that the Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors (unless such liquidation or reorganization is proposed by the Plan). Because the Debtors' Plan proposes a liquidation of all of their assets, for purposes of this test the Debtors believe that the Distribution Trust will have sufficient assets to make the payments to accomplish its tasks under the Plan. A report setting forth the Debtors' analysis in this regard is attached hereto as Exhibit B. Therefore, the Debtors believe that their liquidation pursuant to the Plan meets the feasibility requirements of the Bankruptcy Code.

## 6.    Best Interests Test; Chapter 7 Liquidation Analysis

Notwithstanding acceptance of the Plan by each impaired Class, to confirm the Plan, the Bankruptcy Court must determine that the Plan is in the best interests of each holder of a Claim or Interest in any such impaired Class that has not voted to accept the Plan. Accordingly, if an impaired Class does not accept the Plan, the "best interests" test requires that the Bankruptcy Court find that the Plan provides to each member of such impaired Class a recovery on account of the member's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the distribution that each such member would receive if the applicable Debtor or Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

To estimate what members of each impaired Class of Claims or Interests would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code, the Bankruptcy Court must first determine the aggregate dollar amount that would be available if each of the Chapter 11 Cases were converted to a chapter 7 case under the Bankruptcy Code and each of the respective Debtor's assets were liquidated by a chapter 7 trustee (the "Liquidation Value"). The Liquidation Value of a Debtor would consist of the net proceeds from the disposition of the assets of the Debtor plus any cash held by the Debtor.

As these Chapter 11 Cases are now liquidating cases and the Plan is a liquidating plan, the Liquidation Value available to holders of Claims and Interests would be similar in many ways to the amounts expected to be available for Distribution under the Plan. The Debtors' costs of liquidation in chapter 7 cases would include the compensation of trustees, as well as of counsel and of other professionals retained by such trustees, asset disposition expenses, applicable Taxes, litigation costs, Claims arising from the operation of the Debtors during the pendency of the chapter 7 cases and all unpaid Administrative Claims incurred by the Debtors during the Chapter 11 Cases that are allowed in the chapter 7 cases. Priority Claims and Priority Tax Claims would be paid in full out of the net liquidation proceeds, after payment of Secured Claims, before the balance would be made available to pay Allowed Unsecured Claims or to make any Distribution in respect of Allowed Interests.

The information contained in the Liquidation Analysis attached as Exhibit B provides a summary of the Liquidation Values of the Debtors' interests in property, assuming a chapter 7 liquidation in which one or more trustees appointed by the Bankruptcy Court would liquidate each of the Debtors' properties and interests in property. The Debtors' estimate that a chapter 7 trustee would incur approximately 20% more in costs of liquidation than would the Debtors under the Plan.

In summary, based upon the Liquidation Analysis, while liquidation under chapter 7 is not entirely different from the liquidation proposed by the Plan, the Debtors believe that chapter 7 liquidations of the Debtors would result in a potentially significant diminution in the value to be realized by holders of Claims and Interests, as compared to the proposed Distributions under the Plan. The principal differences in estimated proceeds available for general unsecured Creditors and Interest holders in a chapter 7 liquidation from the Distributions and recoveries estimated in the Plan are (a) estimated chapter 7 trustee fees, and (b) the time and expense the chapter 7 trustee's professionals would incur in "getting up to speed." The delay during which a chapter 7 trustee "gets up to speed" could affect negatively the value of the Debtors' assets. The Liquidation Analysis demonstrates that, in a chapter 7 liquidation, holders of certain Claims and Interests would receive lower recoveries. In addition, while not accounted for in the Liquidation Analysis, the Debtors believe that they are better positioned to maximize the value of certain of their assets and minimize Allowed Claims due to their familiarity with the Debtors' businesses. Although the liquidation analysis does not contain expected recoveries from litigation or the related expenses, the Debtors have already demonstrated an ability to effectively manage and prosecute significant claims and causes of action. Consequently, the Debtors believe that the Plan will provide a greater ultimate return to holders of Claims and Interests and provide greater certainty to such return as compared to a chapter 7 liquidation.

### 7.    Compliance with Applicable Provisions of the Bankruptcy Code

Section 1129(a)(1) of the Bankruptcy Code requires that the Plan comply with the applicable provisions of the Bankruptcy Code.  The Debtors have considered each of these issues in the development of the Plan, believe that the Plan complies with all provisions of the Bankruptcy Code and will File a brief in support of Confirmation of the Plan prior to the Confirmation Hearing.

### 8.    Alternatives to Confirmation and Consummation of the Plan

The Debtors have evaluated alternatives to the Plan, including alternative structures and terms of liquidation for the Debtors.  While the Debtors have concluded that the Plan is the best alternative and will maximize recoveries by holders of Claims and Interests, if the Plan is not confirmed, the Debtors, individually or collectively, or (subject to the Debtors' exclusive periods under the Bankruptcy Code to File and solicit acceptances of a plan or plans of liquidation) any other party in interest in the Chapter 11 Cases could attempt to formulate and propose a different plan or different plans of liquidation.  Further, if no plan of liquidation under chapter 11 of the Bankruptcy Code can be confirmed, the Chapter 11 Cases may be converted to chapter 7 cases.  In a liquidation case under chapter 7 of the Bankruptcy Code, a trustee or trustees would be appointed to liquidate the remaining assets of each Debtor and distribute proceeds to Creditors and Interest holders.  The net proceeds of the liquidation would be distributed in accordance with the priorities established by the Bankruptcy Code.  For further discussion of the potential impact on the Debtors of the conversion of the Chapter 11 Cases to chapter 7 liquidations, see Section IV.K.6.  The Debtors believe that Confirmation and consummation of the Plan is preferable to the available alternatives.

### M.    Conditions Precedent to the Effective Date of the Plan

### 1.    Conditions to the Effective Date

The Effective Date will not occur and the Plan will not be consummated unless and until each of the following conditions have been satisfied or duly waived:

- The Bankruptcy Court shall have entered the Confirmation Order.

- The Bankruptcy Court shall have entered an order (contemplated to be part of the Confirmation Order) approving and authorizing the Debtors to take all actions necessary or appropriate to implement the Plan, including the assets of the Debtors to the Distribution Trust and the implementation and consummation of any contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan.

- The Distribution Trust Agreement shall be executed, the Distribution Trust shall be created and the Distribution Trustee shall have been appointed and accepted such appointment.

- The Trust Accounts shall be created.

- The Plan and all exhibits to the Plan shall have been Filed and shall not have been materially amended, altered or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration or modification has been made in accordance with Section IX.A of the Plan.

### 2.    Waiver of Conditions to Confirmation or the Effective Date

Certain conditions to Confirmation and the Effective Date set forth in Article VII of the Plan may be waived in whole or part at any time by the Debtors without an order of the Bankruptcy Court.

### 3.    Effect of Nonoccurrence of Conditions to the Effective Date

If each of the conditions to the Effective Date is not satisfied or duly waived in accordance with Section VII.C. of the Plan within 60 days of the entry of the Confirmation Order, then upon motion by the Debtors or any party in interest made before the time that each of such conditions has been satisfied and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order may be vacated by the Bankruptcy Court; *provided, however*, that, notwithstanding the Filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is satisfied or waived before the Bankruptcy Court enters an order granting such motion.  If the Confirmation Order is vacated pursuant to Section VII.D. of the Plan, then (a) the Plan will be null and void in all respects and (b) the Distribution Trust will be deemed to be dissolved.

### 4.    Request for Waiver of Stay of Confirmation Order

The Plan will serve as a motion seeking a waiver of the stay of the Confirmation Order imposed by Bankruptcy Rule 3020(e).  Any objection to this request for waiver will be Filed with the Bankruptcy Court and served on the parties listed in Section VII.E. of the Plan on or before the Voting Deadline, or such other date as may be fixed by the Bankruptcy Court.  In the event any such objections are timely Filed, a hearing with respect thereto will occur at the Confirmation Hearing.

### 5.    Modification of the Plan

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code, the Debtors reserve the right to alter, amend or modify the Plan before the Effective Date.

### 6.    Revocation of the Plan

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan, or if Confirmation does not occur, then the Plan will be null and void in all respects, and nothing contained in the Plan will (a) constitute a waiver or release of any Claims by or against, or any Interests in, any Debtor; (b) prejudice in any manner the rights of any Debtor or any other party in interest; or (c) constitute an admission by any Debtor or any other party in interest.

## V.    THE DISTRIBUTION TRUST CREATED PURSUANT TO THE PLAN

### A.    Distribution Trust Generally

On or prior to the Effective Date, the Distribution Trust will be established pursuant to the Distribution Trust Agreement for the purpose of liquidating the assets contributed to the Distribution Trust, resolving all Disputed Claims and Disputed Interests, pursuing any Recovery Actions, making all Distributions to holders of Allowed Claims and Allowed Interests in accordance with the terms of the Plan and otherwise implementing the Plan and administering the Debtors' Estates.  Subject to and to the extent set forth in the Plan, the Confirmation Order, the Distribution Trust Agreement or other agreement (or any other order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan), the Distribution Trust (and the Distribution Trustee) will be empowered to:

- effect all actions and execute all agreements, instruments and other documents necessary to implement the Plan;

- establish, maintain and administer the Trust Accounts, which will be segregated to the extent appropriate in accordance with the Plan;

- accept, preserve, receive, collect, manage, invest, supervise, prosecute, settle and protect the assets of the Distribution Trust (directly or through its professionals or a Third-Party Disbursing Agent), in accordance with the Plan;

- sell, liquidate, transfer, distribute or otherwise dispose of the assets of the Distribution Trust (directly or through its professionals or a Third-Party Disbursing Agent) or any part thereof or any interest therein upon such terms as the Distribution Trustee determines to be necessary, appropriate or desirable;

- dissolve, wind down or liquidate any non-Debtor entity in which the Debtors have an equity interest, including, if determined to be appropriate in the judgment of the Distribution Trustee, authorizing the commencement of insolvency proceedings for any such non-Debtor entity in an appropriate forum;

- calculate and make Distributions to holders of Allowed Claims and Allowed Interests pursuant to the procedures for allowing Claims and Interests and making Distributions prescribed in the Plan;

- comply with the Plan and exercise the Distribution Trustee's rights and fulfill its obligations thereunder;

- review, reconcile, settle or object to Claims and Interests and resolve such objections as set forth in the Plan;

- pursue Recovery Actions and other claims and causes of action that are transferred to the Distribution Trust to the extent that their pursuit would likely

result in a material economic benefit to Creditor-beneficiaries of the Distribution Trust, in its sole discretion;

- retain, compensate and employ professionals to represent the Distribution Trustee with respect to its responsibilities;

- file appropriate Tax returns and other reports on behalf of the Distribution Trust and the Debtors and pay Taxes or other obligations owed by the Distribution Trust and the Debtors;

- exercise such other powers as may be vested in the Distribution Trustee under the Distribution Trust Agreement or the Plan, or as deemed by the Distribution Trustee to be necessary and proper to implement the provisions of the Plan and the Distribution Trust Agreement;

- take such actions as are necessary or appropriate to close, dismiss, or convert any or all of the Chapter 11 Cases; and

- dissolve the Distribution Trust in accordance with the terms of the Distribution Trust Agreement.

