UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
DAVID MOLNER                                    :   Chapter 11
                                                :
          Plaintiff,                            :   Case No. 14-11802 (SHL)
                                                :
     v.                                         :   (Jointly Administered)
                                                :
ARAMID DISTRIBUTION TRUST, LTD.,                :
                                                :
          Defendant.                            :
------------------------------------------------------------ x

------------------------------------------------------------ x


**PLAINTIFFS' NOTICE OF MOTION FOR CLARIFICATION AND/OR RELIEF FROM STAY FROM THE PARTIES' SO ORDERED, MAY 10, 2016 AGREEMENT TO ARBITRATE**

**PLEASE TAKE NOTICE** that upon the accompanying affidavit of David Molner and all prior proceedings herein, plaintiff pro se David Molner will move before the Honorable Sean H. Lane, United States Bankruptcy Judge, at the United States Courthouse, 500 Pearl Street, New York, NY 10007, at a date and time to be determined by the Court, for an Order: (1) clarifying that the London Court of International Arbitration (the "LCIA") has jurisdiction to decide whether Claimant Aramid Distribution Trust, Ltd. ("ADT") is liable to the Respondents in that case for the running costs of the proceedings, based on the applicable indemnification provision of the Services Provision Agreement (as amended) by and between Aramid Entertainment Fund Ltd. ("AEF") and Aramid Capital Partners LLP ("ACP"); (2) further ordering that the LCIA should determine whether ADT is liable for any portion of the proofs of claim submitted by Defendant and/or entities under his control (provided that the final amount of such liability is to be determined by the Court); and (3) granting such other and further relief as shall be just and proper.

Dated:   January 15, 2018
         New York, New York

DAVID MOLNER

PLAINTIFF PRO SE

By: _____

david.molner@gmail.com

GIORDANO D POLANCO
NOTARY PUBLIC-STATE OF NEW YORK
No. 01PO6274703
Qualified in New York County
My Commission Expires 01-14-2021

# [PROPOSED] ORDER

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x

DAVID MOLNER et al.

Plaintiff

v.

ARAMID DISTRIBUTION TRUST, LTD.

Defendant.          :
------------------------------------------------------------ x

       WHEREAS the parties entered into a letter agreement on May 10, 2016 (as so ordered by this Court, the "Letter Agreement"), pursuant to which Defendant Aramid Distribution Trust, Ltd. ("ADT") agreed to withdraw its adversary action against Plaintiff and other defendants (the "Adversary Action") and to arbitrate claims in London, England before the London Court of International Arbitration (the "LCIA" and the current proceedings before the LCIA referred to as the "UK Proceedings");

       WHEREAS the Letter Agreement held in abeyance any decision about the proofs of claim filed by the Defendants in the adversary action;

       WHEREAS this Court so ordered the Letter Agreement; and

       WHEREAS Plaintiff David Molner brought a motion for clarification and/or relief from stay in relation to the indemnification of obligations of ADT and in connection with the Letter Agreement;

f

UPON consideration of Plaintiff's motion, the opposition thereto from ADT, and all other arguments submitted to the Court in papers and at oral argument, it is hereby

ORDERED that:

1. Plaintiffs' motion for clarification and/or relief from stay is hereby GRANTED;

2. Clarified that the LCIA has permission of this Court to decide the nature, extent and timing of ADT's indemnification obligations to the Respondents in the UK Proceedings with respect to any and all of Respondents' costs in connection with the UK Proceedings, based on the Services Provision Agreement between Aramid Entertainment Fund Ltd. and Aramid Capital Partners LLP (including any and all amendments thereto); and

3. Ordered that the LCIA shall further determine whether ADT has any liability, in part or in whole, to the Respondents based on the proofs of claim submitted by Respondents (including any amended proofs of claim) and based on the Services Provision Agreement between Aramid Entertainment Fund Ltd. and Aramid Capital Partners LLP (including any and all amendments thereto), provided however that this Court shall retain jurisdiction over the final calculation of any amounts owing by ADT in connection therewith.

