**Hearing Date: March 12, 2018, at 11:00 A.M. (EST)**

**SIDLEY AUSTIN LLP**
Gregory G. Ballard
Andrew P. Propps
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599
gballard@sidley.com
apropps@sidley.com

Bruce R. Braun (*pro hac vice*)
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
bbraun@sidley.com

*Attorneys for Grant Thornton UK LLP*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re:<br><br>ARAMID ENTERTAINMENT FUND LIMITED, *et al.*,<br><br>                          Debtors. | Chapter 11<br>Case No.: 14-11802 (SHL)<br>(Jointly Administered) |

**REPLY IN FURTHER SUPPORT OF MOTION OF GRANT THORNTON UK LLP FOR
AN ORDER (I) CLARIFYING CONFIRMATION ORDER, PLAN, AND
DISTRIBUTION TRUST AGREEMENT OR (II) IN THE ALTERNATIVE, GRANTING
RELIEF FROM CONFIRMATION ORDER TO PERMIT GRANT THORNTON UK TO
<u>MAKE APPLICATION TO ENGLISH HIGH COURT FOR SECURITY FOR COSTS</u>**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................................................................1

REPLY .......................................................................................................................................2

    **A.**    The Trust Has Obtained All Relief Available Under the Contempt Motion ...........2

    **B.**    The Confirmation Order, Plan, and Distribution Trust Agreement Do Not
Prohibit the Trust's Posting of Security for Costs, But if They Are
Ambiguous in This Regard, the Court Has Discretion to Clarify Them .................4

        **1.**    The Confirmation Order, Plan, and Distribution Trust Agreement
Do Not Prohibit Security for Costs .............................................................5

        **2.**    The Requested Order is an Order of Clarification, Not an Order of
Modification ...............................................................................................14

    **C.**    Alternatively, This Court May Issue an Order of Relief from Prior Orders ..........15

        **1.**    Cause Exists to Relieve Grant Thornton UK of Any Prohibition
Against Making an Application for Security ...............................................15

        **2.**    Granting Relief from the Confirmation Order to Permit the Trust to
Give Appropriate Security is Justified .......................................................17

CONCLUSION ..........................................................................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re AMR Corp.*,
562 B.R. 20 (Bankr. S.D.N.Y. 2016) ......................................................................5

*In re Artisanal 2015, LLC*,
No. 17-12319 (JLG), 2017 WL 5125545 (Bankr. S.D.N.Y. Nov. 3, 2017) ...........................17

*Burger Boys, Inc. v. South St. Seaport Ltd. P'ship (In re Burger Boys, Inc.)*,
183 B.R. 682 (S.D.N.Y. 1994) ..............................................................................15

*Cross Media Mktg. Corp. v. CAB Mktg., Inc. (In re Cross Media Mktg. Corp.)*,
367 B.R. 435 (Bankr. S.D.N.Y. 2007) ....................................................................9

*Etuk v. Slattery*,
936 F.2d 1433 (2d Cir. 1991) ..............................................................................15

*In re Gen. Vision Servs., Inc.*,
Case No. 99-10105 (SMB), 2017 WL 6521601 (Bankr. S.D.N.Y. Dec. 20,
2017) ............................................................................................................18

*Gucci Am., Inc. v. Weixing Li*,
768 F.3d 122 (2d Cir. 2014).................................................................................4

*Hendrix v. Page (In re Hendrix)*,
986 F.2d 195 (7th Cir. 1993) ..............................................................................15

*Int'l Multifoods Corp. v. Commercial Union Ins. Co.*,
309 F.3d 76 (2d Cir. 2002)...................................................................................10

*In re Keene Corp.*,
171 B.R. 180 (Bankr. S.D.N.Y. 1994) ...................................................................15

*King v. Allied Vision, Ltd.*,
65 F.3d 1051 (2d Cir. 1995)..................................................................................3

*Landau v. Vallen*,
895 F.2d 888 (2d Cir. 1990)................................................................................18

*Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*,
595 F.3d 458 (2d Cir. 2010).................................................................................10

*Morgan Stanley Grp. Inc. v. New Eng. Ins. Co.*,
225 F.3d 270 (2d Cir. 2000) ...............................................................................10

*N.Y. State Nat'l Org. for Women v. Terry*,
    886 F.2d 1339 (2d Cir. 1989) ............................................................4

*Nycal Corp. v. Inoco PLC*,
    988 F. Supp. 296 (S.D.N.Y. 1997) ....................................................10

*In re Project Orange Assocs., LLC*,
    432 B.R. 89 (Bankr. S.D.N.Y. 2010) ................................................15

*Record Club of Am., Inc. v. United Artists Records, Inc.*,
    No. 72 CIV. 5234 (WCC), 1991 WL 73838 (S.D.N.Y. Apr. 29, 1991) .................10

*RLS Assocs., LLC v. United Bank of Kuwait PLC*,
    464 F. Supp. 2d 206 (S.D.N.Y. 2006)..................................................4

*Sally v. Sally*,
    225 A.D.2d 816 (3d Dep't. 1996) .....................................................10

*Silvervan v. Cent. Equities Credit Corp. (In re 18th Ave. Realty, Inc.)*,
    Adv. No. 07-01717 (RDD), 2010 WL 1849403 (Bankr. S.D.N.Y. May 7,
    2010) ............................................................................12

*Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.)*,
    907 F.2d 1280 (2d Cir. 1990)...........................................................15

*In re SquareTWO Fin. Servs. Corp.*,
    No. 17-10659 (JLG), 2017 WL 4012818 (Bankr. S.D.N.Y. Sept. 11, 2017) .........15

*U.S. Bank Trust Nat'l Ass'n v. Am. Airlines, Inc. (In re AMR Corp.)*,
    485 B.R. 279 (Bankr. S.D.N.Y. 2013), *aff'd*, 730 F.3d 88 (2d Cir. 2013) ...........16