Notwithstanding anything to the contrary described in this Section VII.A, the Distribution Trust's primary purpose is liquidating the assets transferred to it by the Debtors, with no objective to continue or engage in the conduct of a trade or business except to the extent consistent with the trust's liquidating purpose and reasonably necessary to conserve and protect such assets and provide for the orderly liquidation thereof.

### B.    Funding of and Transfer of Assets Into the Distribution Trust

Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, other than rights under any Executory Contract or Unexpired Lease that is being rejected pursuant to the Plan, the Debtors will transfer all assets, property, interests, rights, claims, causes of action and defenses remaining in their Estates to the Distribution Trust, including their equity or ownership interest in non-Debtor subsidiaries, and all such assets will vest in the Distribution Trust, to be administered by the Distribution Trustee in accordance with the Plan and the Distribution Trust Agreement.  The assets will be transferred to and vest in the Distribution Trust on the Effective Date, free and clear of all Liens, except as set forth in Section III.I of the Plan.

The Distribution Trustee will have the authority to create sub-accounts or sub-trusts within the Distribution Trust, which may have a separate legal existence, and which will be considered sub-accounts or sub-trusts of the Trust Account, and into which the Distribution Trustee may deposit any non-Cash property, including real or personal property pending its liquidation.  Such sub-accounts or sub-trusts may hold legal title to such property.  Once liquidated, any Cash proceeds of such sub-accounts or sub-trusts will be deposited directly into the Trust Account.

The act of transferring assets and rights to the Distribution Trust, as authorized by the Plan, will not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Distribution Trust as if the asset or right was still held by the applicable Debtor. Without limiting the foregoing, the Distribution Trust will be deemed to be the assignee of any financing statements and other security or perfection documents relating to any loans transferred to the Distribution Trust. The Distribution Trust will not be required to file any amendments to such financing statements or other security or perfection documents to perfect, or to maintain the perfection of, any security interest or lien in favor of any of the Debtors or the Distribution Trust (as the Debtors' successor in interest) with respect to the collateral for any loans transferred to the Distribution Trust.

### C.    Distribution Trustee

Geoff Varga and Jess Shakespeare, together, will serve as the initial Distribution Trustee. The Distribution Trustee will be formally identified through the filing of Exhibit III.C.3 to the Plan no later than 10 days prior to the Confirmation Hearing.

The Distribution Trustee will be the successor to and representative of the Estate of each of the Debtors appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code. The powers, rights and responsibilities of the Distribution Trustee will be specified in the Distribution Trust Agreement and will include the authority and responsibility to fulfill the items identified in Section III.C.1 of the Plan. Other rights and duties of the Distribution Trustee and the beneficiaries of the Distribution Trust will be as set forth in the Distribution Trust Agreement.

### D.    Distribution Trust Agreement

The initial Distribution Trust Agreement generally will provide for, among other things: (1) the payment of reasonable compensation to the Distribution Trustee; (2) the payment of other expenses of the Distribution Trust, including the fees, expenses and costs of pursuing the claims assigned to the Distribution Trust; (3) the retention of counsel, accountants, financial advisors or other professionals and the payment of their compensation; (4) the investment of Cash by the Distribution Trustee within certain limitations; (5) the preparation and filing of appropriate Tax returns and other reports on behalf of the Distribution Trust and the Debtors and the payment of Taxes or other obligations owed by the Distribution Trust and the Debtors; (6) the maintenance (if appropriate) of any going concern vested in the Distribution Trust (subject to the limitations described therein and in the Plan); (7) the orderly liquidation of the Distribution Trust's assets; and (8) the litigation, settlement, abandonment or dismissal of the Recovery Actions and any other claims, rights or causes of action assigned to the Distribution Trust.

### E.    Reports to be Filed by the Distribution Trustee

The Distribution Trustee, on behalf of the Distribution Trust, will File with the Bankruptcy Court (and provide to any other party entitled to receive any such report pursuant to the Distribution Trust Agreement), no later than 60 days after December 31 of each calendar year, an annual report regarding the administration of property subject to its ownership and control pursuant to the Plan, Distributions made by it and other matters relating to the implementation of the Plan.

### F.    Fees and Expenses of the Distribution Trust

Distribution Trust Expenses will be paid from the Distribution Trust as required, at the direction of the Distribution Trustee.

In addition, the Distribution Trustee, on behalf of the Distribution Trust, may employ, without further order of the Bankruptcy Court, professionals (including professionals previously employed by the Debtors to assist in carrying out its duties under the Plan and may compensate and reimburse the expenses of these professionals from the Trust Account, based upon the nature of the work performed by such professional, without further order of the Bankruptcy Court, subject to the above limitations and any procedures established by the Distribution Trust Agreement.

### G.    Indemnification

The Distribution Trust Agreement may include reasonable and customary indemnification provisions for the benefit of the Distribution Trustee and/or other parties. Any such indemnification will be the sole responsibility of the Distribution Trust and payable solely from the assets of the Distribution Trust.

### H.    Tax Treatment

Except to the extent the Distribution Trust Assets are allocable to the Disputed Claim or Disputed Interest reserve, consistent with the principles of Revenue Procedure 94-45, 1994-2 C.B. 684, as of the Effective Date, for all federal, state, and local income tax purposes, all parties (including without limitation, the Debtors, the Distribution Trustee and the beneficiaries of the Distribution Trust) shall treat the transfer of the Distribution Trust Assets to the Distribution Trust in the following manner: (i) the Debtors will be deemed to have transferred the Distribution Trust Assets directly to the beneficiaries of the Distribution Trust in proportion to their respective interests in the Distribution Trust; (ii) such beneficiaries will be deemed to have transferred the Distribution Trust Assets to the Distribution Trust in exchange for their respective interests in the Distribution Trust; (iii) the Distribution Trust will be treated as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d), and as a "grantor trust" pursuant to sections 671 through 679 of the IRC; and (iv) the Beneficiaries will be treated as the "grantors" of the Distribution Trust. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

As soon as reasonably possible after the Effective Date, the Distribution Trustee shall determine the fair market value of each Distribution Trust Asset other than Cash based on a good faith determination, a review of the records of the Debtors and the advice of any professional retained by the Distribution Trustee for this purpose. The Distribution Trustee shall then, as soon as reasonably practicable after such determination, notify each beneficiary of the Distribution Trust of the estimated value of such holder's interest in the Distribution Trust. The Debtors, the Distribution Trustee and the beneficiaries of the Distribution Trust shall consistently use such values for all federal, state, and local income tax purposes.

The beneficiaries of the Distribution Trust shall be treated for tax purposes as the grantors and deemed owners of their respective share of the Distribution Trust. As such, the beneficiaries

of the Distribution Trust shall include in their taxable income their respective shares of each item of the Distribution Trust's income, gain, deduction, loss and credit.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Distribution Trustee shall: (i) either timely elect to treat any Distribution Trust Assets allocable to a Disputed Claim or Disputed Interest reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 or, if permitted under applicable law, treat such Distribution Trust Assets as one or more "complex trusts," and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. All parties (including the Distribution Trustee and the beneficiaries of the Distribution Trust) shall report for federal, state, and local income tax purposes consistently with the foregoing.

## I.      Settlement of Claims

Except as otherwise provided in the Plan or the Distribution Trust Agreement, on and after the Effective Date, the Distribution Trustee may compromise or settle any Claims or Interests without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and may pay the charges that it incurs on or after the Effective Date for Distribution Trust Expenses, professionals' fees, disbursements, expenses or related support services (including fees relating to the preparation of Professional fee applications) without application to the Bankruptcy Court.

## J.      Sales of Assets by Distribution Trust

In connection with the sale, liquidation, transfer, distribution or disposition of the assets of the Distribution Trust by the Distribution Trustee, the Distribution Trustee will deposit any proceeds of the litigation or settlement of Recovery Actions and the net proceeds of all other sales, liquidations, transfers or other dispositions into the Trust Account.  The Distribution Trustee may conduct any sales (including public or private foreclosure sales with respect to collateral for any loans transferred to the Trust) or liquidations of non-Cash assets from the Distribution Trust on any terms it deems reasonable, without further order of the Bankruptcy Court.  Any such public or private foreclosure sale on at least ten (10) calendar days' notice is deemed to be "commercially reasonable."

## K.      Maintenance of Businesses by Distribution Trustee

Notwithstanding anything in Section III.C.1 of the Plan, the Distribution Trustee will not be permitted to operate any businesses owned by the Distribution Trust as operating businesses unless the Distribution Trustee reasonably believes that (1)(a) such business operations will either be profitable or (b) the maintenance of the businesses will otherwise be in the best interests of the beneficiaries of the Distribution Trust, considered as a whole; and (2) the maintenance of the business is consistent with the Distribution Trust's liquidating purpose and reasonably necessary to conserve and protect such assets and provide for the orderly liquidation thereof.

L.      **Creation and Maintenance of Trust Accounts and Distribution Trust Pools**

1.      **Creation of Trust Accounts**

On or prior to the Effective Date, appropriate Trust Accounts will be established and maintained in one or more federally insured domestic banks in the name of the Distribution Trust or the Distribution Trustee or, if applicable and appropriate, the Third-Party Disbursing Agent. The number and nature of any Trust Accounts will be determined by the Distribution Trustee. To effect Distributions, the Distribution Trustee may establish and maintain multiple Trust Accounts.