Dated: _____, 2018

_____
Hon. Sean H. Lane
United States Bankruptcy Judge

f

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DAVID MOLNER,<br><br>                    Plaintiff,<br><br>        v.<br><br>ARAMID DISTRIBUTION<br>TRUST, LTD.<br><br>                    Defendant. | No. 14-11802 (SHL)<br><br>Aramid Distribution Trust,<br><br>Ltd.<br><br>(Jointly Administered) |

**AFFIDAVIT OF PLAINTIFF *PRO SE* DAVID MOLNER**
**IN SUPPORT OF HIS MOTION FOR CLARIFICATION**
**AND/OR RELIEF FROM STAY**

> **DAVID MOLNER**
> 85 East End Ave.
> New York, New York 10028
> Telephone: (213) 392-1000
> *david.molner@gmail.com*
> *Plaintiff Pro Se*

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

PROCEDURAL HISTORY......................................................................................................... 2

SUMMARY OF THE RELIEF REQUESTED………………………………………………….. 4

ARGUMENT ................................................................................................................................ 5

    I.    THE INDEMNITY IS A QUESTION OF ENGLISH LAW ................................ 5

    II.    THE UK TRIBUNAL IS BEST POSITIONED TO DECIDE THE UNDER-LYING QUESTION OF LIABILITY UNDER THE INDEMNITY……………. 5

    III.    DEFENDANT ADT AGREED THAT "ALL MATTERS RELATED IN ANY WAY" TO THE UK PROCEEDINGS SHOULD BE DECIDED BY THE LCIA. THE QUESTION OF THE INDEMNITY IN RELATION TO THE COSTS OF ARBITRATION IS CLEALY SUCH A MATTER……………………………... 6

    IV.    ALLOWING THE TRIBUNAL TO DECIDE THE QUESTION OF LIABILITY UNDER THE INDEMNITY IS THE MOST EFFICIENT APPROACH………. 6

    V.    THE INDEMNITY CLAIMS RELATE MAINLY TO LITIGATION AEF LONG AGO DEEMED MERITLESS AND IN RELATION TO WHICH ADT TOOK NO ACTION TO SHIELD THE INDEMNITEES……………………........ 7

    VI.    BIFURCATING THE FUNDAMENTAL ISSUE OF LIABILITY UNDER THE INDEMNITY WOULD MATERIALLY PREJUDICE PLAINTIFF………….. 11

    VII.    THERE IS NO PREJUDICE TO THE ESTATES BY GRANTING THE MOTION …………………………………………………………………….. 11

CONCLUSION........................................................................................................................... 12

I am a creditor in these cases and the plaintiff *pro se* for purposes of this motion. I respectfully submit this affidavit in support of my motion for an order clarifying and/or providing relief from the parties' voluntary stay[1], which would allow the London Court of International Arbitration to decide certain fundamental questions of indemnity, which are already at issue in the proceedings under way in that forum. I previously indirectly controlled one of the three founding members of Aramid Capital Partners LLP ("ACP"), the entity which acted as an advisor to Aramid Entertainment Fund, Ltd. ("AEF"). I am not an attorney, but am representing myself *pro se* with respect to this motion for clarification and/or relief from stay (the "Motion"). I am above 18 years of age. The statements I make herein are true and accurate to the best of my knowledge and made under penalty of perjury.

## PRELIMINARY STATEMENT

For years prior to these cases, it was the custom and practice of Aramid Entertainment Fund Ltd. ("AEF") – without exception - to indemnify me and my related companies pursuant to a contract governed by English law. In objecting to my duly filed proofs of claim in these Cases and in bringing the causes of action that have since been compelled to arbitration in London, Aramid Distribution Trust, Ltd. ("ADT") has refused to honor and continue to uphold those indemnities. The arbitral proceedings fundamentally turn on the question of whether and to what extent the indemnities apply, because short of proving fraud or gross negligence, ADT has no claims against me. I am respectfully asking this Court to clarify its prior order and/or provide relief from that order's stay, such that the UK tribunal be vested with the binding authority to broadly determine the nature and extent of ADT's liability under the indemnity, including as it relates to (i) the cost of the arbitral proceedings and (ii) the claims lodged by me (or my related companies) in these Cases.