*U.S. Naval Inst. v. Charter Commc'ns, Inc.*,
    875 F.2d 1044 (2d Cir. 1989)...........................................................10

*Union Oil Co. of Cal. v. Leavell*,
    220 F.3d 562 (7th Cir. 2000) ..........................................................15

*In re Worldcom, Inc.*,
    352 B.R. 369 (Bankr. S.D.N.Y. 2006) .................................................5

**Statutes**

11 U.S.C. § 105..............................................................................1

**Other Authorities**

Civil Procedure Rule 25.13..................................................................4

Federal Rule of Bankruptcy Procedure 9024 ...................................................1

Grant Thornton UK LLP ("Grant Thornton UK"),[1] by and through its undersigned attorneys, respectfully submits this Reply (the "Reply") in further support of its Motion [Dkt. No. 930][2] (the "Motion") pursuant to section 105 of the Bankruptcy Code and Bankruptcy Rule 9024 for an Order: (i) clarifying that Grant Thornton UK may make an application to the English High Court for security for its costs without violating the Confirmation Order, Plan, and Distribution Trust Agreement or (ii) in the alternative, granting relief from the Confirmation Order to permit Grant Thornton UK to make an application to the English High Court for security for its costs. In support hereof, Grant Thornton UK respectfully states:

## PRELIMINARY STATEMENT

Grant Thornton UK is the respondent in litigation commenced by the Trust in England, regarding a dispute under an English-law contract (regarding work completed four years prior to the Debtors' bankruptcy filings), conducted pursuant to English rules of procedure. English law generally provides prevailing parties the substantive right to recover all or a portion of their litigation costs at the conclusion of litigation. English law also gives respondents the procedural right to request an order requiring a claimant to provide security for those costs where reason exists to believe that the claimant will not pay their costs at the conclusion of the litigation. Grant Thornton UK believes such circumstances exist here, and for over eight months in 2017 Grant Thornton UK and the Trust discussed the proper amount, form, and staging of such security.

After this Court held a hearing on November 9, 2017, on a motion by the Trust to hold Grant Thornton UK in contempt for its assertion and prosecution of a counterclaim in the

---

[1] All capitalized terms used but not defined herein shall be ascribed the same meaning as in the Motion.

[2] References to entries on the docket of the AEF bankruptcy case, Case No. 14-11802 (SHL), are denoted by "Dkt. No. ___."

English proceeding, the parties sought to resolve that motion (at the Court's urging). Unable to reach a mutually satisfactory resolution, Grant Thornton UK unilaterally withdrew its counterclaim and asked the Trust to provide details of the costs it has incurred relating to the counterclaim so that the sum could then be agreed and paid (as is standard in English proceedings). The Trust so far has provided no such details (not even a headline number) but even so complains to this Court that Grant Thornton UK has not yet paid its costs.

In the meantime, the Trust has suggested that any attempt to obtain security would be contempt of this Court's orders. Therefore, Grant Thornton UK filed the Motion on January 12, 2018, and set a hearing for January 23, 2018 (since adjourned to March 12, 2018).

The Distribution Trust Agreement makes no mention of the Trust in relation to a bond or other security, but instead specifically exempts the Distribution Trustee and the Disbursing Agent from providing security. The Trust ignores 14 letters (provided to this Court attached to the Randall Declaration filed with the Motion) between English counsel to the parties regarding security last year. It offers no explanation as to why it participated in discussions about the arrangements for providing security and the amount if they run afoul of this Court's prior orders.

Grant Thornton UK respectfully requests that the Court grant the Motion and enter an Order permitting Grant Thornton UK to ask the English High Court for an order for security for its costs in the English Litigation and permitting the Trust to give any such security ordered by the English High Court.

## **REPLY**

### A.    **The Trust Has Obtained All Relief Available Under the Contempt Motion**

The Trust sought two forms of substantive relief in its Contempt Motion: (1) the enforcement of the injunctions in the Plan and the Confirmation Order (*i.e.*, an injunction against Grant Thornton UK's continued prosecution of the Counterclaim in the English Litigation) and

2

(2) an award of compensatory damages to the Trust purportedly caused by Grant Thornton UK's assertion and prosecution of the Counterclaim. As Grant Thornton UK stated in the "Background" section of the Motion, Grant Thornton UK "has *effectively* render[ed] the Contempt Motion moot." *See* Mot. at 4 (emphasis added).

As Grant Thornton UK reported to this Court on November 22, 2017, Grant Thornton UK filed a notice of discontinuance of the Counterclaim (the "Notice of Discontinuance") with the English High Court on November 20, 2017. Grant Thornton UK served a copy of the Notice of Discontinuance on the Trust, which brought an immediate end to the Counterclaim. *See* Dkt. No. 919. That Grant Thornton UK "has not paid [the Trust's] fees and expenses" incurred in connection with the Counterclaim, Obj. ¶ 15,[3] is not Grant Thornton UK's doing. Grant Thornton UK has requested details of the Trust's costs so that it can agree and pay them, *see* Dkt. No. 919, Ex. B; Dkt. No. 924 at 3, but after three months, the Trust has not provided them.[4] Grant Thornton UK cannot agree and pay the Trust's costs if it will not say what they are.[5] Nor should the Trust be given the remedy of contempt sanctions where Grant Thornton UK has taken all steps within its power to remedy the alleged violation and stands ready to compensate the Trust for its costs shortly after disclosure and review of the asserted costs. *See, e.g.*, *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1062 (2d Cir. 1995) ("A civil contempt sanction should either

---

[3] *Objection of Aramid Distribution Trust to Motion of Grant Thornton UK LLP for an Order (I) Clarifying Confirmation Order, Plan, and Distribution Trust Agreement or (II) In the Alternative, Granting Relief from Confirmation Order to Permit Grant Thornton UK to Make Application to English High Court for Security for Costs* [Dkt. No. 936] (the "Objection").