2.      **Additional Funding of Trust Accounts**

After the funding of the Trust Accounts on the Effective Date, each Trust Account will continue to be funded by the transfer of Cash through litigation or via the sale or dispositions of assets.  Cash deposited in the Trust Accounts will be invested, held and used as provided in the Distribution Trust Agreement or as otherwise determined by the Distribution Trustee.

3.      **Closure of Trust Accounts**

Upon final administration of the Distribution Trust, the Trust Accounts may be closed.

## VI.   RISK FACTORS

Prior to voting on the Plan, each holder of a Claim or Interest entitled to vote should consider carefully the risk factors described below, as well as all of the information contained in this Disclosure Statement, including the exhibits hereto.  These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation.  See Section X for a discussion of certain tax considerations.

A.      **Allowance of Claims**

This Disclosure Statement has been prepared based on a preliminary review of certain of the Filed Claims and Interests and the Debtors' books and records.  Upon completion of more-detailed analysis of Filed Claims and Interests, the actual amount of Allowed Claims and Allowed Interests may differ materially from the Debtors' current estimates.

The Debtors believe that they have valid objections to a majority of the Claims that have been Filed and, thus, the ultimate allowed amount of such Claims will be significantly less than the asserted amounts.  Because the claim reconciliation and objection process has recently begun, the amount of Disputed Claims currently is material.  If Disputed Claims (or a meaningful portion thereof) become Allowed Claims, the ultimate amount of Allowed Claims in these cases could materially exceed the Debtors' estimates in the development of the Plan as set forth in the table in Section II.B.

Approximately $70 million in Claims have been asserted against the Debtors by Interest holders of ALTL.  These alleged Claims assert creditor status based on allegedly complete, crystallized redemptions under Cayman law or some other basis, such as an alleged improper

compulsory *in specie* redemption by AEF. The Debtors have objected to these Claims and believe that they should be disallowed, recharacterized as equity interests, or subordinated pursuant to section 510(b) of the Bankruptcy Code.

The IRS filed "protective claims" against AEF and ALTL for alleged income taxes in the total amount of $58,143.23, including a Priority amount of $20,575.90 and a general unsecured amount of $37,567.33. The IRS alleges that AEF and ALTL, Cayman Islands' entities, are liable for United States Taxes. The Debtors have objected to the IRS' Claims and believe they should be disallowed.

The IRS also filed a proof of Claim against AEI for alleged income taxes in the amount of $1,943,139.16, which includes a Priority amount of $1,638,768.16 and a general unsecured amount of $304,371.00. The Debtors have filed (or will shortly file) an amended tax return for AEI and expect that the IRS may withdraw the Claim. The Debtors, however, filed an objection to the Claim and a request for the Bankruptcy Court to determine under section 505 of the Bankruptcy Code that AEI actually incurred a loss in excess of $900,000 for calendar year 2012.

In addition, the NYC Department of Finance filed proofs of Claim against AEF and AEI alleging a $245,500 Priority Tax Claim consisting of $45,000 for general corporate tax, $91,000 for commercial rent tax, and interest and penalties thereon. The Debtors expect that the Claim will be withdrawn as none of the Debtors conducted business in New York City. If not withdrawn, the Debtors expect that the Claim will be disallowed.

The Debtors also believe that approximately $58.7 million in Claims (ignoring duplication and similar "unliquidated" Claims) Filed against the Debtors for alleged indemnification should be disallowed (if not withdrawn). Those claims include the $50 million Claim Filed by the Tregub Chapter 7 Trustee, and Claims Filed by Molner, Sharma, ACP, ARP, SCIC, and GCC. The $50 million Claim Filed by the Tregub Chapter 7 Trustee was released in the Settlement Agreement. Thus, the Debtors expect that Claim to be withdrawn. Although the Debtors have objected or will object to each of those Claims (if they are not withdrawn) and believe that such Claims should be disallowed in full on other grounds, if such Claims are not disallowed but rather are equitably subordinated under section 510(c) of the Bankruptcy Code, that will substantially reduce or eliminate Distributions on account of Allowed Interests.

There can be no assurance, however, that the Debtors will be successful in litigating the Claims objections described above or the extent of such success. In addition, the Debtors' estimates of the likely aggregate Allowed Priority Claims, Allowed Administrative Claims or Allowed Secured Claims may prove to be inaccurate. The outcome of Claims objection litigation and the accuracy of the Debtors' good faith Claim and Interest estimates largely will determine the amount of Cash available for Distribution to holders of Allowed Claims and Allowed Interests in Classes A-3, A-4, A-5, B-3, B-4, B-5, C-3, C-4 and C-5. Thus, any lack of success in Claims objection litigation or significant inaccuracy in the Debtors' Claim and Interests estimates could materially reduce or eliminate recoveries on account of such Allowed Claims and Allowed Interests.

An additional risk factor relates to the amount of Allowed Unsecured Claims. Several Unsecured Claims have been asserted in unliquidated amounts or as contingent. The Debtors

believe that substantial and material objections to many of these Claims exist. If the Debtors' estimates of Allowed Unsecured Claims are too low, the Cash available for Pro Rata Distribution on account of Allowed Claims and Allowed Interests will be distributed over a greater number of claimants and a higher Claims and Interests total, thus diluting or eliminating recoveries to holders of Allowed Claims and Allowed Interests in Classes A-3, A-4, A-5, B-3, B-4, B-5, C-3, C-4 and C-5.

### B.    Risk of Non-Confirmation of the Plan

Even if all impaired Classes accept or could be deemed to accept the Plan, the Plan may not be confirmed by the Bankruptcy Court. Section 1129 of the Bankruptcy Code, which sets forth the requirements for Confirmation, requires, among other things: (1) that Confirmation not be followed by a need for further reorganization or liquidation (i.e., that the Plan is "feasible"); (2) that the value of Distributions to dissenting holders not be less than the value of Distributions to such holders if the Debtors were liquidated under chapter 7 of the Bankruptcy Code; and (3) that the Plan and the Debtors otherwise comply with the applicable provisions of the Bankruptcy Code. Although the Debtors believe that the Plan will meet all of the applicable requirements, there can be no assurance that the Bankruptcy Court will reach the same conclusion. See Section II.H.3 for additional information regarding the requirements for Confirmation.

### C.    Nonconsensual Confirmation

Pursuant to the "cramdown" provisions of section 1129 of the Bankruptcy Code, the Bankruptcy Court can confirm the Plan at the Debtors' request if, excluding the acceptance of any "insider," at least one impaired Class of Claims or Interests has accepted the Plan and the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each impaired Class that has not accepted the Plan.

The Debtors reserve the right to modify the terms of the Plan, as necessary, to seek Confirmation without the acceptance of all impaired Classes. Such modification could result in less favorable treatment for non-accepting Classes of Claims or Interests than the treatment currently provided for in the Plan. Further, in the event an impaired Class of Claims or Interests fails to approve the Plan, the Debtors may determine, in their sole discretion, not to seek Confirmation of the Plan.

### D.    Delays in Confirmation or Effective Date

Any delay in Confirmation or the effectiveness of the Plan could result in, among other things, increased Administrative Claims. Increased Administrative Claims and any other negative effects of a delay in Confirmation or the effectiveness of the Plan could endanger the ultimate approval of the Plan by the Bankruptcy Court.

### E.    Litigation Risks

The ultimate amount of Cash available for Distribution to holders of Allowed Claims and Allowed Interests in Classes A-3, A-4, A-5, B-3, B-4, B-5, C-3, C-4 and C-5 also will be affected by the performance and relative success of the Distribution Trustee in pursuing claims and causes of action, including without limitation, Recovery Actions, and selling or otherwise

disposing of other assets of the Debtors and the Distribution Trust. The less successful the Distribution Trustee is in pursuing such claims or liquidating such assets, the less Cash there will be available for Distribution to satisfy Allowed Claims and Allowed Interests in such Classes. The Debtors have not assumed any recovery on account of potential Recovery Actions in estimating the recoveries to Allowed Claims and Allowed Interests.

### F.    Distribution Trust Expenses

The ultimate amount of Cash available to distribute on account of the Allowed Claims and Allowed Interests in Classes A-3, A-4, A-5, B-3, B-4, B-5, C-3, C-4 and C-5 depends, in part, on the manner in which the Distribution Trustee operates the Distribution Trust and the expenses the Distribution Trustee incurs. The expenses of the Distribution Trustee will be given priority over Distributions to holders of Claims and Interests in such Classes. As a result, if the Distribution Trustee incurs professional or other expenses in excess of current expectations, the amount of Cash remaining to satisfy Allowed Claims and Allowed Interests in such Classes will decrease.

### G.    Avoidance Actions

In accordance with section 1123(b) of the Bankruptcy Code, even after Confirmation of the Plan, the Distribution Trustee will retain and may enforce any claims, demands, rights and causes of action that the Estates may have against any person or entity, including claims for preference, fraudulent conveyance and setoff. In pursuing any such claims, the Distribution Trustee will act in the best interest of the Estates. Accordingly, a holder of a Claim may be subject to one or more such claims brought by the Distribution Trustee, even if such holder has voted in favor of the Plan. All of the Debtors' claims and causes of action, including without limitation, the Recovery Actions are transferred to the Distribution Trust and preserved for its beneficiaries. Except to the extent (if an) expressly provided otherwise in the Plan, no claim or cause of action is waived or released under the Plan.

### H.    Securities Laws Considerations Regarding Trust Interests

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan from registration under the Securities Act and state securities laws if three principal requirements are satisfied: (1) the securities must be offered and sold under a plan and must be securities of the debtor, an affiliate participating in a joint plan with the debtor or a successor to the debtor under the plan; (2) the recipients of the securities must hold a prepetition or administrative expense claim against the debtor or an interest in the debtor; and (3) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in such exchange and partly for cash or property. To the extent (if any) that the rights to Distributions from the Distribution Trust are deemed to constitute securities issued in accordance with the Plan, the Debtors believe that such interests satisfy the requirements of section 1145(a)(1) of the Bankruptcy Code and, therefore, such interests are exempt from registration under the Securities Act and applicable state securities laws.