---

[1] Based on the Parties May 10, 2016 Letter Agreement, which was "so ordered" by this Court.

1

**PROCEDURAL HISTORY**

On December 9, 2014, I filed several proofs of claim in this case on behalf of myself and entities under my control (the "Claims"). The Claims were substantially based on our contractual right to indemnity from AEF, a right which had been honored at regular intervals and without exception by AEF between September of 2010 and May of 2014 (the "Indemnity").[2]

On October 30, 2015, ADT filed objections to the Claims (the "Objections").

On February 9, 2016, in furtherance of the Objections, ADT filed an adversary proceeding against me and three entities I control and/or manage, ACP, Genco Capital Corporation ("Genco") and Screen Capital International Corp. ("SCI"), alleging various acts of misconduct (the "Adversary Action"). The Objections are part and parcel of the Adversary Action insofar as ADT's principal argument for rejecting the Claims is that the alleged misconduct (if proven true) provides an exemption to the Indemnity and/or results in offsetting or greater damages to ADT.

The filing of the Adversary Action was a deliberate violation by ADT of the Services Provision Agreement between ACP and AEF, which was first signed in or around November 2006 and remained in place until May of 2014 (as amended, the "SPA").[3] Throughout this period, the SPA has always clearly provided for binding arbitration of "any dispute or question" arising "out of or in connection with" the SPA. (Para 18.1). A true and correct copy of the Amended and Restated SPA from 2011 is attached hereto as **Exhibit E**.[4] Similarly, the SPA further provides a very broad indemnity, covering essentially any legally indemnifiable act and extending it to ACP and its members, including me personally and SCI (the "Indemnity"). As stated in Paragraph 12.1 of the 2011 SPA:

---

[2] Though the parties to the Services Provision Agreement (as amended) were consistently AEF and ACP, the benefits of the Indemnity extended to numerous third parties, including myself and my related companies.
[3] The SPA was substantively amended once, in January of 2011; was then amended for purposes of clarification in March of 2012; and then terminated in May of 2014 (but for certain surviving provisions, including the Indemnity).
[4] It is worth noting that this version of the SPA is the one whose amendments were drafted by attorneys at Reed Smith LLP, following their recommendation that ACP's contract be extended by AEF.

2

"The Fund hereby undertakes from the Effective Date to hold harmless and indemnify ACP, and its directors, officers, and employees and Screen Capital International, Inc. and its directors, officers and employees (each and "Indemnified Party") from and against all costs, losses, and expenses (including reasonable attorney fees and costs) attributable to any claim, action, proceeding, or demand (collectively, "Claim") relating to the Fund and brought against any of them in respect of actions or omissions occurring on or after the Effective Date, except for any costs, losses and expenses relating to a Claim due to an Indemnified Party's willful default, bad faith, fraud or gross negligence. **The Fund shall advance or directly pay (at its choice) reasonable attorney fees and other professional costs as incurred,** provided however, that the Indemnified Party shall refund all such amounts paid (and the Fund shall owe no further Indemnity hereunder) if the Claim is determined by a final, binding and non-appealable judgment by a court of competent jurisdiction to be due to the willful default, bad faith, fraud or gross negligence of the Indemnified Party. ACP shall send to the Fund as soon as possible all claims, letters, summonses, writs or documents which it receives from third parties and provide whatever information and assistance the Fund may require and no liability of any sort shall be admitted and no undertaking given nor shall any offer, promise or payment be made nor any legal expenses incurred by ACP without the written consent of the Fund. ACP shall keep the Fund fully informed at all times of the progress of any litigation and shall consult in good faith with the Fund as to the conduct thereof." (Emphasis added).

On April 1, 2016, in response to the filing of the Adversary Action, ACP, SCI and I filed a motion to compel arbitration, consistent with the terms of the SPA, i.e. in London, before the London Court of International Arbitration (hereinafter, the "UK Tribunal" or the "LCIA") and pursuant to English law (the "Motion to Compel").