[4] Grant Thornton UK does not concede, through the filing of the Notice of Discontinuance and its commitment to pay the Trust's costs incurred in connection with the Counterclaim, that its assertion and prosecution of the Counterclaim was in contempt of this Court's orders, for the reasons stated in its prior filings.

[5] Indeed the proposed order submitted by the Trust with its Contempt Motion provides a mechanism for Grant Thornton UK's review of, and challenge to, any asserted costs. *See* Dkt No. 900-1, ¶ 3.

seek to 'coerce the contemnor into future compliance with the court's order or to compensate the complainant for losses resulting from the contemnor's past noncompliance.'" (quoting *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1352 (2d Cir. 1989))).[6]

**B.    The Confirmation Order, Plan, and Distribution Trust Agreement Do Not Prohibit the Trust's Posting of Security for Costs, But if They Are Ambiguous in This Regard, the Court Has Discretion to Clarify Them**

The Trust does not dispute that Grant Thornton UK may be entitled to recover its legal costs (including its attorneys' fees) incurred in defending the English Litigation if Grant Thornton UK ultimately prevails. The Trust also does not dispute that it is bound to adhere to the English High Court's rules of procedure, as it is litigating before that court.[7]

The Trust does not address the fact that the 14 letters between its counsel and Grant Thornton UK's English counsel – over eight months in 2017 – demonstrate that until November 2017 (after the hearing on the Contempt Motion) the Trust believed it to be permissible for Grant Thornton UK to seek security for its costs, with the debate revolving around the proper amount, staging, and form of such security. *See, e.g.*, Randall Decl. Ex. L (on Oct. 20, 2017, issues

---

[6] With the Trust's admission that it intends to seek "fees and expenses . . . incurred by the Trust in connection with" a hearing to determine its fees and expenses, Obj. ¶ 15, it is clear that the Trust's intentions are to inflict as much expense as possible on Grant Thornton UK, making the contempt remedy punitive, if not vengeful, in nature. This is inappropriate for civil contempt. *See Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 144 (2d Cir. 2014) ("It is basic law that a civil contempt sanction must only be compensatory or coercive, and may not be punitive. The $75,000 sanction for *past* noncompliance provided no compensatory relief." (citations omitted)).

[7] The Trust states that Grant Thornton UK "*effectively distinguishes the very case law upon which it relies* by arguing that English Civil Procedure Rule 25.13 is *substantive*, rather than procedural." Obj. ¶ 36 (citing Mot. at 18 n.3). The Trust's reading of the Motion is disingenuous. The passage the Trust cites and the case cited therein state that the ultimate entitlement to attorneys' fees as a prevailing party are substantive – the right to recover costs is part and parcel of the underlying cause of action. *See* Mot. at 18 n.3; *RLS Assocs., LLC v. United Bank of Kuwait PLC*, 464 F. Supp. 2d 206, 213 (S.D.N.Y. 2006). This does not affect the *procedural* protections for that right, which permit a court to require that a claimant post a bond or otherwise set aside funds sufficient to pay those costs should they be awarded.

In any event, the Trust does not explain why, if English Civil Procedure Rule 25.13 were *substantive* rather than *procedural*, the Trust would not be required to comply with it, given the choice of English law in the Engagement Letter's Forum Selection Clause.

surrounding an "application for security . . . should be dealt with at the [case management conference]").[8] The Trust ignores those letters, other than to take issue with Grant Thornton UK's interpretation of the Trust's representation that it "does not have unencumbered funds" with which to offer security. *See* Obj. at 3 n.2. The Trust clearly did not believe then that any such security would violate the Confirmation Order, Plan, and Distribution Trust Agreement.

1.     **The Confirmation Order, Plan, and Distribution Trust Agreement Do Not Prohibit Security for Costs**

Section 12.3 of the Distribution Trust Agreement specifies that "the Distribution Trustee (including any successor) and the Disbursing Agent" are exempt from providing security. Distribution Trust Agreement § 12.3. The Trusts argues that Section 12.3 must be read to include the Trust, because the Distribution Trustee acts on behalf of the Trust. This argument twists the meaning and purpose of Section 12.3 so that the Trust could make use of a provision which is intended very clearly to protect the Distribution Trustee vis-à-vis the Trust and its beneficiaries.

The words "the Distribution Trustee (including any successor) and the Disbursing Agent" clearly mean only those entities. This interpretation is fully consistent with the Confirmation Order and the Plan.[9] Both documents explicitly permit the Trust to pay costs and expenses it incurs in attempting to maximize value for the Trust's beneficiaries, including in its pursuit of litigation. *See* Confirmation Order ¶¶ 18 ("Distribution Trust Expenses shall be paid from the

---

[8] *See also, e.g.*, *id.* Ex. C (on May 15, 2017, "we would be prepared to engage in constructive dialogue with you in relation to [security], and to that end would request that you provide details of your client's costs to date, and what you would estimate those costs to be, going forward"), Ex. E (on Aug. 9, 2017, disputing Grant Thornton UK's "headline figure" and advocating for a "staged approach" to security).

[9] The Trust appears to concede, *see* Obj. ¶¶ 9, 31, and there is no doubt, that the Distribution Trust Agreement, Plan, and Confirmation Order constitute a single contract for purposes of interpretation. It is black-letter law that "[f]or purposes of interpretation, all documents which were confirmed together to form the contract are added to the plan itself. Thus," for instance, "a debtor's plan and disclosure statement should be read together to ascertain the meaning of plan provisions." *In re AMR Corp.*, 562 B.R. 20, 28 (Bankr. S.D.N.Y. 2016) (quoting *In re Worldcom, Inc.*, 352 B.R. 369, 377 (Bankr. S.D.N.Y. 2006)).