1.      **Non-Transferability of Trust Interests**

Holders of Claims and Interests receiving the rights to Distributions from the Distribution Trust should be aware that such interests are not transferable as of right.  Absent the Distribution Trustee's consent, there will not be a trading market for such interests, nor will such interests be listed on any public exchange or other market.  The lack of liquidity of such interests may have a negative impact on their value.

2.      **Uncertainty of Value of Trust Interests**

In addition to the prohibition on the transfer of the rights to Distributions from the Distribution Trust, the value of such interests will depend on various significant risks and uncertainties, including, without limitation, (a) the success of the Distribution Trust in securing judgments and settlements on a favorable basis with respect to claims that the trust is pursuing, (b) the effect of substantial delays in liquidating the assets not sold in the prior to the Effective Date and liquidating the remaining claims and other contingent assets and liabilities and (c) the effects of any changes in tax and other government rules and regulations applicable to the Distribution Trust.  These risks, in part, are beyond the control of the Distribution Trustee.  The amount of any recovery realized by the Distribution Trust and its beneficiaries will vary depending upon the extent to which these risks materialize.  In addition, the resolution of the claims held by the Distribution Trust may require a substantial amount of time to be resolved and liquidated.  The associated delays could reduce the value of any recovery.

## VII.    DISTRIBUTIONS UNDER THE PLAN

A.      **Payment of Administrative Claims**

1.      **Administrative Claims in General**

Except as otherwise specified in Section II.A.1 of the Plan, and subject to the bar date provisions therein, unless otherwise agreed by the holder of an Administrative Claim and the applicable Debtor or the Distribution Trustee, or unless an order of the Bankruptcy Court provides otherwise, each holder of an Allowed Administrative Claim will receive from the Debtors or the Distribution Trustee, in full satisfaction of its Administrative Claim, Cash equal to the amount of such Allowed Administrative Claim either (a) on the Effective Date or (b) if the Administrative Claim is not allowed as of the Effective Date, within 60 days after the date on which such Administrative Claim becomes an Allowed Administrative Claim.

2.      **Statutory Fees**

On or before the Effective Date, Administrative Claims for fees payable pursuant to 28 U.S.C.  § 1930 will be paid by the Debtors in Cash equal to the amount of such Administrative Claims.  Fees payable pursuant to 28 U.S.C. § 1930 for each Debtor's Estate after the Effective Date will be paid from the Distribution Trust by the Distribution Trustee as Distribution Trust Expenses in accordance therewith until the closing of the applicable Chapter 11 Case pursuant to section 350(a) of the Bankruptcy Code.

### 3.    Bar Dates for Administrative Claims

#### a.    General Administrative Claim Bar Date Provisions

Unless previously Filed or as otherwise governed by the Bar Date Order or in another order of the Bankruptcy Court, motions for payment of Administrative Claims must be Filed and served on the parties identified in Section IX.E of the Plan no later than 30 days after the Effective Date.  Holders of Administrative Claims entitled to priority under section 503(b)(9) of the Bankruptcy Code that have asserted such claims as part of a proof of claim Filed in accordance with the Bar Date Order will not be required to File additional requests for payment of Administrative Claims with the Bankruptcy Court to maintain their assertion of such administrative priority claims, and the General Bar Date will continue to apply to such claims. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a motion for payment of such Administrative Claims by the applicable bar date will be forever barred from asserting such Administrative Claims against the Debtors, the Distribution Trust or their respective property, and such Administrative Claims will be deemed discharged as of the Effective Date.  Objections to the requests for payment of postpetition Administrative Claims must be Filed and served on the parties identified in Section IX.E of the Plan and the requesting party within 120 days after the Effective Date.  Nothing in Section II.A.1.c of the Plan shall waive, extend or lengthen the General Bar Date for the holder of any prepetition claim, even if such prepetition claim is an Administrative Claim.

#### b.    Bar Dates for Certain Administrative Claims

*Professional Compensation*.  Professionals or other entities asserting a Fee Claim for services rendered before the Effective Date (excluding ordinary course professionals, if any) must File and serve on the parties identified in Section IX.E of the Plan and such other entities who are designated by the Bankruptcy Rules, the Fee Order, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Fee Claim no later than 120 days after the Effective Date.  Objections to any Fee Claim must be Filed and served on the parties identified in Section IX.E of the Plan and the requesting party by 14 days after the date upon which such Fee Claim is Filed.  To the extent necessary, the Confirmation Order will supersede any previously entered order of the Bankruptcy Court regarding the payment of Fee Claims.

*Ordinary Course Administrative Liabilities*.  Holders of Administrative Claims arising from Liabilities incurred by a Debtor in the ordinary course of its business on or after the Petition Date but prior to the Effective Date must, if not paid within 20 days of the Effective Date, be Filed with the Bankruptcy Court no later than 30 days after the Effective Date or such claims will be forever barred from asserting such claims against the Estates.

### B.    Payment of Priority Tax Claims

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the holder of a Priority Tax Claim and the applicable Debtor or the Distribution Trustee, each holder of an Allowed Priority Tax Claim will receive, in full satisfaction of its Priority Tax

Claim, Cash equal to the amount of such Allowed Priority Tax Claim on the latest of (1) on the Effective Date, (2) 45 days after the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim and (3) the date on which an Allowed Priority Tax Claim would be due and payable in the ordinary course of business.  Notwithstanding the foregoing, the holder of an Allowed Priority Tax Claim will not be entitled to receive any payment under this provision on account of any penalty arising with respect to or in connection with such Allowed Priority Tax Claim.  Any such Claim or demand for any such penalty will be subject to treatment as a Unsecured Claim.  The holder of an Allowed Priority Tax Claim will not assess or attempt to collect such penalty from the Debtors, the Distribution Trust or the Distribution Trustee, or their respective property (other than as a holder of an Unsecured Claim).

## C.    Distributions for Claims Allowed as of the Effective Date

Except as otherwise provided in Article V of the Plan, Distributions of Cash to be made on the Effective Date to holders of Claims as provided by Articles II or V of the Plan that are allowed as of the Effective Date will be deemed made on the Effective Date if made on the Effective Date or as promptly thereafter as practicable, but in any event no later than: (1) 60 days after the Effective Date; or (2) with respect to any particular Claim, such later date when the applicable conditions of Section IV.D of the Plan (regarding cure payments for Executory Contracts and Unexpired Leases being assumed), Section V.E.2 of the Plan (regarding undeliverable Distributions) or Section V.J of the Plan (regarding surrender of canceled instruments and securities) are satisfied.  Distributions on account of Claims that become Allowed Claims after the Effective Date will be made pursuant to Section VI.C of the Plan.

## D.    Method of Distributions to Holders of Claims

The Distribution Trustee, in its capacity as Disbursing Agent, or such Third-Party Disbursing Agents as the Distribution Trustee may employ in its sole discretion, will make all Distributions required under the Plan.  Each Disbursing Agent may serve without bond, and any Disbursing Agent may employ or contract with other entities to assist in or make the Distributions required by the Plan if approved by the Distribution Trustee.

## E.    Compensation and Reimbursement for Services Related to Distributions

Each Third-Party Disbursing Agent providing services related to Distributions pursuant to the Plan will receive from the Distribution Trustee, without further Bankruptcy Court approval, reasonable compensation for such services and reimbursement of reasonable out-of-pocket expenses (including reasonable attorneys' fees and disbursements) incurred in connection with such services, to be paid as a Distribution Trust Expense.

## F.    Investment of Trust Accounts

To assist in making Distributions under the Plan, the applicable Trust Accounts may be held in the name of the Distribution Trustee or in the name of one or more Third-Party Disbursing Agents for the benefit of holders of Allowed Claims and Allowed Interests under the Plan, or a secondary Trust Account may be created in the name of the Third-Party Disbursing Agent for the purpose of making disbursements.  The Distribution Trustee will invest, or will direct the Third-Party Disbursing Agents to invest, Cash in the Trust Accounts, subject to the

limitations established by the Distribution Trust Agreement; *provided, however*, that should such Distribution Trustee determine, in its sole discretion, that the administrative costs associated with such investment will exceed the return on such investment, it may direct the Third-Party Disbursing Agent not to invest such Cash.  Distributions of Cash from accounts held by Third-Party Disbursing Agents will include a Pro Rata share of any interest or other proceeds, if any, from such investment of Cash, net of any Taxes payable with respect thereto.

### G.    Delivery of Distributions and Undeliverable or Unclaimed Distributions

#### 1.    Delivery of Distributions

Distributions to holders of Allowed Claims and Allowed Interests will be made by a Disbursing Agent to the addresses (a) set forth on the respective proofs of Claim Filed by holders of such Claims or request for payment of Administrative Claim, as applicable; (b) for a Claim transferee set forth in a valid and timely notice of transfer of Claim Filed with the Bankruptcy Court; (c) set forth in any written notice of address change Filed with the Bankruptcy Court or delivered to the Disbursing Agent after the date of Filing of any related proof of Claim; (d) reflected in the applicable Debtor's Schedules if no proof of Claim has been Filed and the Disbursing Agent has not received a written notice of a change of address; or (e) set forth in the Debtors' books and records.

Unless a holder of an Allowed Interest has provided written notice of a different address to the Debtors' stock transfer agent prior to the Record Date or the First Distribution Date, Distribution checks shall be mailed to such holders at the addresses shown on the records of the Stock Transfer Agent as of the Record Date.  This means that if your shares are held in the name of a third party, such as a broker or agent, the Distribution Check will be sent to the broker or agent identified on the records of the Stock Transfer Agent as of the Record Date.

#### 2.    Undeliverable or Unclaimed Distributions

##### a.    Holding of Undeliverable or Unclaimed Distributions

Subject to Section V.E.2.c of the Plan, any Distributions returned to a Disbursing Agent or otherwise undeliverable will remain in the possession of the applicable Disbursing Agent pursuant to Section V.E.2.a of the Plan until such time as a Distribution becomes deliverable. Any Disbursing Agent holding undeliverable Cash will invest such Cash in a manner consistent with the Distribution Trust Agreement.  Any Distributions that remain unclaimed or any Distribution checks that are not cashed within one hundred and twenty (120) days following Distribution will be maintained in the applicable Trust Account for redistribution to other claimants entitled to Distribution from the Trust Account; *provided, however,* that the Disbursing Agent, in its sole discretion, may (but is not required to) seek to reissue or redeliver the Distribution to the original intended recipient.