Rather than oppose the Motion to Compel, on May 10, 2016, ADT agreed to arbitrate (as it was required to do by the SPA) by entering into a letter agreement, which was subsequently "so ordered" by this Court (the "So Ordered Stipulation"). (**Exhibit A**).

The arbitration was then commenced by way of a written request by ADT on June 9, 2016, with the Mr. Gavin Kealey QC presiding and is currently in process (the "UK Proceedings").

As "Claimant" in the UK Proceedings, ADT re-styled the Adversary Complaint, alleging various causes of action under English Law in a "Statement of Case" filed on October 12, 2016.

3

The "Respondents", i.e. myself, SCI, ACP and Genco Capital Corporation (another entity I control, "Genco"), opposed the re-styled claims. Various pre-trial conferences have been held and certain procedural and other motions have been submitted. A briefing schedule has now been agreed with a full evidentiary hearing date anticipated to take place in June of 2019 (full schedule attached hereto as **Exhibit B**).

On November 27, 2017, the Respondents filed a "Draft Amended Defence and Counterclaim" seeking, among other things, the Indemnity as provided under the SPA. ADT objected, arguing that the UK Tribunal either lacked jurisdiction to make such a ruling (which it said could only be decided by this Court) or that such a counterclaim was barred by the So Ordered Stipulation. It was resolved that the parties would allow me to seek leave of this Court by filing the instant motion, which is in part a motion for clarification and in part a motion for relief from the stay agreed to in the So Ordered Stipulation.

## SUMMARY OF THE RELIEF REQUESTED

In short, I am asking the Court to clarify and/or amend the So Ordered Stipulation, such that the UK Tribunal can decide whether and to what degree the Indemnity applies. The simple reasons for this are: (i) the applicability of the Indemnity is a question of English law and the UK Tribunal will be confronted with it as part of our affirmative defenses; (ii) the So Ordered Stipulation specifies that "all matters" which are "related in any way" to the Adversary Action filed by ADT (or the UK Proceedings themselves) are to be resolved "exclusively" by the UK Tribunal[5]; (iii) it is now clear that resolving the question of the Indemnity is inextricably linked to both the underlying causes of action in the UK Proceedings and a majority of the Claims; and (iii) the UK Tribunal's conclusions as to the applicability of the Indemnity should be applied consistently and ADT should not be allowed to prejudice me by deferring the impact of any such decision until years from now.

I devote the balance of this brief to the arguments in favor of the two forms of requested relief: (i)

---

[5] End of the first paragraph of Exhibit A: "All matters related in any way to the complaint and/or the LCIA arbitration shall proceed exclusively before the LCIA."

4

the narrower form of relief that the So Ordered Stipulation be clarified in order to permit the UK Tribunal to decide whether to order ADT to honor the Indemnity with respect to the actual running costs of the Respondents in the UK Proceedings; and (ii) relief from the voluntary stay agreed to in the So Ordered Stipulation, such that the UK Tribunal may at least decide the underlying issue of whether the Claims fall under the Indemnity (although I am suggesting that if this second form of relief is granted, this Court should retain jurisdiction over the calculation of the amounts owing and their timely disbursement).

## ARGUMENT

I. THE QUESTION OF THE INDEMNITY IS ONE OF ENGLISH LAW

The immediate issue requiring clarification is whether the UK Tribunal has (or should be granted) jurisdiction to decide (i) whether the Indemnity is valid and, if so, (ii) whether the Claimants should be ordered to honor the Indemnity in connection with the UK Proceedings. This question can be resolved first by looking to the So Ordered Stipulation (**Exhibit A**). The Parties agreed to arbitrate the dispute and ADT failed to oppose the Motion to Compel itself, presumably because the contract and its binding arbitration provision are clear and ADT knew it would not succeed in opposing the motion. Indeed ADT has now sued numerous parties in breach of similar provisions, only to subsequently agree to private arbitration based on analogous contractual obligations.[6] Regardless, the Parties have now further agreed to let this Court decide whether, as part of the arrangements initially set forth in the So Ordered Stipulation, the UK Tribunal should be explicitly allowed additional scope to decide whether the Respondents have a valid counterclaim for the costs of the UK Proceedings based on the Indemnity. It is plain from the SPA that the indemnity arises under, and is to be adjudicated as valid (or not), pursuant to English Law. (SPA (Exhibit E) at Paragraph 24).