Distribution Trust as required."), 19 (The Trust "may pay the charges that it incurs on or after the Effective Date for Distribution Trust Expenses, professional's fees, expenses or related support services."); Plan §§ I.A.50 (defining "Distribution Trust Expenses" to include "any and all reasonable fees, costs, and expenses incurred in connection with the maintenance, preservation, liquidation or administration of assets," as well as those incurred "in connection with any rights or duties under the Plan and the Distribution Trust Agreement, including . . . reasonable attorneys' or other professionals' fees and expenses"), III.C.4.i (The "Distribution Trust Agreement generally will provide for . . . the payment of other expenses of the Distribution Trust, including the fees, expenses, and costs of pursuing the claims assigned to the Distribution Trust."). The Distribution Trustee has decided that the English Litigation has a reasonable chance of providing material value to the Trust's beneficiaries; the provision of security is a necessary expense of maintaining that litigation (and is effectively a refundable prepayment of the costs for which the Trust may ultimately be liable if it loses). The Confirmation Order and the Plan therefore permit the payment of security.

This interpretation of Section 12.3 is consistent with all the terms of the Distribution Trust Agreement. The Distribution Trustee has rights and obligations personal to it, which exist solely because of its appointment as Distribution Trustee but which do not implicate the Trust. For instance, in the Distribution Trust Agreement:

- Section 4.5 provides that "[n]one of the provisions in the Plan or this Distribution Trust Agreement shall be construed to require the Distribution Trustee to expend or risk its own funds or otherwise incur personal liability in the performance of its duties or in the reasonable exercise of its rights, powers and privileges hereunder. Notwithstanding the foregoing, nothing in this Section 4.5 shall relieve the Distribution Trustee of any liability for any action or omission resulting from bad faith, fraud, willful or intentional misconduct, or gross negligence."

- Section 4.8 provides that "[t]he Distribution Trustee . . . shall be held harmless and shall be fully indemnified (pursuant to Section 8.2) by the Distribution Trust

in acting upon any document believed by it to be genuine and delivered by the proper party or parties."

- Section 5.1.1, addressing the "[m]ethod of Distributions to Holders of Allowed Claims and Allowed Interests," specifies that "[t]he Distribution Trustee shall serve without bond and may or contract with other entities, in its Permitted Discretion, to assist in or make the Distributions required by the Plan and this Distribution Trust Agreement. To the extent an Entity other than the Distribution Trustee serves as a Disbursing Agent, the Distribution Trustee will have no liability for any actions or inactions of such entity acting in its capacity as Disbursing Agent."

- Section 5.6 provides that "[p]rovided that the Distribution Trustee has not acted in bad faith, engaged in fraud, willful or intentional misconduct or gross negligence or breached its fiduciary duties, if the Distribution Trust Assets at any point prove insufficient to pay all Beneficiaries of the applicable Trust Account in full or otherwise in accordance with the terms of the Plan, as applicable, the Distribution Trustee shall have no obligation to seek disgorgement from any Beneficiary, but may seek the guidance of the Bankruptcy Court or another court of competent jurisdiction consistent with Section 4.11.2."

- Section 8.1 provides that "[t]he Distribution Trustee shall not be liable for any damages, claims or losses, including punitive, exemplary, consequential or special damages, for a breach of this Distribution Trust Agreement under any circumstances or for any other act or omission not constituting bad faith, fraud, willful or intentional misconduct or gross negligence."

- Section 8.2 provides that, subject to various provisos, "[t]he Indemnified Parties [defined in Section 1.1 as including 'the Distribution Trustee and his, her or its respective Professionals, and the Professionals representing the Distribution Trust'] shall be indemnified by the Distribution Trust from the applicable Trust Account . . . for any losses, claims, damages, liabilities or expenses, including reasonable attorneys' fees, disbursements and related expenses, that the Indemnified Parties may incur or to which the Indemnified Parties may become subject in connection with any action, suit, proceeding, claim, or investigation brought by or threatened against one or more of the Indemnified Parties on account of any action or omission or breach of contract by the Distribution Trustee in its capacity as such including actions or omissions with respect to the Disputed Claims or Disputed Interests or otherwise arising out of or relating to their performance under this Distribution Trust Agreement . . . ."

Distribution Trust Agreement §§ 4.5, 4.8, 5.1.1, 5.6, 8.1, 8.2.

These provisions only make sense *as written to include only the Distribution Trustee and not the Trust itself* and address the relationship between the Distribution Trustee and the

7

Trust (and, by extension, the Trust's beneficiaries). They are entirely consistent with the written words of Section 12.3 and with Grant Thornton UK's interpretation thereof: Section 12.3 of the Distribution Trust Agreement prevents the Distribution Trustee from having to provide a bond or other security for the performance of its duties to the Trust and its beneficiaries.

The Trust's interpretation of the "'clear and unambiguous' provision" of Section 12.3, Obj. ¶ 18, requires that additional words be read into the contract (each instance of "the Distribution Trustee" must be read as "the Distribution Trustee on behalf of the Distribution Trust," Obj. ¶ 17) and is inconsistent with the express terms of the Confirmation Order, Plan, and the other terms of the Distribution Trust Agreement. Grant Thornton UK agrees that "the Distribution Trustee . . . act[s] on behalf of the Distribution Trust," Obj. ¶ 17 (quoting Plan § III.D.3), and that the Trust has no other means to act than through its agents.[10] However, as noted above, multiple provisions of the Distribution Trust Agreement include references to the rights and obligations of the Distribution Trustee that are personal to it and that are not exercised "on behalf of the Distribution Trust."

Further, the Trust's reading ignores that the Distribution Trust Agreement, the Plan, and the Confirmation Order all include, in addition to "the Distribution Trust" and "the Distribution Trustee," various formulations of "the Distribution Trust and/or the Distribution Trustee" and "the Distribution Trustee on behalf of the Distribution Trust." *See, e.g.*, Confirmation Order ¶¶ 15 ("The Distribution Trust (and the Distribution Trustee) shall be empowered . . . ."), 18 ("[T]he Distribution Trustee, on behalf of the Distribution Trust, may employ . . . professionals

---

[10] The Trust's reference to Section 4.1(q) of the Distribution Trust Agreement misreads that provision; the lead-in ("The Distribution Trustee shall have *only the rights, powers and privileges* to act on behalf of the Distribution Trust *expressly provided in the Plan and this Distribution Trust Agreement and as provided by law* in the event that the Plan or this Distribution Trust Agreement does not reference any such right, power or privilege." (emphasis added)) limits the Distribution Trustee's actions, rather than specifying that it only exercises its rights on behalf of the Trust.