##### b.    After Distributions Become Deliverable

On each Distribution Date, the applicable Disbursing Agents will make all Distributions that became deliverable to holders of Allowed Claims or Allowed Interests after the most recent Distribution Date but prior to any Interim Distribution Bar Date.

### c.     Failure to Claim Undeliverable Distributions

Any holder of an Allowed Claim or Allowed Interest that does not assert its right to an undeliverable Distribution within one hundred and twenty (120) days following a Distribution will be forever barred from asserting any such claim against the Debtors, the Distribution Trustee, their respective property or the Trust Accounts.  In such cases, unclaimed Distributions will be maintained in the applicable Trust Account for redistribution to other claimants entitled to Distribution from such Trust Account; *provided, however,* that the Disbursing Agent, in its sole discretion, may (but is not required to) seek to reissue or redeliver the Distribution to the original intended recipient.

### H.     Distributions on Account of Allowed Claims or Allowed Interests

### 1.     De Minimis Distributions

On each Distribution Date, the Disbursing Agent will not distribute cash to the holder of an Allowed Claim or Allowed Interest if the amount of Cash to be distributed on account of such Claim or Interest is less than $50.  Such amount will be redistributed to other holders of Allowed Claims or Allowed Interests and the holder of an Allowed Claim or Allowed Interest whose Distribution is *de minimis* will be forever barred from asserting its Claim or Interest for such Distribution against the Distribution Trust or its property.

### 2.     Postpetition Interest

Unless required by the Bankruptcy Code and otherwise ordered by the Bankruptcy Court, no interest will accrue on any Claims on and after the Petition Date.

### 3.     Compliance with Tax Requirements

Each Disbursing Agent will comply with all Tax withholding and reporting requirements imposed on it by any governmental unit, and all Distributions pursuant to the Plan will be subject to such withholding and reporting requirements.  The Distribution Trustee and any Disbursing Agent will be authorized to take any actions that it determines, in its reasonable discretion, to be necessary or appropriate to comply with such withholding and reporting requirements.

Notwithstanding any other provision of the Plan or the Distribution Trust Agreement, each Person receiving or deemed to receive a Distribution pursuant to the Plan will have sole and exclusive responsibility for the satisfaction and payment of any Tax imposed on such Person on account of such Distribution.  The Distribution Trust or Disbursing Agent may require that a holder of a Claim or Interest provide a W-9 (or such other document as the Distribution Trust or Disbursing Agent may require) as a condition to receipt of any Distribution.  If a holder of a Claim or Interest fails to provide a W-9 (or such other document as the Distribution Trust or Disbursing Agent may require) within thirty (30) days after the Distribution Trustee's or Disbursing Agent's request therefor, such holder (in the Distribution Trustee's or Disbursing Agent's sole discretion) may be deemed to waive its right to all Distributions made prior to the date such holder provides the W-9 (or such other document as the Distribution Trust or Disbursing Agent may require).

### 4.    Allocation of Distributions

All Distributions to a holder of an Allowed Claim that has components of principal and interest will be deemed to apply first to the principal amount of such Claim until such principal amount is paid in full, and then the remaining portion of such Distributions, if any, will be deemed to apply to any applicable accrued interest included in such Claim to the extent interest is payable under the Plan.

### I.    Distribution Record Date

Transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 for which a notice of transfer has been Filed on or prior to the Distribution Record Date will be treated as the holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date. Neither the Distribution Trustee nor any Disbursing Agent will be required to recognize any transfers Filed with the Bankruptcy Court after the Distribution Record Date. The Distribution Trustee and Disbursing Agent will have the authority, but no obligation, to recognize transfers of Claims made after the deadlines set forth above in their respective sole and absolute discretion. Similarly, the Distribution Trustee and Disbursing Agent will have the authority, but no obligation, to recognize transfers of Interests made after the Distribution Record Date in their respective sole and absolute discretion.

### J.    Means of Cash Payments

Except as otherwise specified in the Plan, Cash payments made pursuant to the Plan will be in U.S. currency by checks drawn on a domestic bank selected by the Distribution Trustee or, at the option of the Distribution Trustee, by wire transfer, electronic funds or ACH from a domestic bank; provided, however, that Cash payments to foreign holders of Allowed Claims and Allowed Interests may be made, at the option of the Distribution Trustee, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

### K.    Setoffs

Except with respect to claims of a Debtor expressly released pursuant to the Plan or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disbursing Agent or a Third-Party Disbursing Agent, as instructed by the Distribution Trustee pursuant to section 558 of the Bankruptcy Code or applicable nonbankruptcy law, may set off against any Allowed Claim or Distribution on account of an Allowed Interest (before any Distribution is made on account of such Claim or Interest) the claims, rights and causes of action of any nature that the applicable Debtor or the Distribution Trust may hold against the holder (or prior holder) of such Allowed Claim or Allowed Interest; *provided, however*, that neither the failure to effect a setoff nor the allowance of any Claim or Interest hereunder will constitute a waiver or release by the applicable Debtor or the Distribution Trust of any claims, rights and causes of action that the Debtor or the Distribution Trust may possess against such a Claim or Interest holder, which are expressly preserved under Section III.G.1 of the Plan.

## VIII.    DISPUTED CLAIMS AND IMPLEMENTATION OF THE PLAN

### A.    Treatment of Disputed Claims

#### 1.    Tort Claims

Each Tort Claim, if any, will remain a Disputed Claim until it becomes an Allowed Claim.  The amount of a Tort Claim that is not otherwise settled and resolved by a Stipulation of Amount and Nature of Claim will be determined and liquidated, in the discretion of the Distribution Trustee in either (a) the administrative or judicial tribunal of appropriate jurisdiction or (b) the United States District Court for the Southern District of New York.  The Distribution Trustee will provide written notice to the holder of a Tort Claim of the Distribution Trustee's selection of the appropriate forum after the Effective Date.  Such judicial tribunal will determine the amount of the Tort Claim, but will not enter or enforce a judgment against the Debtors, their Estates or the Distribution Trust, as all Distributions on account of Tort Claims resolved in accordance with Section VI.A.1 of the Plan will be subject to and made in accordance with the Plan.  All claims, demands, rights, defenses and causes of action that the Debtors may have against any Person in connection with or arising out of any Tort Claim are expressly retained and preserved and transferred to the Distribution Trust.

#### 2.    No Distributions Pending Allowance

Notwithstanding any other provision of the Plan, no payments or Distributions will be made on account of a Disputed Claim or Disputed Interest until such Claim or Interest becomes an Allowed Claim or an Allowed Interest.  In lieu of Distributions under the Plan to holders of Disputed Claims or Disputed Interests on the Effective Date, the Distribution Trustee, in accordance with the Distribution Trust Agreement, will establish, as appropriate, Disputed Claims or Disputed Interests reserves, with such reserves held in the applicable Trust Accounts.

### B.    Objections to Claims

#### 1.    Authority to Prosecute

The Distribution Trustee may object to any Claims or Interests it believes warrant the Filing of an objection prior to the Claims Objection Bar Date.  After the Effective Date, only the Distribution Trustee will have the authority to File, settle, compromise, withdraw or litigate to judgment objections to Claims and Interests, including pursuant to any alternative dispute resolution or similar procedures approved by the Bankruptcy Court.  After the Effective Date, the Distribution Trustee may settle or compromise any Disputed Claim or Disputed Interest or any objection or controversy relating to any Claim or Interest without notice, motion, or approval of the Bankruptcy Court.

#### 2.    Pending Objections

To the extent that the Debtors have filed objections to Claims or Interests that remain pending as of the Effective Date, the Distribution Trustee will be substituted as the objecting party without further action of the parties or order of the Bankruptcy Court.

### 3.    Authority to Amend Schedules

The Debtors and the Distribution Trustee, as applicable, will have the authority to amend the Schedules with respect to any Claim or Interest and to make Distributions based on such amended Schedules (if no proof of claim is timely Filed in response thereto) without approval of the Bankruptcy Court. If any such amendment to the Schedules reduces the amount of a Claim or Intrest or changes the nature or priority of a Claim or Interest, the Debtors or the Distribution Trustee will provide the holder of such Claim or Interest with notice of such amendment and such parties will have 30 days to File an objection to such amendment in the Bankruptcy Court.

### 4.    Request for Extension of Claims Objection Bar Date

From time to time, upon motion to the Bankruptcy Court, the Distribution Trustee may request, and the Bankruptcy Court may grant, extensions to the Claims Objection Bar Date generally or with respect to a specific list of Claims or Interests. Any extension granted by the Bankruptcy Court will not be considered to be a Plan modification under section 1127 of the Bankruptcy Code.

### C.    Distributions on Account of Disputed Claim or Disputed Interest that Becomes Allowed

On each Distribution Date, the applicable Disbursing Agent will make all Distributions on account of any Disputed Claim and Disputed Interest that has become an Allowed Claim or Allowed Interest since the most recent Distribution Date. The timing and amount of such Distribution shall be determined in accordance with Sections V.F, V.G and V.H above.

### D.    Corporate Existence

Consistent with Section III.B of the Plan and notwithstanding the transfer of their assets to the Distribution Trust, the Debtors will continue to exist unless and until they have been dissolved by the Distribution Trustee. Upon its dissolution, a Debtor will cease to exist, and all existing certificates of incorporation, certificates of formation, similar documents, and by-laws will be canceled.

### E.    Dissolution Transactions

### 1.    Dissolution Transactions Generally

If and when the Distribution Trustee deems appropriate, the Debtors will enter into such Dissolution Transactions as the Distribution Trustee deems appropriate. The actions to effect any Dissolution Transactions may include: (a) the execution and delivery of appropriate agreements or other documents of transfer, merger, consolidation, disposition, liquidation or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law, as well as other terms to which these entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms of the Plan and having such other terms as these entities may agree; (c) the filing of appropriate certificates or articles of merger, consolidation, continuance or dissolution or similar

instruments with the applicable governmental authorities; and (d) the taking of all other actions that these entities determine to be necessary or appropriate, including making other filings or recordings that may be required by applicable law in connection with the Dissolution Transactions.  Nothing in the Plan will impact the limitations on setoff in Sections II and VII of the Plan.