---

[6] To the best of my knowledge, this includes (i) the firm of Jeffer, Mangels; (ii) Grant Thornton LLP and (iii) BDO USA.

5

II.  THE UK TRIBUNAL IS BEST POSITIONED TO DECIDE THE UNDERLYING QUESTION OF LIABILITY UNDER THE INDEMNITY

It is axiomatic that an English law tribunal, presided over by a highly qualified Queen's Counsel such as Mr. Kealey, is better positioned to decide questions of English law than this Court. Mr. Kealey's *curriculum vitae* is attached hereto as **Exhibit C**. I respectfully submit that, although this Court could also decide questions of English law, doing so would require expert evidence and significant judicial resources that are wholly unnecessary, given the fact the Parties are already engaged in the UK Proceedings.

III.  DEFENDANT ADT AGREED THAT "ALL MATTERS RELATED IN ANY WAY" TO THE UK PROCEEDINGS SHOULD BE DECIDED BY THE LCIA. THE QUESTION OF THE INDEMNITY IN RELATION TO SUCH COSTS IS SUCH A MATTER.

As to the narrower question of whether the Indemnity should apply to the running costs of the UK Proceedings, ADT already agreed in the So Ordered Stipulation, I submit that this initial question is properly one for the LCIA to decide. As ADT stated in the letter it wrote to the Court (which became the So Ordered Stipulation): "All matters related in any way to the complaint and/or the LCIA arbitration shall proceed exclusively before the LCIA". Particularly given the inclusion of the phrase "in any way" in the foregoing sentence, I cannot conceive of how this statement does not include the question of whether the running costs of the UK Proceedings are covered by the Indemnity. However, without clarification from this Court that such is the case, I am unable to resolve the point and the UK Tribunal has now directed the parties back to this Court for clarification.

6

IV.  ALLOWING THE TRIBUNAL TO DECIDE THE QUESTION OF LIABILITY UNDER THE INDEMNITY IS THE MOST EFFICIENT APPROACH.

ADT ultimately submitted to arbitration because the SPA is a valid and binding agreement.[7] To the extent this Court agrees with me that the UK Tribunal should decide the issue of whether the Indemnity is valid in relation to the running costs of the UK Proceedings, I submit that it is plainly in the interest of both judicial economy and the efficient administration of the Estates to allow the UK Tribunal to fundamentally decide the related issue of whether the Indemnity applies to the Claims.[8]

V.  THE INDEMNITY CLAIMS RELATE MAINLY TO LITIGATION AEF LONG AGO DEEMED MERITLESS AND IN RELATION TO WHICH ADT TOOK NO ACTION TO SHIELD THE INDEMNITEES

A majority of the Claims relate to legal expenses incurred by me (or entities under my control) in defending meritless litigation brought by Wimbledon Financing Master Fund, Ltd. ("Wimbledon"). I submit that these Claims are subject to the Indemnity and should be honored because (i) AEF thoroughly looked into the Wimbledon claims and concluded they were without merit, based on the specific recommendations of Reed Smith LLP (following a months-long investigation costing millions of dollars); (ii) AEF then repeatedly honored the Indemnity over the course of nearly four years, spending millions of dollars; and (iii) ADT entered into a settlement agreement on or around December 16, 2014 with Wimbledon that deliberately excluded me, thereby needlessly inviting additional liability under the Indemnity.

In order to understand this line of argument, it is necessary to provide some background as to the

---

[7] As ADT wrote in the Letter Agreement that was so ordered by this Court: "Following its review of Defendants' recently filed reply papers, the Trust has decided to withdraw its opposition to Defendants' Motion to Compel Mandatory Arbitration Pursuant to Contract [Adv. Dkt. #9].