. . . ."); Plan §§ I.A.50 (defining "Distribution Trust Expense" to include "all reasonable fees, costs and expenses incurred by the Distribution Trust or the Distribution Trustee"), III.C.5 ("The Distribution Trustee, on behalf of the Distribution Trust, shall File with the Bankruptcy Court . . . ."); Distribution Trust Agreement §§ 1.1 (defining "Current Report" as "a report, if any, Filed with the Bankruptcy Court by the Distribution Trustee, on behalf of the Distribution Trust . . ."), 4.3(a) ("The Distribution Trustee shall not at any time, on behalf of the Distribution Trust or its Beneficiaries, enter into or engage in any trade or business . . . ."), 7.1 ("Cash proceeds realized by the Distribution Trustee or the Distribution Trust . . ."), 7.2 ("Subject to its Permitted Discretion, the Distribution Trustee, on behalf of the Distribution Trust, shall have the authority to File, settle, compromise, withdraw or litigate to judgment objections to Claims and Interests . . . ."), 7.3 ("The Distribution Trustee, on behalf of the Distribution Trust, shall have the authority to establish, maintain and administer any litigation or similar trusts and related accounts . . . .").[11]

These various different references (depending on the context of each provision) indicate that the drafters of these documents specified both the Trust and the Distribution Trustee when both were intended. By contrast, when only the Distribution Trustee was intended, it alone was mentioned. "[A]s a matter of contract construction . . . the drafter did not intend for the usage of these terms to be interchangeable." *Cross Media Mktg. Corp. v. CAB Mktg., Inc. (In re Cross Media Mktg. Corp.)*, 367 B.R. 435, 450 (Bankr. S.D.N.Y. 2007). The use of "the Distribution

---

[11] *See also, e.g.*, Confirmation Order ¶¶ 28 ("[T]he Distribution Trust or the Distribution Trustee, as applicable, shall be deemed to be substituted as the party to any litigation . . . ."), 56 ("this Confirmation Order shall be immediately effective and enforceable and shall bind the Distribution Trust, the Distribution Trustee, . . ."); Plan §§ II.A.1.b (U.S. Trustee fees "will be paid from the Distribution Trust by the Distribution Trustee"), II.B.1.c ("The Distribution Trust will make Distributions, from time to time as the Distribution Trustee deems appropriate . . . ."), III.C.1 ("[T]he Distribution Trust (and the Distribution Trustee) shall be empowered . . . ."), III.F.1 ("[A]ppropriate Trust Accounts will be established . . . in the name of the Distribution Trust or the Distribution Trustee . . . .").

Trustee" cannot properly be read as "the Distribution Trustee and the Distribution Trust" or even "the Distribution Trustee on behalf of the Distribution Trust."

Even if the Trust's proffered interpretation of Section 12.3 were plausible (and it is not), it would be an alternative interpretation to Grant Thornton UK's straightforward and rational interpretation, rendering the provision ambiguous. *See Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002) ("An ambiguity exists where the terms of [a contract] could suggest 'more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" (quoting *Morgan Stanley Grp. Inc. v. New Eng. Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000))); *see also Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010) (In determining whether an ambiguity exists, the court must read the disputed language "in the context of the entire agreement.").

"In determining the meaning of an ambiguous contract term, the finder of fact seeks to fathom the parties' intent. That intent may be proven by extrinsic evidence, including evidence of trade usage." *U.S. Naval Inst. v. Charter Commc'ns, Inc.*, 875 F.2d 1044, 1048-49 (2d Cir. 1989) (citations omitted). Permissible evidence of trade usage includes reference to provisions of other contracts regarding the same subject matter. *See, e.g.*, *Record Club of Am., Inc. v. United Artists Records, Inc.*, No. 72 CIV. 5234 (WCC), 1991 WL 73838, at *10 (S.D.N.Y. Apr. 29, 1991).[12]

---

[12] Permissible extrinsic evidence does *not* include unexpressed subjective views of one party. *Nycal Corp. v. Inoco PLC*, 988 F. Supp. 296, 302 (S.D.N.Y. 1997) ("[W]hen resolving disputes concerning the meaning of ambiguous contract language, unexpressed subjective views have no proper bearing." (citing *Sally v. Sally*, 225 A.D.2d 816, 818 (3d Dep't. 1996) and other cases)).

Provisions regarding a requirement, or an exemption from a requirement, that a trustee post a bond are common in liquidating trust agreements. Many of these provisions expressly indicate that the trustee "shall serve without bond" or that the trustee is exempted from posting any bond *with respect to the performance of their fiduciary duties*. *See, e.g.*, Liquidation Trust Agreement § 4.3, *In re Saint Michael's Medical Center, Inc.*, No. 15-24999 (VFP) (Bankr. D.N.J. Dec. 16, 2016), ECF No. 1062 ("The Liquidation Trustee shall not be obligated to give any bond or surety for the performance of any of its duties, unless otherwise ordered by the Bankruptcy Court . . . ."); Liquidating Trust Agreement § 2.12, *In re JMO Wind Down, Inc.*, No. 16-10682 (BLS) (Bankr. D. Del. Sept. 30, 2016), ECF No. 390-1 ("The Liquidating Trustee shall serve without bond."); Liquidation Trust Agreement § 3.3, *In re DNIB Unwind, Inc.*, No. 16-11084 (BLS) (Bankr. D. Del. Aug. 15, 2016), ECF No. 354-1 ("The Liquidation Trustee shall serve without bond."); Liquidating Trust Agreement § 3.08, *In re Torch Offshore, Inc.*, No. 05-10137 (Bankr. E.D. La. Apr. 24, 2006), ECF No. 1511 ("The Plan Administrator and Trustee shall serve without bond."); *see also* Mot. at 9-10 (citing trust agreements).[13]