### 2.    Recourse Solely to Distribution Trust Assets

All Claims against and Interests in the Debtors are deemed satisfied, waived and released as to the Debtors in exchange for the treatment of such Claims and Interests under the Plan, and holders of Allowed Claims and Allowed Interests against any Debtor will have recourse solely to the assets of the Distribution Trust for payment on account of their Allowed Claims or Allowed Interests in accordance with the terms of the Plan and the Distribution Trust Agreement.

### F.    Corporate Governance, Directors and Officers

### 1.    Certificates of Incorporation and Bylaws

Consistent with Sections III.A and III.B above, and notwithstanding the transfer of their assets to the Distribution Trust, the Debtors will continue to exist unless and until they have been dissolved by the Distribution Trustee.  Upon any Dissolution Transaction, the Debtors will cease to exist, and all existing certificates of incorporation and by-laws will be canceled.

### 2.    Directors and Officers

The JVLs have succeeded to the rights and powers of the Debtors' officers and directors.

### 3.    Corporate Action

The Dissolution Transactions and the following corporate actions and transactions will occur and be effective as of the Effective Date and will be authorized and approved in all respects and for all purposes without any requirement of further action by the Debtors, the Distribution Trustee or any other Person.  In addition, the following matters are authorized and approved in all respects and for all purposes without any requirement of further action by the Debtors: (a) the establishment of the Distribution Trust; (b) the appointment of the Distribution Trustee to act on behalf of the Distribution Trust; (c) the transfer of assets into the Distribution Trust as set forth in the Plan; (d) the Distribution of Cash pursuant to the Plan; (e) the adoption, execution, delivery and implementation of all contracts, instruments, releases and other agreements or documents related to any of the foregoing; (f) the adoption, execution and implementation of the Distribution Trust Agreement; and (g) the other matters provided for under the Plan involving the corporate structure of any Debtor or corporate action to be taken by or required of any Debtor or the Distribution Trustee.

### G.      No Revesting of Assets

The property of the Debtors' Estates will not revest in the Debtors on or after the Effective Date but will instead vest in the Distribution Trust to be administered by the Distribution Trustee in accordance with the Plan and the Distribution Trust Agreement.

### H.      Preservation of Causes of Action; Settlement Agreements and Releases; Exculpation

#### 1.      <u>Preservation of Causes of Action; Recovery Actions</u>

The Debtors and the Distribution Trust shall retain and may enforce all rights to commence and pursue any and all claims and causes of action belonging to the Debtors or their Estates, whether arising before or after the Petition Date, including but not limited to, any actions specifically enumerated in Debtors' Schedules, this Disclosure Statement, the Plan, or Exhibit III.G.1 to the Plan, and the Debtors' and the Distribution Trust's rights to commence, prosecute, or settle such causes of action shall be preserved notwithstanding the occurrence of the Effective Date, other than: (i) the causes of action against the Released Parties released by the Debtors pursuant to the releases and exculpations contained in Article III.G.3 of the Plan, which shall be deemed released and waived by the Debtors as of the Effective Date and (iii) the causes of action released by the Debtors during the Chapter 11 Cases with approval of the Bankruptcy Court.

**The Debtors or the Distribution Trust may pursue all such causes of action, as appropriate, in accordance with the best interests of the Distribution Trust.  No Entity may rely on the absence of a specific reference in the Schedules, the Plan, Exhibit III.G.1 to the Plan, or in this Disclosure Statement, to any cause of action against it as any indication that the Debtors or the Distribution Trust, as applicable, will not pursue any and all available causes of action against it. Unless any causes of action against a person or entity are expressly and unambiguously waived, relinquished, exculpated, released, compromised, or settled herein or in a Bankruptcy Court order, the Debtors and the Distribution Trust expressly reserve all causes of action, for later prosecution, settlement, or adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such causes of action upon, after, or a consequence of Confirmation, the Effective Date, or consummation of the Plan.**

The Debtors and the Distribution Trust reserve and shall retain causes of action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any causes of action that a Debtor may hold against any person or entity shall vest in the Distribution Trust. The Debtors or the Distribution Trust shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such causes of action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

By way of illustration, and without limiting the foregoing, the Debtors hold (or may hold) claims and causes of action against (i) LNBYB, Baker & Hostetler LLP, Leonard Gumport, Gumport Mastan, Molner, Sharma, ACP, ARP, SCIC, SCII, GCC, Parmar, Tregub, Tregub Chapter 7 Trustee, and all other participants or counsel relating to their involvement in or relating to the Molner Litigation and other claims and causes of action, (ii) the Debtors also hold claims against many defendants, including but not limited to, Molner, Sharma, ACP, ARP, SCIC, SCII, and GCC regarding the mismanagement of the Debtors' business, the taking of exorbitant fees (particularly in transactions that were of little or no benefit to the Debtors), and the commencement and conduct of the Molner Litigation and other claims and causes of action, (iii) Jeffer Mangels for its handling of and excessive billing in the Fortress Action, (iv) all potential defendants in Recovery Actions, (v) the persons and entities listed in AEF's Statement of Financial Affairs [Dkt Item # 58] in response to questions 3b and 3c to recover transfers made to such persons or entities prior to the Petition Date (whether or not listed in the Statement of Financial Affairs), and any other transfers to such persons (or any persons not listed in the Statement of Financial Affairs or herein) that are avoidable or otherwise recoverable by the Debtors or the Distribution Trust, (vi) all persons and entities that owe or that may in the future owe money to the Debtors or the Distribution Trust pursuant to a loan agreement, participation or other contract or agreement, (vii) other persons and entities based, in whole or in part, on any and all insurance contracts, insurance policies, occurrence policies, and occurrence contracts to which any Debtor is a party or pursuant to which any Debtor has any rights whatsoever, (viii) former directors, officers or service provider, for breach of duties, breach contract and other wrongdoing, and (ix) any other persons or entities that breached any agreement or obligation to, or for the benefit of, the Debtors.

## 2.      Settlement of Holders' Claims, Interests, and Controversies

Pursuant to Bankruptcy Rule 9019 and in consideration for the Distributions and other benefits provided under the Plan, the provisions of the Plan, including the releases set forth in Section III.G.3 of the Plan, will constitute a good faith compromise and settlement of all claims or controversies that the holder of a Claim or Interest may have relating to such Claim or Interest other than the right to any Distribution to be made pursuant to the Plan on account of an Allowed Claim or Allowed Interest.  The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors, their Estates and their respective property and Claim and Interest holders and is fair, equitable and reasonable.

## 3.      Releases

### a.      General Releases by Debtors

**Without limiting any other applicable provisions of or releases contained in the Plan, as of the Effective Date, the Debtors, on behalf of themselves and their affiliates, the Estates and their respective successors, assigns and any and all entities who may purport to claim by, through, for or because of them will forever release, waive and discharge all Liabilities (including Derivative Claims) that they have, had or may have against any Released Party, except with respect to any obligations arising under the Plan; provided,**

however, that the foregoing will not affect the liability of any Person that otherwise would result from any act or omission to the extent that the act or omission is determined in a Final Order to have resulted from fraud or willful misconduct.  Any such released Liabilities will not be transferred to the Distribution Trust.

### b.    General Releases by Holders of Claims or Interests

Without limiting any other applicable provisions of or releases contained in the Plan or provided under the Bankruptcy Code, as of the Effective Date, in consideration for the consideration provided under the Plan, each holder of a Claim or Interest that votes in favor of the Plan, to the fullest extent permissible under law, will be deemed to forever release, waive and discharge all Liabilities in any way relating to a Debtor, the Chapter 11 Cases, the Estates, the Plan, the exhibits to the Plan or the Disclosure Statement that such entity has, had or may have against any Released Party; provided, however, that the foregoing will not affect the liability of any Person that otherwise would result from any act or omission to the extent that the act or omission is determined in a Final Order to have resulted from fraud or willful misconduct.

### c.    Injunction Related to Releases

The Confirmation Order will permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, liabilities, rights of contribution or rights of indemnification released pursuant to the Plan, including pursuant to the releases in Section III.G.3 of the Plan.

### d.    Exculpation

From and after the Effective Date, the Released Parties, will not have and will not incur any liability to any Person for any act taken or omitted, or to be taken, in connection with the sale of any of the Debtors' assets or the Debtors' other postpetition liquidation activity, including the formulation, preparation, dissemination, implementation, confirmation or approval of the Plan, the exhibits to the Plan, this Disclosure Statement, the Distribution Trust Agreement or any other contract, instrument, release or other agreement or document provided in connection therewith; provided, however, that the foregoing provisions will not affect the liability of any Person that otherwise would result from any such act or omission to the extent that the act or omission is determined in a Final Order to have resulted from fraud or willful misconduct.

### I.    Cancellation and Surrender of Instruments, Securities and Other Documentation

Except as provided in any contract, instrument or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to the Plan, all outstanding common stock, secured and unsecured notes, indentures, instruments and securities issued by any of the Debtors will be canceled and of no further force and effect, without any further action on the part of the Bankruptcy Court, any Debtor or the Distribution Trustee.  The holders of or parties to such

canceled instruments and securities will have no rights arising from or relating to such instruments and securities or the cancellation thereof, except the rights provided pursuant to the Plan; provided, however, no Distribution under the Plan will be made to or on behalf of any holder of an Allowed Claim or Allowed Interest evidenced by such canceled instruments or securities unless and until such instruments or securities are received by the applicable Disbursing Agent if required pursuant to Section V.J of the Plan.  For the avoidance of doubt, notwithstanding the foregoing, the ALTL Participation and the Class C-5 Interests shall be entitled to receive Distributions under the Plan.

### J.      Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to the Plan, all Liens against the property of any Estate will be fully released and discharged, and all of the right, title and interest of any holder of such Liens, including any rights to any collateral thereunder, will attach to and be enforceable solely against the same assets that are owned by the Distribution Trust in which the holder of such Claim had a Lien, including any net proceeds of sales of such assets.  All such Liens against the assets of the Distribution Trust will be fully released and discharged upon the holder of the Liens receiving its collateral or its full Distribution under the Plan from its collateral.