[8] The precise amount of the Claims has not yet been determined. I have no objection to this Court retaining the right to approve the final amount of the Claims, so long as the issue of liability under the Indemnity is decided by the UK Tribunal. The majority of the Claims relate to expenses incurred in defending meritless litigation pursued against the indemnitees by Wimbledon Financing Master Fund, Ltd., which costs continued after the Claims were filed. Accordingly, I would file amended proofs of claim for myself (and the related entities), pending the Court's decision on how this will be adjudicated.

7

Wimbledon complaint against me, AEF and others, how AEF acted in the past and how we wound up where we are today.

Wimbledon was a shareholder in AEF, whose founder (Albert Hallac) and Chief Investment Officer have since been indicted and accepted plea bargains in relation to managerial misconduct of Wimbledon.[9]

Back on September 3, 2010, a few years into AEF's existence, Wimbledon and Stillwater Market Neutral Fund SPC III filed suit against AEF, its directors, ACP, SCI and me, alleging various acts of wrongdoing which mirror the allegations in the Adversary Complaint and the Statement of Case in the UK Proceedings. In fact, David Bergstein – not Wimbledon – was behind that complaint (more on this below).

AEF engaged Reed Smith LLP to conduct an internal investigation, which took place between September and December of 2010 and cost well over $1 million and resulted in a written report issued to a sub-committee of the AEF board (the "Wimbledon Report"), but whose findings were shared orally among AEF's directors, ACP, AEF's shareholders, its auditor and other advisors (including Guidepost).

At the conclusion of Reed Smith's investigation, ACP, SCI and I were cleared of the wrongdoing alleged in the complaint filed by Wimbledon. In a press release edited by Reed Smith and approved by directors of AEF shortly thereafter, the Board announced that the allegations in the complaint were "without merit" and that I enjoyed the "full confidence" of AEF's directors. (**Exhibit D**).

Based on the conclusions in the Wimbledon Report, the Board entered into a renewed SPA in January 2011 with ACP (including substantially the same indemnity provision), which is attached hereto as **Exhibit E**. Reed Smith lawyers Jim McCarroll and Jim Sanders spent several hours at a

---

[9] Hallac entered into a plea agreement on or around June 23, 2014 (1:15-cr-00512); Wellner pled guilty on or around December 18, 2017 (1:16-cr-00746-PKC).

8

meeting in London in January of 2011 (and on other occasions), briefing investors on the Wimbledon Report and explaining its findings and assuaging investors' concerns.

In the years since the Wimbledon Report, substantial evidence has come to light confirming what ACP, the AEF Board and I all knew at the time the Wimbledon Report was issued: Wimbledon was a failed fund that allowed litigation to be filed in its name by Bergstein, who (i) sought revenge against AEF, ACP and me personally, (ii) provided funding for Wimbledon's litigation efforts against AEF and me and (iii) principally architected the litigation effort. To cite but two examples of recent corroborating evidence of this collusion:

In his plea allocution in federal court in FL, Wimbledon founder Hallac admitted to taking bribes from David Bergstein ("Bergstein"). (**Exhibit F**).[10]

In a deposition taken by the Securities and Exchange Commission on February 13, 2013, Bergstein admitted under oath that he diverted funds from Wimbledon to fund litigation against Aramid. (**Exhibit G**).

Perhaps most importantly, Wimbledon later released all claims against AEF and its related parties when it became urgently necessary to seek AEF's consent to a transfer of Wimbledon's shares in AEF. In late 2011, Wimbledon sought a way to "undo" its merger with Gerova Financial Group, Ltd. ("Gerova"), which had been exposed as a large scale fraud. (Five of the Gerova principals are now serving jail terms, following indictments by the U.S. Attorney for the Southern District of New York[11]). Wimbledon sought a way out of its merger and, as part of an "unwind plan" proposed by Bergstein, it requested a transfer of its shares in AEF from its custodian, Fortis Bank (Cayman) Limited, back to Wimbledon itself.