There are liquidating trust agreements that include provisions that, like Section 12.3 of the Distribution Trust Agreement, are less explicit in this regard. *See, e.g.*, Trinity Unsecured Creditors Trust Agreement § 9.9, *In re Trinity Coal Corp.*, No. 13-50364-tnw (Bankr. E.D. Ky. Jan. 31, 2014), ECF No. 1186-1 ("Notwithstanding any state law to the contrary, the Liquidating Trustee (including any successor Liquidating Trustee) shall be exempt from giving any bond or other security in any jurisdiction."); Saltire Industrial, Inc., Creditors Liquidating Trust Agreement § 11.3, *In re Saltire Indus., Inc.*, No. 04-15389 (BRL) (Bankr. S.D.N.Y. Apr. 27,

---

[13] The liquidating trust agreements approved by a bankruptcy court and cited herein, as well as those in the Motion, are being filed contemporaneously herewith.

11

2006), ECF No. 245-1 ("Notwithstanding any state law to the contrary, the Trustee (including

any successor) shall be exempt from giving any bond or other security in any jurisdiction.").

None of these agreements, however, can be fairly read to exempt the ***trusts*** from posting any

bond or security of any kind for any purpose, and the Trust points to no case in which that has

been the result.

These examples all have two things in common with each other and with the Distribution

Trust Agreement. First, each of these provisions falls under a section in the applicable agreement

labeled either "Bond," or "No Bond." Second, nowhere does any plan proponent or the court

explain exactly what was meant by those provisions.[14] Indeed, here, neither the Court nor any

party in interest (including the U.S. Trustee) appears to have sought any clarification as to the

meaning of Section 12.3 of the Distribution Trust Agreement, meaning that (if the provision had

been noticed at all) all involved believed it to have the standard purpose of such provisions. *See,*

*e.g.*, *Silvervan v. Cent. Equities Credit Corp. (In re 18th Ave. Realty, Inc.)*, Adv. No. 07-01717

(RDD), 2010 WL 1849403, at *7 (Bankr. S.D.N.Y. May 7, 2010) ("Admittedly this

interpretation is based on the Court's experience reading the same or similar definitions in

hundreds of chapter 11 plans, but it is reasonable to assume that these parties would have had a

similar interpretation.").

To the extent the Court finds that Section 12.3 of the Distribution Trust Agreement is

ambiguous (rather than clearly exempting only "the Distribution Trustee (including any

---

[14] Some "no bond" provisions are accompanied by what appears to be reinforcing language in a confirmation order or plan, as is the case in the Confirmation Order and Plan here. *See* Confirmation Order ¶ 36 (specifying that the Disbursing Agent "may serve without bond"); Plan § IV.B (same); *see also, e.g.*, 4th Am. Plan § IV.C.11, *In re Trinity Coal Corp.*, No. 13-50364-tnw (Bankr. E.D. Ky. Nov. 6, 2013), ECF No. 1004 ("The Liquidating Trustee shall not be required to give any bond, surety or other security for the performance of its duties."). This reinforcing language provides additional support to an interpretation of the language in the respective trust agreements that the "bond" referred to is a bond securing a fiduciary's performance of his duties.

successor) and the Disbursing Agent"), the remaining text of the Distribution Trust Agreement and related documents, the above examples, the complete absence of any discussion or debate of this provision in the record, and the understanding of the Distribution Trust Agreement as providing the relative "rights and duties of the Distribution Trustee and the beneficiaries of the Distribution Trust," Confirmation Order ¶ 17, establish that Grant Thornton UK's understanding of Section 12.3 is the most reasonable interpretation of the Distribution Trust Agreement.[15]

Because the Trust is not exempted from any requirement to give bond or other security, Section 12.6 should not be read to prohibit a payment to provide such security. That section permits payments "to or *for the benefit of* a Beneficiary," and requires that "[p]ayment shall be solely governed by the Plan and this Distribution Trust Agreement." Distribution Trust Agreement § 12.6. Presumably – and correctly – the Distribution Trustee reads this provision to permit payments of, among other things, Distribution Trust Expenses (pursuant to Section 3.2.1), professional fees (pursuant to section 4.1(j)), and indemnification expenses (pursuant to Section 8.2), each as either being "for the benefit of a Beneficiary" in that they are necessary for preservation and liquidation of the Liquidation Trust Assets or as being permitted "by the Plan

---

[15] Similar "no bond" provisions are common in documents outside bankruptcy, and they contain similar wording to the provisions in the above-cited agreements and to the provision in the Distribution Trust Agreement. *See, e.g.*, Sooner Holdings Trust Liquidating Trust Agreement § 10.4 (dated as of May 6, 2015) (avail. at https://www.sec.gov/Archives/edgar/data/1029023/000119312515179030/d922770dex101.htm) ("Notwithstanding any state law to the contrary, the Trustee shall not be required to post any bond or other undertaking."); KGen Power Liquidating Trust Agreement § 14.11 (dated as of May 21, 2014) (avail. at http://www.kgenpower.com/fw/filemanager/Liquidating_Trust_Agreement837a.pdf?F=6383767F637F9BDBE1D4 D295A79BA79B9286DCE1DEE2937499AB99989FCFDADF9CA49798%7C656667) ("No bond shall be required of the initial Trustees appointed hereunder. Unless a bond is required by law, and such requirement cannot be waived by the remaining Trustees (if any) or the Beneficiaries, no bond shall be required of any successor Trustee hereunder."). In those situations, it is beyond peradventure that those provisions are waivers by the grantor and the beneficiaries of a bond or other security that might normally be given by a trustee to secure the satisfaction of its duties: a provision in a private agreement among those parties could not prevent a stranger to that agreement from exercising its rights to seek a bond or other security. While those agreements do not have the force of law of a confirmation order, the "no bond" provisions are analogous, and support an interpretation of Section 12.3 to exempt only the Distribution Trustee and not the Trust itself from providing a bond or other security.