### K.      Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes

#### 1.      Effectuating Documents and Further Transactions

Prior to the Effective Date, the JVLs, and after the Effective Date, the Distribution Trustee, will be authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan.

#### 2.      Exemption From Transfer Taxes

Pursuant to section 1146(a) of the Bankruptcy Code, the following will not be subject to any stamp Tax, real estate transfer Tax, mortgage recording Tax or similar Tax: (a) any transfer made by the Debtors to the Distribution Trust; (b) any sales (including, without limitation, private or public foreclosure sales) made by the Distribution Trust to liquidate such assets in the Distribution Trust and convert such assets into Cash; (c) any sales of assets made by the Debtors under section 363 of the Bankruptcy Code, to the extent that title to the assets being sold transfers after the Confirmation Date; (d) the making or assignment of any lease or sublease; (e) any Dissolution Transaction; or (f) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including any merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale, or assignments executed in connection with any of the foregoing or pursuant to the Plan.

### L.    Substitution of Pending Legal Actions

On the Effective Date, the Distribution Trust or the Distribution Trustee, as applicable, will be deemed to be substituted as the party to any litigation in which the Debtors are a party, including (but not limited to) (1) pending contested matters or adversary proceedings in the Bankruptcy Court, (2) any appeals of orders of the Bankruptcy Court and (3) any state court or federal or state administrative proceedings pending as of the Petition Date.  The Distribution Trustee and its professionals are not required to, but may take such steps as are appropriate to provide notice of such substitution.

## IX.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.    Rejection of Executory Contracts and Unexpired Leases

#### 1.    Rejection

Except as otherwise provided in the Plan, in any contract, instrument, release or other agreement or document entered into in connection with the Plan or in a Final Order of the Bankruptcy Court, on the Effective Date, pursuant to section 365 of the Bankruptcy Code, the Debtors will be deemed to reject each Executory Contract or Unexpired Lease not previously assumed, assumed and assigned, or rejected during the Chapter 11 Cases, or which is not the subject to a motion to assume or to assume and assign that is pending as of the Effective Date. Subject to the foregoing, the Executory Contracts and Unexpired Leases to be rejected include, but are not limited to, the Executory Contracts and Unexpired Leases identified on Exhibit IV.A.1 to the Plan; *provided, however,* that the Debtors reserve the right, at any time prior to the Effective Date, to amend Exhibit IV.A.1 to the Plan to delete any Executory Contract or Unexpired Lease listed therein.  Parties that desire to object to the rejection of a specific Executory Contract or Unexpired Lease must File an objection to the Plan by the deadline for filing objections to the Plan.

#### 2.    Notice of Rejection

Service of the Plan constitutes notice of rejection to all known counterparties to Executory Contracts or Unexpired Leases that are to be rejected pursuant to the Plan.

#### 3.    Bar Date for Rejection Damages

In accordance with the Bar Date Order, and except as otherwise provided in a Final Order of the Bankruptcy Court approving the rejection of an Executory Contract or Unexpired Lease, Claims arising out of the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan must be Filed with the Bankruptcy Court on or before the thirtieth (30th) day after the Effective Date.  Any Claims not Filed by that deadline will be forever barred from receiving a Distribution from the Debtors or the Distribution Trust on account of any Claim for rejection of such Executory Contract or Unexpired Lease.

**B.      Contracts and Leases Entered Into After the Petition Date**

Contracts and leases that a Debtor entered into after the Petition Date are not subject to assumption or rejection.

**C.      Pre-existing Obligations to the Debtors Under Executory Contracts and Unexpired Leases**

Rejection or repudiation of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise will not constitute a termination of pre-existing obligations owed to the Debtors under such Executory Contracts or Unexpired Lease.  Notwithstanding any applicable nonbankruptcy law to the contrary, the Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties, indemnifications or continued maintenance obligations on goods previously purchased by the contracting Debtors from counterparties to rejected or repudiated Executory Contracts or Unexpired Leases, and any such rights will vest in the Distribution Trust as of the Effective Date.

**D.      Payments Related to the Assumption of Executory Contracts and Unexpired Leases**

**1.      Assumption and Assignment Generally**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into in connection with the Plan, on the Effective Date, pursuant to section 365 of the Bankruptcy Code, the applicable Debtor will assume each of the respective Executory Contracts and Unexpired Leases listed on Exhibit IV.D.1 to the Plan; *provided, however*, that the Debtors reserve the right, at any time prior to the Effective Date, to amend Exhibit IV.D.1 to the Plan to: (a) delete any Executory Contract or Unexpired Lease listed therein, thus providing for its rejection under Section IV.A of the Plan; or (b) add any Executory Contract or Unexpired Lease to such Exhibit IV.D.1, thus providing for its assumption pursuant to Section IV.D.1 of the Plan.  The Debtors will File Exhibit IV.D.1 to the Plan, and any amendments thereto, with the Bankruptcy Court.  Nothing in the Plan or this Disclosure Statement shall constitute an admission by a Debtor that any contract or lease is an Executory Contract or Unexpired Lease or that a Debtor has any liability thereunder.

**2.      Assignments to Distribution Trust**

As of the Effective Date, any Executory Contract or Unexpired Lease identified upon Exhibit IV.D.1 to the Plan will be deemed assigned to the Distribution Trust, pursuant to section 365 of the Bankruptcy Code.  Any Allowed Cure Amount Claims associated with the assumption and assignment of an Executory Contract or Unexpired Lease will be paid by the Distribution Trustee from the Trust Account.

**3.      Approval of Assumptions and Assumption Procedures**

The Confirmation Order will constitute an order of the Bankruptcy Court approving the assumptions and assignments described in Section IV.D.1 of the Plan, pursuant to section 365 of

the Bankruptcy Code, as of the Effective Date. The procedures for assumption of an Executory Contract or Unexpired Lease will be as follows:

- Any entity wishing to object to (a) the proposed assumption of an Executory Contract or Unexpired Lease under the Plan or (b) the proposed amount of the related Cure Amount Claim must File and serve on counsel to the Debtors or the Distribution Trustee, as applicable, a written objection setting forth the basis for the objection within (i) 20 days of service of Exhibit IV.D.1 or (ii) with respect to any contract or lease first added to Exhibit IV.D.1 by an amendment thereto, within 20 days after service of such amendment.

- If no objection to the proposed assumption or Cure Amount Claim is properly Filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease: (a) the proposed assumption of the Executory Contract or Unexpired Lease will be deemed to be approved upon entry of the Confirmation Order, effective as of the Effective Date, without further action of the Bankruptcy Court; and (b) the Cure Amount Claim identified by the Debtors in Exhibit IV.D.1 will be fixed and will be paid to the appropriate contract or lease party on the Effective Date (or as soon thereafter as is practicable) by the Distribution Trust.

- If an objection to the proposed assumption or Cure Amount Claim is properly Filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease, the Debtors or the Distribution Trustee, as applicable, and the objecting party may resolve such objection by stipulation, without further action of the Bankruptcy Court.

- If an objection to the proposed assumption or Cure Amount Claim is properly Filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease and the parties are unable to resolve such objection then: (a) either party may notice the dispute for hearing by Filing a notice of hearing in the Bankruptcy Court no later than 20 days prior to the hearing date; and (b) the Debtors or the Distribution Trustee may File a reply to such objection no later than seven days prior to the proposed hearing date.

- If, at or as a result of a hearing on an objection to the proposed assumption or Cure Amount, the Bankruptcy Court imposes requirements upon the Debtors or the Distribution Trustee as a condition to assuming an Executory Contract or Unexpired Lease, or if the Bankruptcy Court determines that the Cure Amount Claim for a particular Executory Contract or Unexpired Lease is in excess of the amount proposed by the Debtors or the Distribution Trustee, the Debtors or the Distribution Trustee may, within their sole discretion, choose to reject such Executory Contract or Unexpired Lease by filing an appropriate amendment to Exhibit IV.A.1 or Exhibit IV.D.1 to the Plan, as applicable, within fourteen days of the entry of a Final Order with respect to such matter.

X.   CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION
OF THE PLAN

A.   General

A DESCRIPTION OF CERTAIN U.S. FEDERAL INCOME TAX
CONSEQUENCES OF THE PLAN IS PROVIDED BELOW.  THE DESCRIPTION IS
BASED ON THE INTERNAL REVENUE CODE, TREASURY REGULATIONS,
JUDICIAL DECISIONS AND ADMINISTRATIVE DETERMINATIONS, ALL AS IN
EFFECT ON THE DATE OF THIS DISCLOSURE STATEMENT AND ALL SUBJECT
TO CHANGE, POSSIBLY WITH RETROACTIVE EFFECT.  CHANGES IN ANY OF
THESE AUTHORITIES OR IN THEIR INTERPRETATION COULD CAUSE THE
FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO DIFFER
MATERIALLY FROM THE CONSEQUENCES DESCRIBED BELOW.

THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE
COMPLEX AND IN IMPORTANT RESPECTS UNCERTAIN.  NO RULING HAS BEEN
REQUESTED FROM THE INTERNAL REVENUE SERVICE (THE "IRS"); NO
OPINION HAS BEEN REQUESTED FROM COUNSEL TO THE PLAN PROPONENTS
CONCERNING ANY TAX CONSEQUENCE OF THE PLAN; AND NO TAX OPINION
IS GIVEN BY THIS DISCLOSURE STATEMENT.

THE DESCRIPTION THAT FOLLOWS DOES NOT COVER ALL ASPECTS OF
U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO THE
DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS.  FOR EXAMPLE, THE
DESCRIPTION DOES NOT ADDRESS ISSUES OF SPECIAL CONCERN TO
CERTAIN TYPES OF TAXPAYERS, SUCH AS DEALERS IN SECURITIES, LIFE
INSURANCE COMPANIES, FINANCIAL INSTITUTIONS, AND TAX EXEMPT
ORGANIZATIONS, AND NON-U.S. TAXPAYERS, NOR DOES IT ADDRESS U.S.
FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF INTERESTS IN THE
DEBTORS OR HOLDERS OF SECTION 510(b) CLAIMS AGAINST THE DEBTORS.
IN ADDITION, THE DESCRIPTION DOES NOT DISCUSS STATE, LOCAL, NON-U.S.
OR NON-INCOME TAX CONSEQUENCES.