AEF had a customary (but absolute) approval right over any share transfer and debated for many

---

[10] It is my understanding that a plea allocution is properly subject to judicial notice under Federal Rule of Evidence 201. *See, e.g.*, *Scholes v. Lehmann*, 56 F.3d 750, 762 (7th Cir. 1995) (district court properly took notice of plea agreement of Ponzi scheme operator in subsequent civil action against other parties); *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1095 (2d Cir. 1995) (taking judicial notice of fraudsters' guilty pleas in subsequent civil action by bankruptcy trustee).

[11] Add details.

9

months over what to do with Wimbledon's transfer request. Eventually, with the supporting advice of Reed Smith, AEF signed the transfer in exchange for a full-spectrum release covering AEF, ACP and related parties, including myself as an individual (the "Release"). A true and correct copy of the Release is attached hereto as **Exhibit H**. The Release was later "so ordered" by the Cayman court.

Wimbledon itself later fell into an "official liquidation" in the Cayman Islands, the equivalent of an involuntary bankruptcy in the U.S. Despite the existence of the Release, Wimbledon's (then newly appointed) liquidator decided to continue the legal actions originated by Bergstein and his co-conspirators at Wimbledon. Because ADT failed to do anything about this, I have been forced to defend myself against what is essentially a meritless 'zombie lawsuit' – meritless both as to the substance of the allegations and because of the Release.[12] By not causing the Wimbledon litigation to be dismissed, not continuing to honor the Indemnity and not including me in the settlement with Wimbledon, ADT disregarded the prior advice of Reed Smith, broke with its customary practice of honoring the Indemnity and has tried to leverage me into a settlement while its professionals enjoy the privilege of administrative payment priority in these Cases.

On June 22, 2016, I successfully obtained dismissal of the Wimbledon Action on the basis of *forum non conveniens*. Wimbledon appealed that decision (the "Appeal"), which appeal has been fully briefed but not yet resolved.

During the pendency of the Appeal (and despite the fact the CA court ruled that the Cayman Islands were the most convenient forum), Wimbledon filed substantially an *identical* action in the Supreme Court of New York, which l and the other defendants opposed, among other reasons, for its violation of the "first filed" rule.[13]

Though no ruling has yet been issued in that case, oral argument was heard on October 12, 2017

---

[12] Wimbledon revived the lawsuit launched by Bergstein in Wimbledon's name in CA in 2010. It was dismissed, but Wimbledon has appealed (Case No. BC466001 before the Hon. Justice Stephanie M. Bowick).
[13] Index No. 650520/2017 before the Hon. Justice Eileen J. Bransten.

and Judge Bransten indicated she was likely to grant the motion to dismiss, having found the plaintiff (Wimbledon) was plainly engaged in "forum shopping". (**Exhibit I**; Transcript at page 26, lines 6-9).

I apologize for the lengthy digression into the procedural history of the Wimbledon litigation, but I feel it is necessary for three reasons. **First**, ADT could have avoided the now significant liability under the Indemnity that is embodied in the Claims, if it had simply included me in the settlement with Wimbledon or sought the dismissal of the action based on the Release. **Second**, ADT's claims in the UK proceedings include the allegation, in sum and substance, that I caused AEF to enter into litigation which was either "unwinnable" or pursued out of "personal animus" – but that is not the case and it is through my defense in the UK Proceedings that I intend to persuade the UK Tribunal of that conclusion.[14] When I do so, I will have also made the case that the Indemnity should apply to the litigation-related Claims, an issue which will have been fully aired in the UK Proceedings. Accordingly, the fundamental conclusion as to whether that portion of the Claims that pertains to the Indemnity is valid should be decided in the forum that will be trying the relevant facts, i.e. the UK Tribunal. **Third** (and finally), ADT agreed to let the LCIA decide any matter which is "connected in any way" to the Adversary Action. That includes, by definition, my rights to Indemnity, which are a central part of my defense.