and this Distribution Trust Agreement." An expenditure of funds (which will be temporary if the Trust prevails in the English Litigation) for security for costs is both "for the benefit of a Beneficiary," in that the security preserves the Trust's rights in the English Litigation, and permitted "by the Plan and this Distribution Trust Agreement," in that the expenditure is a Distribution Trust Expense and is not prohibited by any of the documents.[16]

## 2. The Requested Order is an Order of Clarification, Not an Order of Modification

If the Court determines that the Confirmation Order, Plan, and Distribution Trust Agreement unambiguously do not prevent Grant Thornton UK from requesting, or the Trust from giving, security for Grant Thornton UK's costs, then an order of clarification is not necessary.

If it does not so determine, because Grant Thornton UK has demonstrated that the Confirmation Order, Plan, and Distribution Trust are ambiguous in that they can (and should) be interpreted to permit Grant Thornton UK to apply for security and the Trust to give such security (if ordered by the English High Court), then by the Trust's admission, Obj. ¶ 26, an order of clarification is appropriate, and Grant Thornton UK respectfully requests such an order be entered.

---

[16] In any event, to the extent the English High Court orders security for Grant Thornton UK's costs, one form of such security that would protect Grant Thornton UK's right to payment of its costs if it prevails is a reserve established by the Distribution Trustee, which the Distribution Trustee is permitted to create. *See* Distribution Trust Agreement §§ 1.1 (definition of "Distributable Cash," which is certain cash assets net of "any other reserves the Distribution Trustee determines, in his Permitted Discretion, are necessary or appropriate for the Distribution Trustee to fulfill its obligations under the Plan and this Distribution Trust Agreement"), 4.11.3 (permitting the Distribution Trustee to create procedures for "the creation of reserves").

### C.    Alternatively, This Court May Issue an Order of Relief from Prior Orders

#### 1.    Cause Exists to Relieve Grant Thornton UK of Any Prohibition Against Making an Application for Security

In the Motion, Grant Thornton UK requested that to the extent this Court determines that the Confirmation Order, Plan, and Distribution Trust Agreement do prohibit an application to the English High Court for security for its costs, this Court grant it relief to make such an application.[17] As Grant Thornton UK showed in the Motion, cause exists under the relevant "*Sonnax* Factors" for this Court to grant relief to permit Grant Thornton UK to make an application for security for its costs in the English Litigation. *See generally Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.)*, 907 F.2d 1280, 1286 (2d Cir. 1990). Although *Sonnax* lists twelve factors to consider in determining whether cause exists, the Court "need only apply the factors that are relevant to the particular case, and does not need to give each factor equal weight." *In re Project Orange Assocs., LLC*, 432 B.R. 89, 104 (Bankr. S.D.N.Y. 2010) (citing *Burger Boys, Inc. v. South St. Seaport Ltd. P'ship (In re Burger Boys, Inc.)*, 183 B.R. 682, 688 (S.D.N.Y. 1994)); *see also Sonnax Indus.*, 907 F.2d at 1285; *In re Keene Corp.*, 171 B.R. 180, 183 (Bankr. S.D.N.Y. 1994). As the Court is aware, "many of these

---

[17] The Trust argues that even if the Court grants "relief from the injunctions in the Plan and Confirmation Order . . . GT's course of action would violate the Court-approved provisions of the DTA, which are part of the Plan." Obj. ¶ 37. To the extent that the Trust is arguing that Grant Thornton UK's actions are restrained by a provision not labeled "injunction" and therefore the restraint is not an injunction, that argument is misguided. Courts, including the Second Circuit, have rejected similar arguments, concluding that where a "court essentially has precluded" an action, whether labelled "injunction" or something else, the prohibition is analytically an injunction. *Etuk v. Slattery*, 936 F.2d 1433, 1440 (2d Cir. 1991) ("Coercive relief that is sought by the plaintiff and granted by the court has been considered to be an injunction for the purposes of § 1292(a)(1) if it is relief that . . . could have been granted, in equity." (internal quotation omitted)); *see also, e.g., Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 566 (7th Cir. 2000) ("The district judge did not use the magic word 'injunction,' but his order is injunctive in nature, requiring the Leavells to perform enumerated steps under threat of the contempt power."). Thus to the extent that Section 12.3 of the Distribution Trust Agreement (or any other provision) restrains Grant Thornton UK from taking action, it is injunctive in nature and is subject to this Court's inherent power to modify its injunction for good cause shown. *See In re SquareTWO Fin. Servs. Corp.*, No. 17-10659 (JLG), 2017 WL 4012818, *4 (Bankr. S.D.N.Y. Sept. 11, 2017) (citing *Hendrix v. Page (In re Hendrix)*, 986 F.2d 195, 198 (7th Cir. 1993)).

factors specifically relate to efforts to lift the stay to pursue proceedings in other courts," *U.S. Bank Trust Nat'l Ass'n v. Am. Airlines, Inc. (In re AMR Corp.)*, 485 B.R. 279, 295 (Bankr. S.D.N.Y. 2013), *aff'd*, 730 F.3d 88 (2d Cir. 2013), and are therefore not relevant here, where the Court already has determined to allow such a proceeding to go forward.