FOR THESE REASONS, THE DESCRIPTION THAT FOLLOWS IS NOT A
SUBSTITUTE FOR CAREFUL TAX PLANNING AND PROFESSIONAL TAX ADVICE
BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A
CLAIM OR INTEREST.  HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO
CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE FEDERAL,
STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.

B.   U.S. Federal Income Tax Consequences to AEI.

Generally, if there is a discharge of indebtedness by a debtor, such discharge would give
rise to cancellation of debt ("COD") income, which must be included in the debtor's income.
However, the IRC permits a debtor to exclude its COD income from gross income if the

discharge occurs in a Chapter 11 case. Thus, although AEI may realize COD income as a result of the satisfaction of the Claims, AEI should not be required to recognize such COD income.

A corporation may incur an alternative minimum tax ("AMT") liability even where a net operating loss ("NOL") is generated for regular corporate income tax purposes or where NOL carryovers and certain other tax attributes are sufficient to eliminate taxable income as computed under the regular corporate income tax. In general, the AMT is imposed on a corporation's alternative minimum taxable income at a twenty percent (20%) rate to the extent such tax exceeds the corporation's regular U.S. federal income tax. For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances allowed in computing a corporation's regular U.S. federal income tax are modified or eliminated. In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, a portion of a corporation's taxable income for AMT purposes may not be offset by available NOL carryforwards (as computed for AMT purposes). Although it is possible that AEI could be liable for the AMT, at this time AEI does not expect to incur a material amount of AMT as a result of the discharge of indebtedness pursuant to the consummation of the Plan.

### C.    U.S. Federal Income Tax Consequences to the U.S. Holders of Claims or Interests

For purposes of this discussion, a "U.S. Holder" is a holder of an Allowed Claim or Allowed Interest that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate, the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury regulations to be treated as a United States person. The discussion below assumes that the U.S. Holders of Allowed Claims and Allowed Interest against any Debtor are treated as receiving property from that Debtor in satisfaction of their Allowed Claims or Allowed Interests, as applicable, and the Debtors intend to treat distributions under the Plan as such.

The U.S. federal income tax consequences of the Plan to a U.S. Holder will depend, in part, on the tax characterization of the exchanges of Allowed Claims for other property, whether the Allowed Claims relate to "tax securities" for U.S. federal income tax purposes, what type of consideration was received in exchange for an Allowed Claim or Allowed Interest, whether the U.S. Holder reports income on the accrual or cash basis, whether the U.S. Holder has taken a bad debt deduction or worthless security deduction with respect to an Allowed Claim or Allowed Interest and whether the U.S. Holder receives distributions under the Plan in more than one taxable year.

Each U.S. Holder generally will recognize gain or loss in its taxable year that includes the Effective Date in an amount equal to the difference between the amount realized or deemed realized in respect of its Allowed Claim and its adjusted tax basis in such Claim. The amount

realized for this purpose should generally equal the amount of cash and the fair market value of any other assets (net of any applicable liabilities) received or deemed received for U.S. federal income tax purposes under the Plan in respect of such U.S. Holder's Allowed Claim. Although not free from doubt, U.S. Holders of Allowed Claims that are Beneficiaries of the Distribution Trust as of the Effective Date should be treated as receiving from the Debtor their respective shares of the Distribution Trust assets in satisfaction or partial satisfaction, as the case may be, of their Allowed Claims, and simultaneously transferring such assets (net of any applicable liabilities) to the Distribution Trust. Additionally, Holders that are Beneficiaries of the Distribution Trust should generally recognize their allocable share of income, gain, loss and deductions recognized by the Distribution Trust on an annual basis, as discussed below.

### D.    Certain Other Tax Considerations for U.S. Holders of Claims

#### 1.    Accrued but Unpaid Interest

In general, a U.S. Holder that was not previously required to include in taxable income any accrued but unpaid interest on the U.S. Holder's Allowed Claim may be required to include such amount as taxable interest income upon receipt of a distribution under the Plan. A U.S. Holder that was previously required to include in taxable income any accrued but unpaid interest on the U.S. Holder's Allowed Claim may be entitled to recognize a deductible loss to the extent that such interest is not satisfied under the Plan. The Plan provides that, to the extent applicable, all distributions to a holder of an Allowed Claim will apply first to the principal amount of such Allowed Claim until such principal amount is paid in full and then to any accrued but unpaid interest on such Allowed Claim.  There is no assurance, however, that the IRS will respect this treatment and will not determine that all or a portion of amounts distributed to such U.S. Holder and attributable to principal under the Plan is properly allocable to interest. Each U.S. Holder of an Allowed Claim on which interest has accrued is urged to consult its tax advisor regarding the tax treatment of distributions under the Plan and the deductibility of any accrued but unpaid interest for U.S. federal income tax purposes.

#### 2.    Post-Effective Date Distributions

Because certain U.S. Holders of Allowed Claims may receive distributions subsequent to the Effective Date, the imputed interest provisions of the IRC may treat a portion of any post-Effective Date distribution as imputed interest.  Imputed interest may, with respect to certain U.S. Holders, accrue over time using the constant interest method, in which event the U.S. Holder may, under some circumstances, be required to include imputed interest in income prior to receipt of a post-Effective Date distribution. Additionally, to the extent U.S. Holders may receive distributions in a taxable year or years following the year of the initial distribution, any loss and a portion of any gain realized by the holder may be deferred. U.S. Holders should consult their tax advisors regarding the possible application of (or ability to elect out of) the "installment method" of reporting with respect to their Allowed Claims or Allowed Interest.

#### 3.    Bad Debt Deduction and/or Worthless Securities Deduction

A U.S. Holder who, under the Plan, receives, in respect of an Allowed Claim, an amount less than the U.S. Holder's tax basis in the Allowed Claim may be entitled in the year of receipt

(or in an earlier or later year) to a bad debt deduction in some amount under section 166(a) of the IRC or a worthless securities deduction under section 165 of the IRC. The rules governing the character, timing and amount of bad debt or worthless securities deductions place considerable emphasis on the facts and circumstances of the U.S. Holder, the obligor and the instrument with respect to which a deduction is claimed. U.S. Holders of Allowed Claims, therefore, should consult their tax advisors with respect to their ability to take such a deduction.

### 4.   Market Discount

A U.S. Holder that purchased its Allowed Claim from a prior U.S. Holder with market discount will be subject to the market discount rules of the IRC. Under those rules, assuming that the U.S. Holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of its Allowed Claim (subject to a de minimis rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Allowed Claim as of the date of the exchange.

### 5.   Installment Method

A U.S. Holder of an Allowed Claim constituting an installment obligation for U.S. federal income tax purposes may be required to currently recognize any gain remaining with respect to the obligation if, pursuant to the Plan, the obligation is considered to be satisfied at other than its face value, distributed, transmitted, sold or otherwise disposed of within the meaning of section 453B of the IRC.

In addition, a U.S. Holder of an Allowed Claim may be deemed to receive an installment obligation in satisfaction of its Allowed Claim because of the potential additional payments such holders would receive if one or more Disputed Claims are disallowed.  Under the IRC's installment method of reporting, any loss and a portion of any gain realized by the holder of an Allowed Claim would be deferred until the holder has received its final distribution from the Distribution Trust.  U.S. Holders of Allowed Claims are urged to consult their tax advisors regarding the possible application of, or ability to elect out of, the installment method of reporting gain that may be recognized in respect of a Allowed Claim.

### 6.   Medicare Tax

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, gains from the sale or other disposition of capital assets.  U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

### 7.   Information Reporting and Backup Withholding

A U.S. Holder may be subject to backup withholding, currently at the rate of 28%, with respect to any "reportable" payments received pursuant to the Plan unless (i) such U.S. Holder is a corporation or comes within certain other exempt categories and, when required, demonstrates this fact or (ii) provides a correct taxpayer identification number, certifies as to no loss of

exemption from backup withholding and complies with applicable requirements of the backup withholding rules. A U.S. Holder who does not provide a correct taxpayer identification number may be subject to penalties imposed by the IRS. Amounts withheld under the backup withholding rules may be credited against a U.S. Holder's tax liability, and a U.S. Holder may obtain a refund of any excess amounts withheld under the backup holding rules by timely filing the appropriate claim for refund with the IRS.

The Distribution Trustee will report annually to each beneficiary, and to the IRS, such beneficiary's share of any income, gains and losses of the Distribution Trust during the calendar year to the extent required by law.

### E.    Importance of Obtaining Professional Tax Assistance

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES, INCLUDING WHETHER SUCH HOLDER IS SUBJECT TO TAXATION BY THE UNITED STATES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS ABOUT THE FEDERAL, STATE, LOCAL AND NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

## XI.    ADDITIONAL INFORMATION

Any statements in this Disclosure Statement concerning the provisions of any document are not necessarily complete, and in each instance reference is made to such document for the full text thereof. Certain documents described or referred to in this Disclosure Statement have not been attached as exhibits because of the impracticability of furnishing copies of these documents to all recipients of this Disclosure Statement.

## XII.    RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtors believe that the Confirmation and consummation of the Plan is preferable to all other alternatives. Consequently, the Debtors urge all holders of Claims and Interests in Classes entitled to vote on the Plan, to vote to accept the Plan and to evidence their acceptance by duly completing and returning their ballots so that they will be received on or before the Voting Deadline.

Dated:  December 15, 2015                     ARAMID ENTERTAINMENT FUND LIMITED
                                              ARAMID LIQUIDATING TRUST LIMITED
                                              ARAMID ENTERTAINMENT INC.


                                              By: *Geoffrey Varga*_____
                                                   Geoffrey Varga, Joint Voluntary Liquidator


Filed by:


*/s/ James C. McCarroll*_____
James C. McCarroll
Jordan W. Siev
Kurt F. Gwynne (pro hac vice)
REED SMITH LLP
599 Lexington Avenue
New York, NY  10022-7650
Telephone:  (212) 521-5400
Facsimile:  (212) 521-5450
Email: jmccarroll@reedsmith.com
         jsiev@reedsmith.com
         kgwynne@reedsmith.com

*Counsel for the Debtors and*
*Debtors in Possession*

- 71 -