VI. BIFURCATING THE FUNDAMENTAL ISSUE OF LIABILITY UNDER THE INDEMNITY WOULD MATERIALLY PREJUDICE PLAINTIFF

What was not known at the time the UK Proceedings were commenced was how long the process would take. Therefore when the Parties agreed to hold the Claims in abeyance, the consent of the parties under my control was predicated upon a relatively swift dispute resolution process. If the issue of liability is not at least decided by the UK Tribunal, I will be materially prejudiced. As the

---

[14] This is the same litigation that Reed Smith not only supported, but in relation to which it rendered ongoing legal advice costing very significant amounts.

11

Court will have noticed from this *pro se* submission, I am unable to afford counsel in all these various forums after years of ADT refusing to honor the Indemnity. If ADT is liable under the Indemnity – which I have argued above is a question properly resolved by the UK Tribunal – then ADT should be made to pay now. Allowing ADT to bifurcate the issue would permit them to defer their liability in a way that continues to unfairly penalize me by turning what should be my shield into ADT's sword. [15]

VII.    THERE IS NO PREJUDICE TO THE ESTATES IN GRANTING THE MOTION

The Estates would suffer no prejudice if the Court grants the Motion and the proposed order. They are well represented by counsel and will have every opportunity to make whatever arguments and introduce any evidence they wish to before the UK Tribunal. Moreover, the Motion and proposed order reserve for this Court the right to review and rule upon the final calculation of any amounts owing as to the Claims. The only difference I am proposing is to let the UK Tribunal do its job properly, decide all matters of liability arising from the Indemnity (including any portions of the Claims) and not allow a course of piecemeal justice to ensue at greater expense and delay to me personally.

My limited understanding of bankruptcy law leads me to believe that granting my Motion would be both consistent with the Code and fundamentally in the interest of the efficient administration of the Estates. I will try to explain my reasoning from my layman's perspective. First, the issue of the indemnity in relation to the running costs of the arbitration is a non-core issue, capable of being resolved by the UK Tribunal and the parties have already agreed to arbitrate (with a broad definition of what the UK Tribunal should be allowed to decide). In that regard, I believe the Motion only seeks a clarification from this Court which is reasonable and follows from the So Ordered Stipulation. In addition to the healthy regard I understand that bankruptcy courts generally

---

[15] The average time of LCIA disputes is approximately 18 months. We are now facing an end-to-end process lasting twice as long (from June of 2016 to June of 2019). That is a material change in circumstances.

12

have for the federal policy favoring arbitration, I believe there should be no question as to the LCIA being allowed to decide this first issue. Second, while ADT's *objections* to the Claims are a "core" matter, the underlying question of whether the indemnity is valid is not and therefore allowing the LCIA to decide that issue is akin to permitting a state court action to go forward where the litigation claims are non-core. My proposed order preserves the function of this Court reviewing and approving the calculation of amounts owing (but accepting as binding the LCIA's determination of liability). Third, it is my further understanding that whether courts have "cause" to permit pending litigation to be concluded in another forum is not defined in the Code, but rests on a number of non-exclusive factors, including (1) the interests of judicial economy and the expeditious and economical determination of the issues in dispute (points I have made in this brief); (2) whether the dispute has progressed to the point where the parties are prepared to go to trial (a now self-evident fact); (3) whether the continuation of the arbitration proceeding will interfere with the bankruptcy (to the contrary, it will expedite it); and (4) whether other creditors will be prejudiced (to which the answer is: certainly no more so than if this Court decides the issue of the indemnity (if at all)).

## CONCLUSION

For the foregoing reasons, I respectfully request that the Court grant the Motion in its entirety. I confirm under penalty of perjury that no prior request for the relief sought herein has been submitted in any other court in the United States.

Dated: New York, New York
January 15, 2018

Respectfully submitted,

DAVID MOLNER

By: _____
david.molner@gmail.com

85 East End Ave
New York, NY 10028
Telephone: 213.392.1000

GIORDANO D. POLANCO
NOTARY PUBLIC-STATE OF NEW YORK
No. 01PO6274703
Qualified in New York County
My Commission Expires 01-14-2021

13