The Trust relies, in conclusory fashion and with no supporting authority, primarily on factors that are irrelevant to the question before the Court; the others actually support a finding of cause to grant relief to Grant Thornton UK. As Grant Thornton UK demonstrated in the Motion, *Sonnax* factors 2, 7, 10, and 12 support granting relief. The Trust's arguments regarding *Sonnax* factors 2, 7, and 12 are of no avail because ***if the Trust does not prevail in the English Litigation, it likely will be liable for the costs for which the security would be given, and if it does prevail, it will redeem its security. By choosing to litigate, the Trust is choosing to expose itself to potential liability for those costs, and the only questions are of timing and whether the Trust will satisfy its obligations.*** These factors therefore weigh in Grant Thornton UK's favor. With respect to the Trust's argument regarding *Sonnax* factor 10 – granting the Motion will encourage the "Molner parties" to seek security for their costs in litigation in England[18] – again, the Trust will be liable for Grant Thornton UK's costs if the Trust does not prevail, and presumably a similar result will obtain in the Molner litigation. The Distribution Trustee has discretion to determine whether the Trust proceeds in litigating claims, Distribution Trust Agreement § 7.1, and the Distribution Trustee should not foist the Trust's own risk onto Grant Thornton UK to pursue litigation in which it apparently has little faith.

---

[18] Presumably this is litigation before the London Court of International Arbitration, as described in Paragraphs 12.2-12.4 of the Distribution Trustee's Annual Report on Plan Implementation, Dkt. No. 877.

In addition to the factors addressed in the Motion, this Court has the authority to issue a ruling that would both permit Grant Thornton UK to apply for security in the English High Court and authorize the Trust to provide such security if ordered to do so by the English High Court (*Sonnax* factor 1). Moreover, while the English High Court is not a "specialized tribunal," the English Litigation already is proceeding there, and it is the tribunal best positioned to apply its own rules (*Sonnax* factor 4). *See In re Artisanal 2015, LLC*, No. 17-12319 (JLG), 2017 WL 5125545, at *12 (Bankr. S.D.N.Y. Nov. 3, 2017) (finding fourth *Sonnax* factor supported relief from stay because "[a]lthough the State Court is not necessarily a 'specialized tribunal,' it has familiarity with the matters at issue"). Indeed, regardless of whether the parties are immediately prepared for trial, or whether the action involves third parties, this Court has already determined that the English High Court is the *only* forum in which such litigation may proceed (*Sonnax* factors 6 and 11). Nor does the availability of insurance coverage for Grant Thornton UK's costs bear on the question, as such costs already are the Trust's responsibility if the Trust loses (*Sonnax* factor 5). Accordingly, these primarily irrelevant factors do nothing to change the fact that the applicable, relevant *Sonnax* factors overwhelmingly support granting Grant Thornton UK relief from the plan injunctions.

### 2.    Granting Relief from the Confirmation Order to Permit the Trust to Give Appropriate Security is Justified

To the extent this Court determines the Confirmation Order, Plan, and Distribution Trust Agreement prohibit the Trust from giving security, relief from those prohibitions is justified. Under the substantive law of the Engagement Letter, the Trust may be responsible for Grant Thornton UK's costs, and absent security for those costs, Grant Thornton UK ultimately may be left without any recourse if and when it prevails on the merits. Permitting the Trust to provide security – as may be required by the English High Court pursuant to the rules governing

17

litigation in England, and as the Trust itself contemplated doing, where AEF agreed in the

Engagement Letter to litigate, and where this Court determined the Trust must litigate – will

provide Grant Thornton UK some protection.

The Trust's argument that the *in custodia legis* language of Section 12.6 prevents a court

from ordering security misses the point.[19] The Distribution Trust Agreement provides that this

Court has authority to enter an order permitting payment of funds otherwise held *in custodia*

*legis*, and Grant Thornton UK properly is requesting permission from this Court. *See Landau v.*

*Vallen*, 895 F.2d 888, 896 (2d Cir. 1990) ("In this case, the request for attachment was made in

the court with custody of the *res*. Accordingly, the *custodia legis* doctrine, standing alone, did

not preclude attachment."). In any event, the question of payment of security is only relevant if

this Court determines (as it should) that the Trust itself is not exempt from a requirement to give

security. Assuming the Trust is ordered to pay security by the English High Court, the payment

of security will be of benefit to the Trust's beneficiaries in that such payment will preserve

whatever value the English Litigation has for ultimate distribution.

## CONCLUSION

WHEREFORE, Grant Thornton UK respectfully requests that this Court enter an Order

permitting Grant Thornton UK to make an application to the English High Court for an order for

---

[19] In *General Vision Services*, cited by the Trust, *see* Obj. ¶¶ 22-24, the party seeking to attach the funds held by the court for a creditor was the assignee of a judgment creditor of that creditor (where the judgment was entered in 2002, the creditor's claim was allowed in 2010 or later, and the judgment creditor assigned the judgment in 2015) and had no authority under applicable law to attach the creditor's assets. *In re Gen. Vision Servs., Inc.*, Case No. 99-10105 (SMB), 2017 WL 6521601, *3 (Bankr. S.D.N.Y. Dec. 20, 2017). As the Trust noted, the court's denial was without prejudice, and Judge Bernstein suggested that the assignee of the judgment creditor commence a state law proceeding against the creditor to obtain such right, or file an involuntary petition against the creditor so that its trustee could request the payment. *Id.* This is a far cry from the situation here, where a denial of the right to seek security may deprive Grant Thornton UK of its ability to recover amounts the Trust will owe it under applicable law for litigation the Trust is currently pursuing, allegedly for the benefit of its Beneficiaries.

security for its costs in the English Litigation and permitting the Trust to give any such security

ordered by the English High Court.

Dated: New York, New York                     SIDLEY AUSTIN LLP
       February 23, 2018

                                            By:    /s/ *Bruce R. Braun*
                                                     Gregory G. Ballard
                                                     Andrew P. Propps
    787 Seventh Avenue
    New York, New York 10019
    Telephone: (212) 839-5300
    Facsimile: (212) 839-5599
    gballard@sidley.com
    apropps@sidley.com

    Bruce R. Braun (*pro hac vice*)
    One South Dearborn Street
    Chicago, Illinois 60603
    Telephone: (312) 853-7000
    Facsimile: (312) 853-7036
    bbraun@sidley.com

    *Attorneys for Grant Thornton UK LLP*